## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

HUAWEI TECHNOLOGIES USA, INC. &
HUAWEI TECHNOLOGIES CO., LTD.,

        *Plaintiffs*,

    v.

UNITED STATES OF AMERICA,

EMILY WEBSTER MURPHY, ADMINISTRATOR OF
THE GENERAL SERVICES ADMINISTRATION,

ALEXANDER ACOSTA, SECRETARY OF LABOR,

ALEX AZAR II, SECRETARY OF HEALTH AND
HUMAN SERVICES,

BETSY DEVOS, SECRETARY OF EDUCATION,

SONNY PERDUE, SECRETARY OF
AGRICULTURE,

ROBERT WILKIE, SECRETARY OF VETERANS
AFFAIRS, &

DAVID L. BERNHARDT, SECRETARY OF THE
INTERIOR,

in their official capacities,

        *Defendants*.

No. 4:19-cv-159-ALM

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES ........................................................................................................ 3

STATEMENT OF THE CASE.................................................................................................. 3

    A.  Congressional Targeting of Huawei ....................................................................... 3

    B.  The 2019 NDAA's Vastly Expanded Targeting and Sanctioning of Huawei .............. 5

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................................... 9

STANDARD OF REVIEW ...................................................................................................... 9

ARGUMENT ........................................................................................................................ 10

I.     SECTION 889 IS AN UNCONSTITUTIONAL BILL OF ATTAINDER ....................... 10

    A.  The Bill of Attainder Clause Prohibits Selective Legislative Punishment ................. 11

    B.  Section 889 Imposes Selective Legislative Punishment............................................ 15

II.    SECTION 889 DEPRIVES HUAWEI OF LIBERTY AND PROPERTY
     WITHOUT DUE PROCESS .......................................................................................... 28

    A.  Due Process Prohibits Selective Legislative Deprivations of Liberty and
       Property ................................................................................................................ 28

    B.  Section 889 Imposes Such an Unconstitutional Selective Deprivation....................... 31

III.   SECTION 889 VIOLATES THE VESTING CLAUSES AND THE RESULTING
     SEPARATION OF POWERS ........................................................................................ 32

    A.  Congress Lacks the Power to Adjudicate Facts and Apply Rules to Individuals........ 32

    B.  Section 889 is an Unconstitutional Exercise in Rule-Application ............................ 34

CONCLUSION...................................................................................................................... 35

## TABLE OF AUTHORITIES

**Page**

CASES

*Bi-Metallic v. State Bd. of Equalization*,
  239 U.S. 441 (1915)..............................................................................................30

*Bloomer v. McQuewan*,
  14 How. 539 (1852) ..............................................................................................29

*Bowsher v. Synar*,
  478 U.S. 714 (1986)..............................................................................................35

*Club Misty, Inc. v. Laski*,
  208 F.3d 615 (7th Cir. 2000) ...............................................................................30

*Consol. Edison Co. v. Pataki*,
  292 F.3d 338 (2d Cir. 2002)............................................................................18, 19

*Cummings v. Missouri*,
  4 Wall. 277 (1866) ......................................................................................11, 12, 16

*Decker v. Nw. Envtl. Def. Ctr.*,
  568 U.S. 597 (2013) (Scalia, J., concurring in part and dissenting in part)............................32

*Ex parte Garland*,
  4 Wall. 333 (1866) ................................................................................11, 12, 16, 17

*Fletcher v. Peck*,
  6 Cranch 87 (1810) ......................................................................................2, 33, 34

*Foretich v. United States*,
  351 F.3d 1198 (D.C. Cir. 2003) ................................................................... passim

*Holden v. James*,
  11 Mass. 396 (1814) ..............................................................................................29

*Hurtado v. California*,
  110 U.S. 516 (1884)......................................................................................29, 31, 32

*INS v. Chadha*,
  462 U.S. 919 (1983) (Powell, J., concurring in the judgment).........................33, 35

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
  909 F.3d 446 (D.C. Cir. 2018) ..............................................................17, 18, 19, 22

## TABLE OF AUTHORITIES

**Page**

*Lovett v. United States*,
   66 F. Supp. 142 (Ct. Cl. 1945) (Madden, J., concurring in the result) ...................................31

*Merrill v. Sherburne*,
   1 N.H. 199 (1818) .........................................................................................................29, 31

*Myers v. United States*,
   272 U.S. 52 (1926)................................................................................................29, 34, 35

*N. Haven Bd. of Educ. v. Bell*,
   456 U.S. 512 (1982)...................................................................................................23

*Nasierowski Bros. v. Sterling Heights*,
   949 F.2d 890 (6th Cir. 1991) ......................................................................................30

*Nixon v. Administrator*,
   433 U.S. 425 (1977).......................................................................................... passim

*Paul v. Davis*,
   424 U.S. 693 (1976)....................................................................................................31

*Plaut v. Spendthrift Farm, Inc.*,
   514 U.S. 211 (1995)........................................................................................31, 33, 35

*RR Village Ass'n, Inc. v. Denver Sewer Corp.*,
   826 F.2d 1197 (2d Cir. 1987)......................................................................................30

*SBC Commc'ns, Inc. v. FCC*,
   154 F.3d 226 (5th Cir. 1998) ........................................................................... passim

*Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*,
   468 U.S. 841 (1984)...............................................................................................14, 16

*Sierra Club v. Espy*,
   18 F.3d 1202 (5th Cir. 1994) .......................................................................................31

*Sys. Contractors Corp. v. Orleans Parish Sch. Bd.*,
   148 F.3d 571 (5th Cir. 1998) ......................................................................................31

*Trifax Corp. v. District of Columbia*,
   314 F.3d 641 (D.C. Cir. 2003) ....................................................................................31

## TABLE OF AUTHORITIES

**Page**

*United States v. Brown*,
  381 U.S. 437 (1965) ...................................................................................... passim

*United States v. Clark*,
  582 F.3d 607 (5th Cir. 2009) ....................................................................................9

*United States v. Lovett*,
  328 U.S. 303 (1946) ...................................................................................... passim

*United States v. Winstar Corp.*,
  518 U.S. 839 (1996) ..............................................................................................29, 30

*Vanzant v. Waddel*,
  10 Tenn. 260 (1829) .................................................................................................29

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) .............................................................................................27

*Zivotofsky v. Kerry*,
  135 S. Ct. 2076 (2015) .............................................................................................35

STATUTES

5 U.S.C. § 706 ...............................................................................................................8

41 U.S.C. §§ 1321–28 ..................................................................................................25

Federal Acquisition Supply Chain Security Act of 2018, Pub. L. No. 115-390, 132
  Stat. 5173 (2018) ..............................................................................................4, 25

John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub.
  L. 115-232, 132 Stat. 1636 (Aug. 13, 2018) § 889 ........................................ passim

National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, §
  1656, 131 Stat. 1283 (2017) ......................................................................................5

OTHER AUTHORITIES

1 William Blackstone, COMMENTARIES *44 ...............................................................29

2 William Blackstone, COMMENTARIES *58 ...............................................................32

# TABLE OF AUTHORITIES

**Page**

Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 YALE L.J. 1672 (2012) ...............................................................28, 31

164 Cong. Rec. H5805 (daily ed. June 27, 2018) ................................................7

164 Cong. Rec. S2674 (daily ed. May 15, 2018) ................................................8

164 Cong. Rec. S3362 (daily ed. June 7, 2018) ................................................6

164 Cong. Rec. S3896 (daily ed. June 13, 2018) ................................................6

164 Cong. Rec. S3938 (daily ed. June 14, 2018) ................................................7

John Hart Ely, *The Bounds of Legislative Specification: A Suggested Approach to the Bill of Attainder Clause*, 72 YALE L.J. 330 (1962) ............................................2

Fed. R. Civ. P. 56(a) ................................................................................9

THE FEDERALIST No. 48 (James Madison) (Clinton Rossiter ed., 1961) ........................1

THE FEDERALIST No. 51 (James Madison) (Clinton Rossiter ed., 1961) ........................1

H.R. 4747, 115th Cong. (2018) ....................................................................5

H.R. 5515, 115th Cong. (2018) ...............................................................5, 6

H.R. Permanent Select Comm. on Intelligence, 112th Cong., INVESTIGATIVE REP. ON THE U.S. NAT'L SEC. ISSUES POSED BY CHINESE TELECOMMUNICATIONS COS. HUAWEI AND ZTE (Oct. 8, 2012) .......................................................4, 8, 21

John Lilburne, THE LAWES FUNERALL 9 (1648) ..................................................32

John Locke, TWO TREATISES OF GOVERNMENT 284 (1690, Peter Laslett ed. 1988) ...................28

Charles-Louis de Secondat, Baron de la Brede et de Montesquieu, SPIRIT OF THE LAWS, Bk. XI, Ch. 6 ...........................................................................32, 34

U.S. CONST. amend. V ..............................................................................28

U.S. CONST. art. I, § 9, cl. 3 ...................................................................10

White House, *Cyberspace Policy Review* 34 (May 29, 2009) ......................................3

The Framers of our Constitution were deeply concerned about potential abuse of legislative power. They cautioned that "[t]he legislative department is everywhere extending the sphere of its activity and drawing all power into its impetuous vortex"; that the legislature tends to "mask, under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments"; and that "it is against the enterprising ambition of this department that the people ought to indulge all their jealousy and exhaust all their precautions." THE FEDERALIST No. 48 at 309–310 (James Madison) (Clinton Rossiter ed., 1961). They thus granted only "enumerated" "legislative" powers; divided them between a House and a Senate; subjected their exercise to strict procedures; and vested the "executive" and "judicial" powers in separate, independent branches. The Framers considered these safeguards "essential to the preservation of liberty." *Id.* at 312; THE FEDERALIST No. 51 at 321–22 (Madison).

One particular concern was use of legislative power directly against specific persons. As the Supreme Court has explained, the Framers knew that, if the legislature could itself sanction specific persons "without hearing or trial" conducted by the executive or the courts, "no man can be safe, nor know when he may be the innocent victim of a prevailing faction," and that "[t]he name of liberty applied to such a government, would be a mockery of common sense." *United States v. Brown*, 381 U.S. 437, 444 (1965). Thus, even where the Framers granted enumerated legislative powers, they prohibited bills of attainder—i.e., laws imposing punishment on specific persons. Moreover, through the Due Process Clause, they prohibited legislation singling out persons for deprivation of liberty or property. And, through the Vesting Clauses and the separation-of-powers, the Framers prohibited laws that, rather than simply create a general rule, assumed executive or judicial powers and themselves applied a rule to specific persons.

Provisions of section 889 of the National Defense Authorization Act for Fiscal Year 2019

(2019 NDAA) contravene these constitutional limitations. Section 889 calls out by name

Plaintiff Huawei Technologies Co., Ltd. (Huawei Technologies), and its subsidiaries and

affiliates—such as Plaintiff Huawei Technologies USA, Inc. (Huawei USA; together, Huawei).

Section 889 prohibits federal agencies from procuring, federal contractors from using, and/or

federal grant and loan recipients from employing grant or loan funds to purchase specified

Huawei equipment and services. In so doing, section 889 disrupts Huawei's existing contracts;

stigmatizes Huawei and its employees as supposed tools of the Chinese government, bad actors,

and purported security risks; and seriously threatens Huawei's continued ability to do business in

the United States. Indeed, while it imposes these restrictions and badges of infamy on other

unspecified entities only where the Secretary of Defense "reasonably believes"—subject to

judicial review—that an entity is "owned or controlled" by, or "otherwise connected to," the

Chinese government, section 889 itself conclusively adjudicates all factual issues where Huawei

is concerned, and denies Huawei any procedure for providing rebuttal and escaping sanction.

This is exactly the kind of "trial by legislature" that the Bill of Attainder, Due Process, and

Vesting Clauses were designed to prevent. *See, e.g.*, *United States v. Lovett*, 328 U.S. 303, 316–

18 (1946); *Brown*, 381 U.S. at 442–43; *Fletcher v. Peck*, 6 Cranch 87, 136 (1810).

 Congress may and should protect the American people—including the U.S. citizens who

work for Huawei—from security risks posed by the Chinese government (and anyone else). But

it must abide by the Constitution in doing so. As Dean John Hart Ely so wisely wrote:

> We live in an age of anxiety. But so did the framers of our Constitution. We would do well to
> heed their warning that, in calm and anxious ages alike, the "accumulation of all powers,
> legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and
> whether hereditary, self-appointed, or elective, may justly be pronounced the very definition
> of tyranny."

*The Bounds of Legislative Specification: A Suggested Approach to the Bill of Attainder Clause*,

72 YALE L.J. 330, 367 (1962) (citation omitted). In the way that it targets, adjudicates facts about, and sanctions Huawei, section 889 so accumulates all governmental powers in one body, and produces the very tyranny which the Framers feared. This Court should accordingly declare unconstitutional the pertinent provisions of section 889.

## STATEMENT OF ISSUES

Section 889 defines equipment produced and services provided by Huawei as "covered telecommunications equipment and services" (§ 889(f)(3)(A), (C)) and restricts federal agencies from procuring such equipment and services, contracting with entities that use such equipment and services, and/or awarding grant or loan funds for procurement of such equipment and services (§ 889(a)–(b)). Also, although the Secretary of Defense (subject to judicial review) determines whether these restraints apply to other entities, section 889 directly applies them to Huawei (§ 889(f)(3)(A), (C), (D)). The issues presented are whether, with respect to Huawei, §§ 889(a)–(b), (f)(3)(A), (f)(3)(C), and (f)(3)(D) violate: (1) the Bill of Attainder Clause; (2) the Due Process Clause; and/or (3) the Vesting Clauses and the resulting separation of powers.

## STATEMENT OF THE CASE

### A. Congressional Targeting of Huawei

As publicly available documents demonstrate (Complaint ¶ 35), for more than twenty years, the U.S. Government has sought to identify and mitigate cybersecurity threats, including supply-chain threats. In so doing, the Government has repeatedly recognized that the supply chain for telecommunications equipment is global, and that effective supply-chain-risk mitigation is not seriously advanced by company-specific limitations. *See, e.g.*, White House, *Cyberspace Policy Review* 34 (May 29, 2009), https://tinyurl.com/y3w4rngw (recognizing "the emergence of new centers for manufacturing, design, and research across the globe," and calling for "[a] broad, holistic approach to risk management . . . rather than a wholesale condemnation of foreign

3

products and services"); Federal Acquisition Supply Chain Security Act of 2018, Pub. L. No. 115-390, 132 Stat. 5173, 5180, 5184 (2018) (requiring government-wide rules for assessing and mitigating supply chain risks posed by *all* global suppliers to the government). Indeed, just last Fall, the Chairman of the House Energy and Commerce Committee dismissed the notion that "we can simply ban [specific] vendors from American markets," as "the marketplace for hardware and software is global." Greg Walden, Chairman Walden Delivers Remarks at White House 5G Summit (Oct. 1, 2018), https://tinyurl.com/WaldenRemarks.

Since 2011, however, Congress has nonetheless been preoccupied with Huawei, seeking to show that it is a bad actor under Chinese government influence. *See, e.g.*, Ex. 17 at 107–10 (Press Release, Jim Webb (Feb. 10, 2011)). ("Ex." citations refer to exhibits attached to the Declaration of Michael C. Smith.) But, as Huawei is a privately owned and controlled entity that is independent of the Chinese government, Affidavit of Li Xu (Xu Aff.) ¶¶ 5, 8–10, Huawei has responded that "any thorough government investigation will prove that Huawei is a normal commercial institution and nothing more," Huawei Open Letter from Ken Hu, Deputy Chairman of Huawei Technologies, Chairman of Huawei USA, at 6 (Feb. 5, 2011), https://on.wsj.com/2yJvFgB.

In 2012, the House conducted an investigation and, in the end, admitted that it could "not prove wrongdoing" by Huawei. H.R. Permanent Select Comm. on Intelligence, 112th Cong., INVESTIGATIVE REP. ON THE U.S. NAT'L SEC. ISSUES POSED BY CHINESE TELECOMMUNICATIONS COS. HUAWEI AND ZTE v–vi, 8–10 (Oct. 8, 2012) (HPSCI Report), https://tinyurl.com/y5hd9zcv. But it asserted that Huawei had not explained "its relationships with the Chinese government in a way that would alleviate security concerns," *id.* at 22, and recommended, among other things, that Huawei equipment be excluded from "sensitive [government] systems" and "sensitive U.S.

programs," *id.* at 45.

Five years later, in the National Defense Authorization Act for Fiscal Year 2018 (2018 NDAA), Congress itself enacted an exclusion of this type. Ex. 1 at 14 (Pub. L. No. 115-91, § 1656, 131 Stat. 1283 (2017)). Section 1656 of the 2018 NDAA called out "Huawei Technologies Company" by name and prohibited the Secretary of Defense from "procur[ing] or obtain[ing]" its equipment for use "as a substantial or essential component" of, or "a critical technology" in, any system that carries out "the nuclear deterrence mission" or "homeland defense mission" of the Department of Defense. *Id.*

## B.   The 2019 NDAA's Vastly Expanded Targeting and Sanctioning of Huawei

But Congress did not stop there. The next year, Representative Conaway and Senator Cotton separately introduced bills in the House and Senate, respectively, proposing to bar all federal agencies from procuring, or contracting with entities that use, telecommunications equipment or services produced by Huawei Technologies and its "subsidiar[ies] or affiliate[s]," and another Chinese company, ZTE. Ex. 2 § 3 at 22 (H.R. 4747, 115th Cong. § 3 (2018)); Ex. 3 § 3 at 30 (S. 2391, 115th Cong. § 3 (2018)). Both bills made "findings" that Huawei is "subject to state influence," "maintain[s] close ties to the [People's Liberation Army]," and was "issued a subpoena" for alleged trade violations. Ex. 2 § 2 at 17, 18, 20; Ex. 3 § 2 at 25, 26, 28.

A month later, Representative Thornberry introduced H.R. 5515, the bill that ultimately became the 2019 NDAA. Ex. 4 (115th Cong. (2018)). H.R. 5515 was promptly marked up to include essentially the same "findings" about Huawei and ZTE and prohibitions on federal procurement and federal-contractor use of their equipment or services found in those prior bills. Ex. 5 § 866(a), (b). Thereafter, the House passed H.R. 5515, retaining the "findings" and bans on procurement and use of Huawei and ZTE equipment and services, but also adding a prohibition on using federal grant or loan funds to purchase such equipment or services. Ex. 8 § 880(a), (b).

Two days after the Senate received H.R. 5515, Senator Cotton, joined by Senators Van Hollen, Rubio, Schumer, Blumenthal, Collins, and Nelson, proposed an amendment that ultimately became section 889. Ex. 9 at 80 (164 Cong. Rec. S3362 (daily ed. June 7, 2018) (SA 2514)). Like H.R. 5515, the amendment contained a ban on federal-agency procurement, federal-contractor use, and federal grant and loan purchases of covered Huawei equipment. It also allowed the Defense Secretary to subject additional entities to the ban upon making certain findings, and included a provision reinstating penalties that had been imposed on ZTE for violations of export control laws in the event they were subsequently reduced or eliminated. *Id.* § 1727(a)–(c), (f). In a press release, Senator Rubio explained that Huawei has "direct links" to the "Communist Party," that its products "are used for espionage and intellectual property theft," and that it had acted "without consequence for far too long." Ex. 10 at 82 (Press Release, Marco Rubio (June 7, 2018)). In the same press release, Senator Cotton stated that, "[g]iven [Huawei's] repeated violations of U.S. law," it must be held "accountable" through "this amendment." *Id.* at 83. And Senate Minority Leader Schumer commented that, because Huawei was one of the "absolute worst offenders" in a "country full of bad actors," Congress had to "bring the hammer down." *Id.*

On the Senate floor, Senator Cotton further declared that Huawei is an "extension[] of the Chinese Communist Party;" that "its greatest claim to fame is shamelessly stealing the secrets of American companies;" that it was "under investigation by the Department of Justice for that and for violating sanctions against Iran;" and that Huawei has "broken our laws and abused the rights of our citizens." Ex. 11 at 86 (164 Cong. Rec. S3896 (daily ed. June 13, 2018)). Senator Cotton concluded that Huawei and ZTE "have proven themselves to be untrustworthy, and at this point, I think the only fitting punishment would be to give them the death penalty; that is, to put them out of business in the United States." *Id.*; *see also id.* at 87 (S3897) ("I and the Senators in this Chamber

6

believe the death penalty is the appropriate penalty."). Senator Van Hollen voiced his agreement, adding that "U.S. taxpayer dollars" should not be "spent to purchase [Huawei] equipment" and that the amendment would "send a message" that "flagrant violator[s]" of U.S. laws would not be let "off the hook with a slap on the wrist." *Id*. For his part, Senator Blumenthal stated that Huawei should "not [be] a part of our communications system." Ex. 12 at 92 (164 Cong. Rec. S3938 (daily ed. June 14, 2018)). And Senator Rubio was adamant that "Huawei . . . shouldn't be allowed to operate in the United States, and we should put [it] out of business." Ex. 13 at 94 (Press Release, Marco Rubio (June 20, 2018)). Indeed, after the bill proceeded to conference, Representative Gallego explained his support, stating that, "[t]ime and time again, we have seen" Huawei—a "bad apple[]"—"manipulate [its] placement in the market to attack" U.S. interests. Ex. 14 at 99 (164 Cong. Rec. H5805 (daily ed. June 27, 2018)).

The 2019 NDAA was enacted in August 2018, and included as its section 889 the prohibitions on procurement and use of Huawei equipment proposed by Senator Cotton's amendment. *See* Ex. 15 (Pub. L. No. 115-232, 132 Stat. 1636, Aug. 13, 2018). Section 889 targets "covered telecommunications equipment or services," a term that expressly includes "telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities)." § 889(f)(3)(A). Section 889 bans government *procurement* of such equipment or services: "the head of an executive agency may not . . . procure or obtain . . . any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as a critical technology as part of any system." § 889(a)(1)(A). It restricts federal contractors' *use* of such equipment: "the head an executive agency may not . . . enter into a contract . . . with an entity that uses any equipment, system, or service that uses covered telecommunications

equipment or services as a substantial or essential component of any system, or as a critical technology as part of any system." § 889(a)(1)(B). And it prohibits use of federal loan and grant funds to *procure* such equipment: "the head of an executive agency may not obligate or expend loan or grant funds to procure or obtain . . . [such] equipment, services, or systems." § 889(b)(1).

While section 889 directly imposes these restrictions on Huawei, it takes a categorically different approach to most other telecommunications companies with potential connections to China and its government. As the House reported in 2012, numerous companies have manufacturing facilities in China, embed components imported from China, or have other ties to China and its government. HPSCI Report, at 8. Indeed, two major telecommunications companies operate joint ventures with the Chinese government. *See* Ex. 45 (Press Release, Nokia Corp. Stock Exchange (May 18, 2017)); Ex. 34 (*China* entry on Ericsson's corporate website); Ex. 37 (Ericsson 20-F Report (2018)). Members of Congress expressly named some of these other companies while section 889 was pending. *E.g.*, Ex. 7 at 58 (164 Cong. Rec. S2674 (daily ed. May 15, 2018) (Senator Rubio discussing Lenovo, BBK, and Tsinghua Unigroup)); Exs. 5, 8 (prior 2019 NDAA versions mentioning Datang). Yet section 889 does not itself adjudicate any issue about these companies or impose any sanctions on them. Instead, it merely authorizes the Defense Secretary, in consultation with the Director of National Intelligence or the FBI Director, to apply the statute's restrictions to covered equipment of any company that the Secretary "reasonably believes"—subject to judicial review, *see* 5 U.S.C. § 706—is "owned or controlled by, or otherwise connected to" the Chinese government. § 889(f)(3)(D). No such executive charging or judicial review is necessary or available as to Huawei.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  Plaintiff Huawei Technologies Co., Ltd, is a limited liability company organized in Shenzhen, Guangdong Province, in the People's Republic of China, and is the company named

in section 889(f)(3)(A) of the 2019 NDAA. Affidavit of Kevin Lu (Lu Aff.) ¶ 5.

2. Plaintiff Huawei Technologies USA, Inc., is a corporation organized under Texas law with headquarters at 5700 Tennyson Parkway #500 in Plano, Texas 75024, and is an "affiliate" of Plaintiff Huawei Technologies Co., Ltd. *Id.* ¶¶ 4, 6.

3. Huawei Technologies produces, and Huawei USA markets and sells, information-technology and communications-technology products and services, including products (such as routers and layer 3 switches) that are capable of routing or redirecting user data traffic and thus constitute "covered telecommunications equipment" under section 889. *Id.* ¶ 7; Affidavit of David He (He Aff.) ¶ 4.

4. Defendants Emily Webster Murphy, Alexander Acosta, Alex Azar II, Betsy DeVos, Sonny Perdue, Robert Wilkie, and David Bernhardt are heads of executive agencies of the United States, and are acting pursuant to section 889. Affidavit of Kai Song ¶¶ 4–5; Ex. 16 (Fall 2018 Unified Agenda).

5. Section 889 has disrupted existing Huawei contracts and caused Huawei and its employees economic and reputational injury. Lu Aff. ¶¶ 8–25; Affidavit of Thomas Dowding (Dowding Aff.) ¶¶ 3–10; He Aff. ¶¶ 6–20; Affidavit of Joseph O'Daniel (O'Daniel Aff.) ¶¶ 5–6; Affidavit of Terah Atha (Atha Aff.) ¶¶ 6–7; Affidavit of Tim Danks (Danks Aff.) ¶¶ 4–7; Exs. 18–32 (media reports publicizing section 889 and congressional statements about Huawei).

## STANDARD OF REVIEW

Because Plaintiffs bring "a facial challenge to the constitutionality of" section 889 that "presents a pure question of law," there is no genuine dispute of material fact about their claims. *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009). The only question is whether Plaintiffs are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**ARGUMENT**

Based on Huawei's alleged past conduct and associations with the Chinese government and Communist Party, and notwithstanding its vigorous denials, section 889 legislatively adjudicates Huawei to be a tool of the Chinese government, imposes vast restrictions on it, and burdens its constitutional rights; and, in doing so, it tries to drive Huawei out of the country, defames it as disloyal and untrustworthy, and denies it the administrative and judicial process available to others to contest such charges. Section 889 thereby violates the constitutional provisions—the Bill of Attainder, Due Process, and Vesting Clauses—that prohibit "trials by legislature" and ensure due process and the independent exercise of executive and judicial powers.

## I.    Section 889 Is An Unconstitutional Bill of Attainder.

The Bill of Attainder Clause provides that "No Bill of Attainder . . . shall be passed." U.S. CONST. art. I, § 9, cl. 3. The Clause was designed to prevent "a parliamentary act" that imposes "a penalty" upon "specific persons." *United States v. Brown*, 381 U.S. 437, 441–42 (1965).

Attainders were "often resorted to in sixteenth, seventeenth and eighteenth century England for dealing with persons who had attempted, or threatened to attempt, to overthrow the government." *Id.* "Members of a political group thought to present a threat to the national security . . . were the targets of the overwhelming majority of English . . . bills of attainder." *Id.* at 453. During colonial times, "the legislatures of all thirteen States" passed bills of attainder "against the Tories." *Id.* at 442. But the Framers believed that such bills violate "the general principle of fractionalized power," because they exercise executive and judicial power. *Id.* at 445. The Framers also believed that such bills threaten individual liberty, observing that, "[i]f the legislature can [punish] any number of citizens at pleasure . . . no man can be safe, nor know when he may be the innocent victim of a prevailing faction." *Id.* at 444.

Consistent with the Framers' intent, and even where supposed defense or security threats

have been at issue, the Supreme Court has consistently held that selective legislative punishment

violates the Bill of Attainder Clause. Section 889 is such a statute.

### A.  The Bill of Attainder Clause Prohibits Selective Legislative Punishment.

The Supreme Court's earliest bill of attainder cases arose out of the Civil War. *See*

*Cummings v. Missouri*, 4 Wall. 277 (1866); *Ex parte Garland*, 4 Wall. 333 (1866). The laws at

issue permanently prohibited particular persons—those who had assisted the Confederacy—from

working as priests (*Cummings*) or lawyers (*Garland*). The Court held these laws

unconstitutional. *Cummings*, 4 Wall. at 324–25; *Garland*, 4 Wall. at 377. "Punishment," the

Court explained, "is not limited to criminal sanctions." *Cummings*, 4 Wall. at 320. "[R]ather, the

deprivation of *any rights*, civil or political, previously enjoyed, may be punishment," *id.*

(emphasis added), and "a legislative enactment barring designated individuals or groups from

participation in specified employments or vocations" is such a punishment. *Nixon v. Adm'r*, 433

U.S. 425, 474 (1977) (discussing *Cummings* and *Garland*); *see also Garland*, 4 Wall. at 377

("[E]xclusion from any of the professions or any of the ordinary avocations of life for past

conduct can be regarded in no other light than as punishment for such conduct.").

The Court again found unconstitutional attainders in laws passed during the Cold War, when

Congress sought to remove "subversive" elements from the federal government—just as it had

unconstitutionally sought to remove disloyal elements after the Civil War. In *United States v.

Lovett*, 328 U.S. 303 (1946), the Court reviewed legislation setting salaries for three federal

employees at zero. *Id*. at 305. Congress enacted the law after finding that the three employees

were communist sympathizers who posed a risk of subverting critical government institutions,

and it sought to justify the law based on national security concerns—protecting the Government

from communist infiltration—and the Spending Clause—exercising its discretion to determine

appropriations for government employee salaries. *Id.* at 306–08. But the Court found an

unconstitutional attainder, explaining that the law "was designed to apply to particular individuals," and imposed on them a "permanent proscription from any opportunity to serve the Government"—the same kind of "legislative decree of perpetual exclusion from a chosen vocation" invalidated in *Cummings* and *Garland. Id.* at 316. Although Congress had found the three employees "unfit" to hold federal office and "guilty of disloyalty," the Court held that Congress lacked the constitutional power to adjudicate such facts and thereby circumvent the "safeguards" of a "judicial trial" by "duly constituted courts." *Id.* at 308, 316–18.

Next, in *United States v. Brown*, 381 U.S. 437 (1965), the Court held unconstitutional a criminal statute that barred past and present members of the Communist Party from serving as officers or employees of labor unions. *Id.* at 438–39. The Court reiterated that such "[d]isqualification[s] from the pursuit[] of a lawful avocation, or from positions of trust," constitute "punishment." *Id*. at 448 (quoting *Cummings*, 4 Wall. at 320). And it found that this legislative punishment was selective: it "[did] not set forth a generally applicable rule decreeing that any person who commits certain acts or possesses certain characteristics . . . shall not hold union office." *Id*. at 450. Instead, it "designate[d] in no uncertain terms the persons who possesse[d] the feared characteristics and therefore cannot hold union office . . . —members of the Communist Party." *Id*. The law's applicability to past members of the Communist Party— which meant that a person could not "escape" from the statute by resigning—underscored its selective, punitive character. *Id*. at 455. And the law's claimed purpose of protecting the national economy by minimizing political strikes could not save it. *Id*. at 457. As the Court explained, many English and colonial bills of attainder "were enacted for preventive purposes," when the legislature made a judgment "that a given person or group was likely to cause trouble (usually, overthrow the government)." *Id*. at 458–59. Yet the Framers still proscribed such laws, because

they "inflicted deprivations upon that person or group in order to keep it from bringing about the feared event." *Id*. at 459. The Court did not deny Congress' authority to "weed dangerous persons out of the labor movement." *Id*. at 461. But it held that "Congress must accomplish such results by rules of general applicability. It cannot specify the people upon whom the sanction it prescribes is to be levied. Under our Constitution, Congress possesses full legislative authority, but the task of adjudication must be left to other tribunals." *Id*.

Of course, where laws have not both singled out and punished, they have survived bill of attainder scrutiny. Thus, in *Nixon v. Administrator*, 433 U.S. 425 (1977), the Court upheld a law directing a federal official to take custody of, preserve, and eventually provide public access to former President Nixon's presidential records. *Id*. at 433–35. The Court initially found that, although the law applied only to Nixon's records, it was not selective, because Nixon was a "legitimate class of one," as "he alone" among former Presidents "had entered into a depository agreement . . . which by its terms called for the destruction of [presidential records]." *Id*. at 472. The Court next found that the law did not impose punishment on Nixon: First, making a "historical" inquiry, it found that the preservation mandate—in contrast to a prohibition "from participation in specified employments"—was not historically recognized "as a form of punishment." *Id*. at 473–74. Second, recognizing that the historical inquiry alone failed to account for "the possibility that new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee," the Court made a "functional" inquiry into the "punishment" issue, concluding that the law meaningfully "further[ed] nonpunitive legislative purposes" (preserving "records of historical value") without unduly burdening President Nixon. *Id*. at 475–78. Third, turning to a "motivational" test, the Court found "no evidence . . . in the legislative record" that Congress had intended to punish Nixon. *Id*. at 478.

13

Finally, turning to "[o]ther features of the Act," the Court found that the Act's procedural protections for Nixon, including judicial review and a provision for payment of just compensation, along with the absence of less burdensome alternatives, "belie[d] any punitive interpretation." *Id*. at 481–83.

Similarly, in *Selective Service System v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841 (1984), the Court upheld a law that denied federal financial aid to male students who had failed to register for the draft, but that allowed them to reestablish financial-aid eligibility by registering late. Because the law allowed late registration, the Court found that it did not "single[] out nonregistrants and ma[k]e them ineligible for aid." *Id*. at 848. And "[e]ven if the specificity element were deemed satisfied," the law was not punitive, because "the denial of [financial] aid" was not by itself one of "the burdens historically associated with punishment"; the law reasonably served the nonpunitive purpose of "improv[ing] compliance with the [draft] registration requirement"; and the legislative record contained no evidence of intent to punish. *Id*. at 847 n.3, 851, 853–54.

A panel of the Fifth Circuit similarly rejected (over the dissent of Judge Smith) a Bill of Attainder challenge in *SBC Communications, Inc. v. FCC*, 154 F.3d 226 (5th Cir. 1998). Congress had imposed time-limited restrictions on the Bell Telephone operating companies, all of which were heirs to the AT&T Bell Telephone monopoly, in order to promote fair competition. *Id*. at 231–32. "First and perhaps foremost," the panel found that, from a historical perspective, the temporary restrictions at issue were "not punitive because they d[id] not impose a perpetual bar on [the companies'] entry into any of life's avocations." *Id.* at 242–43. Second, the court held that the statute "serve[d] a nonpunitive purpose: attempting to ensure fair competition," and had "tailored the burdens [it] imposed" to this "appropriate end" by, among

other things, imposing only temporary restrictions that would lift when competition improved. *Id.* at 243. Third, the panel found that the legislative history lacked sufficient evidence of punitive intent. *Id*. Finally, "and perhaps most fundamentally," the statutory restrictions were "part of a larger quid pro quo" in which Congress had also "lifted" other existing "restrictions" on the affected companies—again belying punitive intent. *Id.* at 244.

## B.   Section 889 Imposes Selective Legislative Punishment.

Under these precedents, section 889 is an unconstitutional attainder. It is plainly selective, targeting Huawei by name. It is also punitive: By debarring Huawei from selling covered equipment to federal agencies, contractors, and grant and loan recipients, section 889 imposes the kind of permanent disability on serving the Government and/or pursuing the avocation of one's choice that has historically been viewed as punishment; indeed, by casting Huawei as a tool of the Chinese government, section 889 marks Huawei and its employees with a brand of infamy or disloyalty, as some notable historic punishments also have done, and, in conjunction with the vast restrictions and constitutional burdens it imposes, attempts to "banish" Huawei from the country—another historical concern of the Bill of Attainder Clause. Further, section 889 fails to state a nonpunitive governmental purpose on its face and, in any event, piles on restrictions that are both unnecessary and inadequate to any apparent nonpunitive purpose. Moreover, as its legislative history confirms, section 889 was plainly motivated by an intent to punish Huawei for asserted past acts and associations and with the goal of driving Huawei out of the country. Finally, section 889 lacks the unique features that have led courts to find other laws not punitive and, instead, through its specificity, further evidences punitive intent. In short, section 889 is a classic attainder: it is a legislative adjudication of guilt and punishment.

### 1.   Section 889 is Selective.

Section 889 is selective—in fact, it is far more selective than laws applicable to all Civil

War rebels (*Cummings* and *Garland*) or to all members of the Communist Party (*Brown*). It singles out "Huawei Technologies Company" and "any subsidiary or affiliate" by name. And, in contrast to its treatment of other companies with supposed connections to the Chinese government (who are entitled to a determination of such facts by the Secretary of Defense, subject to judicial review), it legislatively adjudicates all issues where Huawei is concerned—with no process, no judicial review, and no possibility of revision.

**2.   Section 889 is Punitive.**

Section 889 is also punitive. Notably, "the very specificity of the statute" tends to "mark it as punishment, for there is rarely any valid reason for such narrow legislation." *Nixon*, 433 U.S. at 485 (Stevens, J., concurring); *see also Foretich v. United States*, 351 F.3d 1198, 1224 (D.C. Cir. 2003) ("it is the Act's specificity that renders the asserted nonpunitive purposes suspect"). That "mark" of punishment is confirmed here by each mode of inquiry that courts have used in assessing whether statutes are punitive.

***First***, section 889 satisfies the historical test for punishment because it imposes the same burdens historically found to constitute punishment—"exclusion from . . . [one] of the ordinary avocations of life," *Garland*, 4 Wall. at 377, "[d]isqualification from . . . positions of trust," *Cummings*, 4 Wall. at 320, "permanent proscription from any opportunity to serve the Government," *Lovett*, 328 U.S. at 316, and "banishment," *Brown*, 381 U.S. at 441, all "mode[s] of punishment commonly employed against those legislatively branded as disloyal," *Nixon*, 433 U.S. at 474. Like the laws at issue in *Cummings*, *Garland*, and *Lovett*—and unlike the temporary disabilities at issue in *Selective Service* and *SBC Communications*—section 889 imposes a permanent disability on Huawei, excluding it both from the trusted position of providing covered equipment to federal agencies *and* from providing such equipment to a vast number of private entities that are government contractors and/or federal loan and grant recipients. Moreover,

16

section 889 "mark[s] [Huawei and its employees] with a brand of infamy or disloyalty,"
*Foretich*, 351 F.3d at 1219, casting them as a tool of the Chinese government and thereby further
discouraging any "patriotic" entity in the United States from doing business with Huawei. Lu.
Aff. ¶ 23; Dowding Aff. ¶ 9; Danks Aff. ¶ 5; Atha Aff. ¶ 6. Indeed, as its sponsors boasted (e.g.,
Ex. 10), section 889 seeks both to sanction Huawei for its alleged past misdeeds and associations
with the Chinese government and Communist Party and to drive Huawei out of the United
States—that is, to "banish" it from the country. Unsurprisingly, section 889 is thus a serious
threat to Huawei's ability to continue to do business here, not to mention to its rights of political
association. He Aff. ¶ 20; Lu Aff. ¶ 24. In fact, there is no time limit on section 889's
restrictions, and nothing that Huawei can do to escape them. Even if it were to leave China and
entirely eliminate any conceivable basis for alleging that it is subject to Chinese government
influence, Huawei would *still* remain subject to section 889's restrictions. Such a permanent,
defamatory, and potentially life-threatening "exclusion" "can be regarded in no other light than
as punishment." *Garland*, 4 Wall. at 377.

   ***Second***, section 889 also functionally imposes punishment because its restrictions are not
closely tailored to any nonpunitive purpose. Section 889 does not facially identify its own *actual*
purpose. That omission alone, combined with the law's selectivity, makes it "reasonable to
conclude that punishment of individuals disadvantaged by [its] enactment was the purpose of the
decisionmakers." *Nixon*, 433 U.S. at 476; *see also Foretich*, 351 F.3d at 1221 ("[T]he
nonpunitive aims must be 'sufficiently clear and convincing' before a court will uphold a
disputed statute against a bill of attainder challenge."); *Kaspersky Lab, Inc. v. U.S. Dep't of
Homeland Security*, 909 F.3d 446, 456 (D.C. Cir. 2018) (functional inquiry requires an "actual"
purpose, rather than merely "some conceivable nonpunitive purpose").

In any event, a statute that is not closely tailored to a nonpunitive purpose is functionally a punitive statute. As the D.C. Circuit has explained, "a statute performs poorly on the functional test when its effect is significantly overbroad," and "a statute flounders on the functional test when its reach is underinclusive." *Kaspersky*, 909 F.3d at 454–55.

Thus, in *Consolidated Edison Co. v. Pataki*, the Second Circuit invalidated a state statute that barred a utility company from passing on costs from a power outage that the legislature deemed to be the company's fault; the statute barred the company not merely from recovering costs attributable to the accident, but also costs it would have incurred anyway (such as costs incurred during ordinary scheduled outages). 292 F.3d 338, 342–43 (2d Cir. 2002). Concluding that the statute was punitive under the functional inquiry, the court "discern[ed] no wholly non-punitive purpose to justify the entire cost-pass-through prohibition." *Id*. at 351. It noted that "[t]he legislature easily could have tailored" the statute to prohibit the company from passing on only "incremental cost[s]" due to the accident. *Id*. at 354. But because the statute instead "lump[ed] all costs of the outage together and forc[ed] [the company] to absorb them, the legislature piled on a burden that was obviously disproportionate to the harm caused." *Id*.

Further, in *Foretich v. United States*, the D.C. Circuit held unconstitutional a federal statute that prohibited a trial court in a pending custody dispute from awarding visitation rights without the consent of a child to her father—Dr. Foretich—who was accused of sexually abusing her. 351 F.3d at 1207–08. The court noted that, under the functional inquiry, "to avoid designation as a bill of attainder," there "must be a nexus between the legislative means and legitimate nonpunitive ends," and, citing *Consolidated Edison*'s concern about selective legislation that "pile[s] on" burdens "disproportionate to the harm caused," ruled that, "where there exists a significant imbalance between the magnitude of the burden imposed and a purported nonpunitive

purpose, the statute cannot reasonably be said to further nonpunitive purposes." *Id.* at 1221–22. The court found that "there can be no doubt as to the magnitude of the burden the Act imposes" on Dr. Foretich, because it "memorializes a judgment by the United States Congress that [he] is guilty of horrific crimes," and thus "inflicts significant and costly injury to Dr. Foretich's reputation." *Id.* at 1223. The court next held that the asserted nonpunitive purposes of the statute—i.e., the "purposes of promoting the best interests of the child, reuniting a family, and facilitating the return of U.S. citizens to this country"—could not "be viewed as nonpunitive," because the restrictions applied only to Dr. Foretich and not more broadly to "*all* pending custody disputes." *Id.* at 1223–24. The court found that this "specificity" "cast aspersions" only on Dr. Foretich, by "impl[ying] that his daughter alone needs special protections," and that, in so "creat[ing] a vilified class of one with no attendant nonpunitive purposes," "the Act imposes 'punishment' under the functional test[.]" *Id.* at 1224.

*Consolidated Edison* and *Foretich* show why section 889 also fails the functional inquiry. As there—and in contrast to laws found sufficiently tailored in *SBC Communications*, 154 F.3d at 243, and *Kaspersky*, 909 F.3d at 457–58—section 889 is both seriously overbroad and seriously underinclusive in relation to the two most apparent nonpunitive purposes the statute could have—i.e., national defense and government network security.

With respect to national defense, section 889 is not tailored at all: Its prohibitions apply to every federal agency—even agencies that have no plausible connection to national defense, such as the National Rural Development Council, the Bureau of Indian Affairs, and the Fish and Wildlife Service. The statute's restrictions also cover vast numbers of private companies that merely contract with or receive grants or loans from federal agencies, and that themselves have nothing to do with national defense. And, unlike the 2018 NDAA, which at least limited its ban

19

on Huawei equipment to certain specific, sensitive defense systems, *see* Ex. 1 § 1656(a), section 889 has no such defense focus. Section 889 is thus markedly overbroad as a ban supposedly serving national defense. At the same time, section 889 is also seriously underinclusive with respect to national defense: It does not prevent continued use of covered equipment by federal agencies or federal grant and loan recipients, even if those agencies or recipients *are* involved in national defense. And it fails to prevent future purchase and use of covered equipment by federal grant and loan recipients—even those connected to national defense—so long as the equipment is not purchased with federal funds.

With respect to government network security, section 889's prohibitions are also seriously overbroad and underinclusive. On its face, section 889 prohibits the government from procuring Huawei equipment even if it is not for use in its own networks. Section 889 also prevents Huawei from doing business with federal contractors, even where such private entities do not operate government information systems and have no potentially compromising connections to those systems. Indeed, section 889 applies even where private entities use covered equipment for private functions unrelated to their government contracts at all. For example, if an elevator company buys covered equipment to use in its back offices, section 889 would preclude it from contracting to repair elevators at the Department of Agriculture—even though the elevator-repair contract has no connection to government information security, and the equipment in the contractor's offices is unrelated to performance of the government contract. Similarly, section 889's prohibition on use of federal loan and grant funds to buy covered equipment applies even if the recipient has no interaction with government information systems.

At the same time, section 889 is severely underinclusive with respect to government network security. Section 889 does not prohibit continued use of covered equipment by federal

agencies; it only restricts future procurement of such equipment. And, with respect to federal grant and loan recipients, section 889 permits not only continued use of covered equipment, but also its future purchase and use, so long as the new equipment is not purchased with federal grant or loan funds. Thus, if use of covered equipment by federal agencies and grant and loan recipients is a network security risk, the legislation is wholly inadequate to address it.

Concomitantly, section 889 does not itself impose any legislative restriction on many other telecommunications companies that are from or do business in China—even though the Chinese government could also seek to influence those companies. For example, section 889 does not itself impose any legislative restriction on equipment sold by the Chinese government's joint ventures with other telecommunications companies, even though these joint ventures are connected by ownership to the Chinese government. Similarly, section 889 does not itself impose any legislative restriction on purchase or use of equipment from companies that have manufacturing facilities in China, embed Chinese components, or use software written in China—even though these companies, too, are subject to the same theoretical risk of Chinese government influence. *See* HPSCI Report, at 8; Exs. 5, 8 (prior 2019 NDAA versions mentioning Datang); Ex. 7 at 58 (S2674 (Sen. Rubio discussing Lenovo, BBK, and Tsinghua Unigroup)); Lu Aff. ¶ 11; Dowding Aff. ¶ 7; He Aff. ¶ 12; Exs. 33–66 (publicly available materials regarding multiple companies' links to China). In other words, because section 889 applies only to Huawei (and ZTE) and not to others that present the asserted risk, it is both a highly selective and terribly inadequate means of protecting government network security—so obviously selective and inadequate as to make the asserted justification legally insufficient.

In short, section 889 is not closely tailored to either a national defense or government network security purpose, and thus fails the functional test for punishment. By imposing

restrictions far in excess of what is necessary for either purpose, section 889 "pil[es] on" the "additional, entirely unnecessary burden[s]" that the functional test forbids. *Kaspersky*, 909 F.3d at 460 (citations omitted), And, by imposing restrictions far less than necessary for either purpose, section 889 has the kind of "narrow focus" that, under the functional inquiry, is inexplicable "without resort to inferences of punitive purpose." *Foretich*, 351 F.3d at 1224 (citations omitted). Indeed, as explained below, section 889's selectivity makes it punitive for the same reason that the law in *Foretich* was deemed punitive—i.e., it unfairly and unnecessarily casts uniquely damaging aspersions on Huawei. *See id*.

*Third*, section 889 is also punitive under the motivational inquiry. As in *Lovett*, where members of Congress found that the targeted federal employees were "radical bureaucrats" "unfit" to hold federal office and "guilty" of being communist subversives, *Lovett*, 328 U.S. at 308–12, Congress here, in effect, tried Huawei, found it guilty of being a bad actor subject to Chinese government influence, and sanctioned it—despite Huawei's vigorous denials.

As the record shows, having made and investigated accusations concerning Huawei since at least 2011, in May 2018, the House passed a bill making express "findings" that Huawei is supposedly "subject to state influence," was allegedly "shar[ing] with the Chinese state intimate and extensive knowledge of foreign telecommunications systems," purportedly "maintain[s] close ties to the [People's Liberation Army]," and had been "issued a subpoena" for alleged trade violations. Ex. 8 § 880(a). In the Senate, Minority Leader Schumer, a co-sponsor of section 889, declared that "Huawei and ZTE are both state-backed companies," Ex. 6 at 54 (S2230), and Section 889's lead sponsor, Senator Cotton, described "Huawei and ZTE" as "extensions of the Chinese Communist Party," alleging that both are guilty of "stealing the secrets of American companies" and "br[eaking] our laws." Ex. 11 at 86 (S3896). Another co-sponsor, Senator Van

Hollen, endorsed these comments, and stated that Huawei had "close and very longstanding ties to the [Chinese] government." *Id.* at 87 (S3897). And Representative Gallego condemned Huawei as a "bad apple[]" that had "abuse[d] and manipulate[d] [its] placement in the market to attack sensitive American communications." Ex. 14 at 99 (H5805).

Equally important, the record reveals an unmistakable intent to punish Huawei for its alleged misdeeds and ties to the Chinese government and Communist Party. Senator Cotton announced that "[Huawei and ZTE] have proven themselves to be untrustworthy, and at this point, I think the only fitting *punishment* would be to give them the death penalty; that is, to put them out of business in the United States." Ex. 11 at 86 (S3896) (emphasis added); *see also id.* at 87 (S3897) (similar). Senator Van Hollen concurred, stating that the bill would ensure that companies that violate U.S. laws get more than a mere "slap on the wrist." *Id.*; *see also* Ex. 12 at 92 (S3938) (statement of Sen. Blumenthal). And Senator Rubio agreed, stating that Huawei's products "are used for espionage and intellectual property theft," that Huawei had acted "without consequence for far too long," Ex. 10 at 82, and that "Huawei . . . shouldn't be allowed to operate in the United States, and we should put them out of business," Ex. 13 at 94. Indeed, Minority Leader Schumer advocated that Congress "bring the hammer down" on Huawei, accusing it of being one of the "absolute worst offenders." Ex. 10 at 83; *see also id.* (Senator Cotton's statement that Huawei must be held "accountable" for its "repeated violations of U.S. law").

These statements from section 889's sponsors, made largely on the congressional floor and as part of a bi-partisan organizational effort, "are an authoritative guide to [the] statute's construction" and purpose. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 526–27 (1982); *see also Nixon*, 433 U.S. at 479–80 (examining statements from "a key sponsor of the measure" to assess

punitive intent). Like the supportive statements of others, they show that section 889 is not a mere regulatory prophylactic nobly aimed at serving legitimate governmental interests in a manner consistent with American due process and separation of powers traditions. Rather, they expose a raw and impermissible motive to legislatively single out and punish Huawei—all without allowing Huawei to have its day in a "duly-constituted court[]." *Lovett*, 328 U.S. at 317. This is unconstitutional selective legislative punishment; indeed, it is *Lovett* all over again.

**Finally**, section 889 lacks the virtues of laws that have been upheld against bill of attainder challenge. Indeed, its selectivity and structure evidence an intent to single out Huawei and treat it more harshly than other technology companies from or doing business in China.

To begin with, section 889 lacks procedural safeguards—but only as to Huawei (and ZTE). In *Nixon*, the challenged statute guaranteed President Nixon the "opportunity to assert any legally or constitutionally based right or privilege," granted him "sole custody and use" of records that were not related to the statute's objectives, "assure[d] district court jurisdiction and judicial review over all legal claims," and "expressly provide[d] for the payment of just compensation." 433 U.S. at 481–82. In contrast, while other unnamed entities fall within section 889's coverage only after a judicially-reviewable determination made by the Secretary of Defense, section 889 automatically and permanently subjects Huawei to its sanctions—with no process, no opportunity for judicial review, and no possibility of escape. This is punishment.

Second, unlike in *Nixon*, Congress had available to it obvious, less burdensome alternatives to section 889's permanent blacklisting of Huawei without opportunity for hearing or judicial review. *See Nixon*, 433 U.S. at 482 ("In determining whether a legislature sought to inflict punishment . . . it is often useful to inquire into the existence of less burdensome alternatives by which that legislature . . . could have achieved its legitimate nonpunitive objectives."). Congress

24

could, at a minimum, have granted Huawei the same process to which other companies with

putative connections to the Chinese government are entitled: administrative evaluation by the

Secretary of Defense (subject to judicial review) of whether they are "owned or controlled" by,

or "otherwise connected to" the Chinese government. Furthermore, for agencies, contractors, and

or federal fund recipients truly involved in national defense, or for agencies, contractors, and

federal fund recipients truly connected to government information networks, Congress could

have forbidden use of covered equipment that did not satisfy specified design and engineering

standards, independent security testing, and/or other protocols necessary to ensure national and

network security. Indeed, similar to the Federal Acquisition Supply Chain Security Act of 2018,

Congress could have provided government-wide criteria for identifying, assessing, and

mitigating supply-chain risks, while also guaranteeing procedural protections (such as notice,

opportunity for rebuttal, and judicial review) to suppliers potentially affected. *See* 41 U.S.C.

§§ 1321–28. But section 889 does not adopt any of these narrower, less burdensome approaches

or allow the executive branch or the courts to apply the statute's prohibitions evenhandedly to

Huawei, consistent with their application to others. Instead, section 889 itself imposes an

outright, permanent, and unreviewable ban on covered Huawei equipment—but not on unnamed

others. This is selective legislative punishment.

Last, rather than show section 889 to be a reasonable means of achieving nonpunitive ends,

other features of the statute confirm its punitive nature. Unlike the law challenged in *SBC

Communications*, section 889 is not part of a "larger" legislative "quid pro quo" in which

Huawei received other, offsetting benefits. 154 F.3d at 244. Moreover, in contrast to the

situations in *Nixon* and *SBC Communications*, the selectivity of section 889 reflects punitiveness:

President Nixon was a "legitimate class of one" because "he alone had entered into a depository

25

agreement . . . which by its terms called for the destruction of [presidential records]." *Nixon*, 433 U.S. at 472. And the Bell Operating Companies alone could "exercise bottleneck control over both ends of a [long distance] telephone call." *SBC Communications*, 154 F.3d at 243 (citation omitted). But as shown above, as Congress has long been aware, many technology companies are from, operate in, or obtain parts or software from China; a number sell equipment that would otherwise be covered by section 889; and, indeed, some are even in joint ventures with the Chinese government. Yet section 889 does not unilaterally impose upon these other companies the same restrictions that it unilaterally imposes on Huawei; to the contrary, those companies are exempted from the statutory restrictions absent a determination by the Secretary of Defense that they are owned or controlled by, or otherwise connected to, the Chinese government. And, by so singling out Huawei, section 889 casts uniquely damaging aspersions as well as burdensome restrictions on Huawei, thereby creating "a vilified class of one" and unconstitutionally imposing "punishment" under the Bill of Attainder Clause. *Foretich*, 351 F.3d at 1224. To paraphrase the *SBC Communications* court, section 889 does not establish a rule even-handedly "condemning all men" in particular positions; rather, section 889 ignores almost all others in such positions and instead simply renders a targeted and "impermissible 'judgment censuring or condemning . . . [Huawei]' for [its] personal conduct." 154 F.3d at 243. Section 889 is thus punitive in both design and effect.

### 3.  Section 889 Constitutes An Unconstitutional Legislative Adjudication.

In short, section 889 gives punitive effect to a legislative adjudication that Huawei is a tool of the Chinese government, an untrustworthy bad actor, and a risk to the nation's security. But Huawei was not allowed to confront the putative evidence against it, offer rebuttal, or avail itself of the other protective procedures that truly impartial adjudicative forums provide to ensure a fair search for the truth. Rather, as the statements of section 889's sponsors confirm, Congress here

26

simply took it upon itself legislatively to adjudicate Huawei's "guilt" and impose sanctions—i.e., it selectively punished Huawei for its alleged misdeeds and associations, including trying to drive Huawei out of the United States. This is the "trial by legislature" "concern that prompted the bill of attainder prohibition: the fear that the legislature, in seeking to pander to an inflamed popular constituency, will find it expedient openly to assume the mantle of judge or, worse still, lynch mob." *Nixon*, 433 U.S. at 480.

In the Supreme Court's words, Congress has not "set forth a generally applicable rule decreeing that [an entity that] commits certain acts or possesses certain characteristics . . . shall not [sell certain equipment]," leaving to the executive and the judiciary "the job of deciding what [entities] have committed the specified acts or possess the specified characteristics." *Brown*, 381 U.S. at 450. Rather, Congress "designate[d] in no uncertain terms the persons who possess the feared characteristics and therefore cannot [sell certain equipment]"—Huawei and its subsidiaries and affiliates. *Id.* This restriction, like the anti-communist restrictions in *Lovett* and *Brown*, assumes that "a given person" (Huawei) is "likely to cause trouble," and then "inflict[s] deprivations" "in order to keep [the person] from bringing about the feared event." *Brown*, 381 U.S. at 458–59. But, as *Lovett* and *Brown* held, while Congress may pass generally applicable laws to counter perceived threats to national defense and/or government network security, Congress may not itself so adjudicate Huawei to be such a threat and mete out punishment as part of that judgment. *Id.* at 461; *see Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017) ("national security concerns must not become a talisman used to ward off inconvenient claims").

As history shows, in times of political excitement or anxiety, legislatures are sometimes tempted to cast aside ordinary legal process and directly impose punishments on persons deemed threats to society. From parliamentary sentences levied against purported conspirators seeking to

overthrow the British crown, to statutes that barred Confederate sympathizers from working in common vocations, to laws that excluded persons connected to the Communist Party from working for the federal government or holding positions in unions, measures of this kind, enacted under such circumstances, all share a common defect: they constitute the kind of legislative trial and punishment that is contrary to our constitutional order. History has repeated itself with section 889. The target today is new—a successful Chinese company and its American subsidiary operating in times of concern about cybersecurity risks and the reach and influence of the Chinese government. But the constitutional flaws in section 889 are no different from those in past laws that selectively targeted and punished persons of governmental concern. And if Congress can select and punish Huawei in this way, it can do the same to others in the future. This Court should declare section 889 to be the unconstitutional attainder that it is.

## II.   Section 889 Deprives Huawei of Liberty and Property Without Due Process.

The Due Process Clause provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. Whereas the Bill of Attainder Clause prohibits selective *punishments*, the Due Process Clause prohibits selective legislative *deprivations of liberty and property* interests. Section 889 violates this rule too.

### A.   Due Process Prohibits Selective Legislative Deprivations of Liberty and Property.

As Professors Chapman and McConnell have demonstrated, at the time the Bill of Rights was ratified, the term "law," as used in the Due Process Clause, connoted general rather than selective legislation. *See* Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 YALE L.J. 1672, 1734 (2012). Locke had described "law" as "a standing Rule to live by, common to every one of that Society." TWO TREATISES OF GOVERNMENT 284 (1690, Peter Laslett ed. 1988). Blackstone had written that "law" is "not a transient sudden order . . . to or concerning a particular person; but something permanent,

uniform, and universal." 1 COMMENTARIES *44. And early American state courts shared this understanding of "law" when interpreting state counterparts of the Due Process Clause. *See, e.g.*, *Vanzant v. Waddel*, 10 Tenn. 260, 270 (1829) ("law" is "general and public"); *Holden v. James*, 11 Mass. 396, 405 (1814) ("law" operates on all persons "under like circumstances"); *Merrill v. Sherburne*, 1 N.H. 199, 204 (1818) ("[Laws] must too, in general, be rules prescribed for civil conduct to the whole community, and not a transient, sudden order from a superior to, or concerning a particular person.").

Against this background, the Supreme Court has repeatedly indicated that a legislative deprivation of liberty or property is constitutional only if imposed through general rules, and not through selective ones. For example, in *Bloomer v. McQuewan*, 14 How. 539 (1852), the Court invoked due process and constitutional avoidance principles to interpret a federal statute not to restrict an assignment of patent rights, explaining that "[t]he right to construct and use [the patented] machines had been purchased and paid for . . . . And a special act of Congress, passed afterwards, depriving the [assignees] of the right to use them certainly could not be regarded as due process of law." *Id.* at 553. In *Hurtado v. California*, 110 U.S. 516 (1884), the Court explained: "It is not every act, legislative in form, that is law. Law is something more than mere will exerted as an act of power. It must not be a special rule for a particular person or a particular case, but . . . the general law, a law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial, so that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society." *Id.* at 535–36 (internal quotation marks omitted). And in *United States v. Winstar Corp.*, 518 U.S. 839 (1996), the plurality opinion endorsed "*Hurtado* [and] its principle of generality," repeating that "law must be not a special rule for a particular person or a particular case, but the general law, so

that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society." *Id.* at 897–98 & n.43 (some punctuation omitted). As the opinion explained, this principle of generality "reflects the traditional 'rule of law' assumption that generality in the terms by which the use of power is authorized will tend to guard against its misuse to burden or benefit the few unjustifiably." *Id.* at 897; *see also Bi-Metallic v. State Board of Equalization*, 239 U.S. 441, 446 (1915) (Due Process requires notice and opportunity for individualized hearing before government deprives "a relatively small number of persons" of liberty or property, but not before a "general determination" that affects the public at large).

Following this understanding of "law," numerous courts of appeals have found due process violations in legislative acts that were specific rather than general and that deprived affected individuals of protected liberty or property interests. *See, e.g.*, *Club Misty, Inc. v. Laski*, 208 F.3d 615, 620 (7th Cir. 2000) (state statute authorizing residents to terminate specific business owners' liquor licenses by majority vote violated due process, because "the very foundation of the concept of the rule of law (as well as of the prohibition of bills of attainder)" is "that a legislature can prohibit private conduct only through general rules"); *RR Village Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1199, 1205 (2d Cir. 1987) (town resolution imposing retroactive increases in sewage-disposal rates on specific residents violated due process, because the resolution was "not a [generally applicable] policy decision but rather an adjudicative determination of disputed facts about the parties and their activities, businesses, and properties"); *Nasierowski Bros. v. Sterling Heights*, 949 F.2d 890, 892, 896 (6th Cir. 1991) (zoning amendment that "conveniently encompassed [the plaintiff's] property" precluding its development violated due process, because the amendment "single[d] out and specifically target[ed] an individual's property"). And, in the lower court decision in *Lovett*, in addition to

30

finding a bill of attainder, Judge Madden found that the statutory deprivation of salaries for the three federal employees violated due process, stating that the statute was "so foreign to our concepts of law that it is difficult to think of it as law at all." *Lovett v. United States*, 66 F. Supp. 142, 151 (Ct. Cl. 1945) (Madden, J., concurring in the result) (citing *Hurtado*, 110 U.S. at 535).

To be sure, while expressly not addressing due process concerns, the Supreme Court has indicated in dicta that "particularized legislative action" is not, for that reason alone, unconstitutional, citing the example of private bills. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 217, 239 n.9 (1995). But as an early court said, "[private] statutes, when lawful, . . . forbear to interfere with past transactions and vested rights." *Merrill*, 1 N.H. at 204. In contrast, when selective laws *do* interfere with protected interests in life, liberty, or property, they violate due process. *See* Chapman & McConnell, 121 YALE L.J. at 1734.

### B.   Section 889 Imposes Such an Unconstitutional Selective Deprivation.

Section 889 fails this constitutional test of due process. It expressly singles out Huawei and legislatively deprives it of protected liberty and property interests.

First, section 889 selectively interferes with Huawei's existing contracts. He Aff. ¶ 17–18; Dowding Aff. ¶ 8; O'Daniel Aff. ¶ 5–6; *cf. Sierra Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir. 1994) ("companies have legally protectable property interests in existing . . . contracts"). Second, section 889 selectively interferes with Huawei's "protected liberty interest" in bidding on future government and private contracts. Lu Aff. ¶¶ 8–22; He Aff. ¶¶ 8–16, 19; Dowding Aff. ¶ 6; *cf. Sys. Contractors Corp. v. Orleans Parish Sch. Bd.*, 148 F.3d 571, 574–75 (5th Cir. 1998); *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643–44 (D.C. Cir. 2003). Finally, official action deprives a person of liberty if it imposes a "stigma" that is sufficiently serious to "alte[r]" the person's "status," *Paul v. Davis*, 424 U.S. 693, 708 (1976), and section 889 so selectively stigmatizes Huawei—by effectively declaring it is subject to Chinese government influence, an

untrustworthy bad actor, and a security risk. Lu Aff. ¶ 23; Dowding Aff. ¶¶ 9–10; Atha Aff.

¶¶ 6–7; Danks Aff. ¶ 5; Exs. 18–32 (media reports concerning Huawei and section 889).

Section 889, in short, is precisely the kind of targeted statute that the Due Process Clause

forbids. It is "a special rule for a particular person," rather than a "general rul[e] which govern[s]

society." *Hurtado*, 110 U.S. at 535–36. And it deprives Huawei of protected liberty and property

interests. It therefore violates due process.

### III. Section 889 Violates the Vesting Clauses and the Resulting Separation of Powers.

Just as the Bill of Attainder Clause prohibits selective punishments and the Due Process

Clause prohibits selective deprivations of liberty and property, the Vesting Clauses prohibit

congressional exercise of executive and judicial powers. Section 889 violates this rule too.

#### A.    Congress Lacks the Power to Adjudicate Facts and Apply Rules to Individuals.

The most "fundamental principle of separation of powers" is that the power to write the law

and the power to apply it "cannot rest in the same hands." *Decker v. Nw. Environmental Defense*

*Center*, 568 U.S. 597, 619 (2013) (Scalia, J., concurring in part and dissenting in part). John

Lilburne, a leading English thinker, explained that, "if the Law-makers should in any case be the

Law-executioners," "partiality or faction" would be unavoidable. THE LAWES FUNERALL 9

(1648). Blackstone wrote that allowing "the legislature to decide particular disputes . . . affords

great room for partiality and oppression." 2 COMMENTARIES *58. And Montesquieu wrote that,

where the powers to make law and apply it "are united in the same person," "there can be no

liberty," because "the same monarch or senate [may] enact tyrannical laws, to execute them in a

tyrannical manner." SPIRIT OF THE LAWS 151–52, Bk. XI, Ch. 6.

The Supreme Court has thus consistently stated that Congress may not assume executive and

judicial powers and itself apply rules to individuals. Early in our history, Chief Justice Marshall

wrote: "It is the peculiar province of the legislature to prescribe general rules for the government

of society; the application of those rules to individuals in society would seem to be the duty of other departments." *Fletcher*, 6 Cranch at 136. Over a century later, Chief Justice Warren wrote: "[The] separation of powers was . . . looked to as a bulwark against tyranny. For if governmental power is fractionalized, if a given policy can be implemented only by a combination of legislative enactment, judicial application, and executive implementation, no man or group of men will be able to impose its unchecked will." *Brown*, 381 U.S. at 443. Congress is limited "to the task of rule-making," and cannot constitutionally engage in rule-application. *Id.* at 446.

Echoing Justice Black's majority opinion in *Lovett*, 328 U.S. at 317, Justice Powell has explained how the legislature's limited role protects against "unchecked power." *INS v. Chadha*, 462 U.S. 919, 966 (1983) (Powell, J., concurring in the judgment). "Unlike the judiciary or an administrative agency, Congress is not bound by established substantive rules. Nor is it subject to the procedural safeguards, such as the right to counsel and a hearing before an impartial tribunal, that are present when a court or an agency adjudicates individual rights. The only effective constraint on Congress' power is political, but Congress is most accountable politically when it prescribes rules of general applicability. When it decides rights of specific persons, those rights are subject to 'the tyranny of a shifting majority.'" *Id.*

Justice Breyer too has noted "the Framers' concern that a legislature should not be able unilaterally to impose a substantial deprivation on one person." *Plaut*, 514 U.S. at 241 (Breyer, J., concurring in the judgment). "[T]he authoritative application of a general law to a particular case by an independent judge, rather than by the legislature itself, provides an assurance that even an unfair law at least will be applied evenhandedly according to its terms." *Id.*

The upshot is simple: The Vesting Clauses protect "liberty" by ensuring that "the same monarch or senate" cannot "enact tyrannical laws, to execute them in a tyrannical manner."

SPIRIT OF THE LAWS, *supra*, at 151–52. They thus grant only the Executive and the Judiciary, but not Congress, power to adjudicate facts and apply law to individuals. *Fletcher*, 6 Cranch at 136; *Brown*, 381 U.S. at 443, 446.

### B.   Section 889 is an Unconstitutional Exercise in Rule-Application.

Section 889, however, adjudicates facts and applies law to Huawei. Whereas section 889 entrusts the executive and judiciary with determining whether others meet statutory standards barring provision of covered equipment, section 889 itself determines that Huawei is barred from doing so. This is the kind of congressional adjudication that the Vesting Clauses prohibit.

Specifically, under section 889(f)(3)(D), the statute's restrictions may be applied to "an entity owned or controlled by, or otherwise connected to, the government of [China]." Under that provision, however, the Secretary of Defense must "reasonably believe" that an entity satisfies this general standard; the Secretary must consult with the Director of National Intelligence or the FBI Director before making such a decision; the courts may review the lawfulness of the Secretary's determination; and the Secretary may revoke the decision if the facts change or the Secretary changes his or her mind. In Huawei's case, by contrast, Congress itself has unilaterally adjudicated the statute's application—with no opportunity for exercise of executive judgment, no executive consultation, no process for Huawei, no subsequent judicial review, and no opportunity for reconsideration. In other words, rather than allow the executive and the courts to perform their constitutional functions, Congress has excluded them and has itself unconstitutionally adjudicated Huawei's guilt and blacklisted it.

The Supreme Court has repeatedly held that such attempts to reserve or exercise the other branches' powers violate the Vesting Clauses. In *Myers v. United States*, 272 U.S. 52 (1926), for example, the Court invalidated a statute requiring Senate consent before the President could remove a postmaster, holding that Congress cannot "draw to itself . . . the power to remove or the

34

right to participate in the exercise of that power." *Id*. at 161. In *Bowsher v. Synar*, 478 U.S. 714 (1986), the Court held that Congress could not "aggrandize" its own powers at the expense of the executive by giving a congressionally-removable officer executive powers. *Id*. at 727–28. In *Chadha*, where Congress had granted the Attorney General the discretion to suspend deportation of particular individuals, the Court held that Congress could not reserve to itself the power to veto such determinations. *See* 462 U.S. at 923–25. In his famous concurrence, Justice Powell explained that, in so doing, Congress was attempting to exercise "a judicial function in violation of the principle of separation of powers." 462 U.S. at 960 (Powell, J., concurring in the judgment). In *Plaut*, the Court held that Congress could not reopen final judgments, because the Judiciary has the exclusive power "not merely to rule on cases, but to *decide* them." 514 U.S. at 218–19. And in *Zivotofsky v. Kerry*, 135 S. Ct. 2076 (2015), the Court invalidated a statute allowing Congress to contradict Executive recognition of a foreign state, because it allowed Congress to "aggrandiz[e] its power at the expense of another branch." *Id*. at 2096.

Like the statutes at issue in these cases, section 889 is a congressional attempt to exercise powers that, as explained above, belong exclusively to the Executive and the Judiciary—i.e., the power to adjudicate facts and apply law to specific individuals. This too is unconstitutional.

## CONCLUSION

The Court should grant Huawei's motion for summary judgment and declare unconstitutional the provisions of section 889 that define equipment and services provided by Huawei as "covered telecommunications equipment and services" (§ 889(f)(3)(A), (3)(C)), that restrict the procurement and use of such equipment and services by executive agencies, government contractors, and loan and grant recipients (§ 889(a)–(b)), and that deny Huawei the administrative and judicial process made available by the statute to other entities (§ 889(f)(3)(D)).

May 28, 2019

Respectfully submitted,

 _/s/ Glen D. Nager_

Glen D. Nager (D.C. Bar No. 385405)*
Ryan J. Watson (D.C. Bar No. 986906)*
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
gdnager@jonesday.com
rwatson@jonesday.com

Clyde M. Siebman (TX Bar No. 18341600)
Michael C. Smith (TX Bar No. 18650410)
Elizabeth Forrest (TX Bar No. 24086207)
SIEBMAN, FORREST, BURG & SMITH, LLP
Federal Courthouse Square
300 North Travis Street
Sherman, TX 75090
(903) 870-0070
clydesiebman@siebman.com
michaelsmith@siebman.com
elizabethforrest@siebman.com

*Admitted _pro hac vice_

Andrew D. Lipman (D.C. Bar No. 280123)*
Russell Blau (D.C. Bar No. 366697)*
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-6033
andrew.lipman@morganlewis.com
russell.blau@morganlewis.com

_Counsel for Plaintiffs_