**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

|  |  |  |
|---|---|---|
| HUAWEI TECHNOLOGIES USA, INC. & HUAWEI TECHNOLOGIES CO., LTD., | | |
| *Plaintiffs*, | | |
| v. | | No. 4:19-cv-159-ALM |
| UNITED STATES OF AMERICA, | | |
| EMILY WEBSTER MURPHY, ADMINISTRATOR OF THE GENERAL SERVICES ADMINISTRATION, | | |
| EUGENE SCALIA, SECRETARY OF LABOR, | | |
| ALEX AZAR II, SECRETARY OF HEALTH AND HUMAN SERVICES, | | |
| BETSY DEVOS, SECRETARY OF EDUCATION, | | |
| SONNY PERDUE, SECRETARY OF AGRICULTURE, | | |
| ROBERT WILKIE, SECRETARY OF VETERANS AFFAIRS, & | | |
| DAVID L. BERNHARDT, SECRETARY OF THE INTERIOR, | | |
| in their official capacities, | | |
| *Defendants*. | | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

I.    The Attainder Clauses Are Enforceable by Corporations................................................. 2

    A.    The Text and Structure of the Attainder Clauses and the Reasons for Their Inclusion in the Constitution Allow Enforcement by Any Person Subject to Legislative Punishment...................................................................................... 2

    B.    Denying Corporate Enforcement of the Attainder Clauses Would Undermine the Equal Status of Corporations Under the Law and Permit Injuries That the Attainder Clauses Were Designed to Prevent ........................... 5

    C.    Precedent and Prudence Support Enforcement by Corporations........................... 9

II.    The Government's Contrary Arguments Are Meritless................................................. 10

    A.    The Government Poses the Wrong Question...................................................... 10

    B.    The Function, History, Purposes, and Nature of the Attainder Clauses Do Not Limit Enforcement Rights to Natural Persons ....................................... 11

    C.    The Few Constitutional Provisions That Are Not Enforceable by Corporations Are Distinguishable.................................................................. 18

    D.    *Consolidated Edison* Was Correctly Decided.................................................... 19

CONCLUSION............................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACORN v. United States*,
618 F.3d 125 (2d Cir. 2010) ............................................................................9, 13

*Adirondack Record v. Lawrence*,
195 N.Y.S. 627 (App. Div. 1922) ..............................................................................8

*Advanced Training Sys., Inc. v. Caswell Equip. Co., Inc.*,
352 N.W.2d 1 (Minn. 1984) .......................................................................................8

*Am. Commc'ns Ass'n, C.I.O., v. Douds*,
339 U.S. 382 (1950) ............................................................................................9, 11

*BMW of N. Am., Inc. v. Gore*,
517 U.S. 559 (1996) .....................................................................................................6

*Brown & Williamson Tobacco Corp. v. Jacobson*,
713 F.2d 262 (7th Cir. 1983) .....................................................................................8

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ..........................................................................................*passim*

*Carlisle v. United States*,
83 U.S. (16 Wall.) 147 (1872) .................................................................................15

*Citizens United v. FEC*,
558 U.S. 310 (2010) ...................................................................................................14

*Colo. Dep't of Labor & Emp't v. Dami Hosp., LLC*,
442 P.3d 94 (Colo. 2019) ...........................................................................................6

*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833 (1986) .....................................................................................................3

*Communist Party of the United States v. Subversive Activities Control Bd.*,
367 U.S. 1 (1961) ...................................................................................................9, 11

*Coniston Corp. v. Village of Hoffman Estates*,
844 F.2d 461 (7th Cir. 1988) ...................................................................................15

*Consolidated Edison Co. of N.Y., Inc. v. Pataki*,
292 F.3d 338 (2d Cir. 2002) ...........................................................................*passim*

*Covington & L. Turnpike Road Co. v. Sandford*,
164 U.S. 578 (1896) .....................................................................................................6

*Cummings v. Missouri*,
71 U.S. (4 Wall.) 277 (1866) ...............................................................4, 6, 14, 20

*Diplomat Elec., Inc. v. Westinghouse Elec. Supply Co., Div. of
Westinghouse Elec. Corp.*,
378 F.2d 377 (5th Cir. 1967) .....................................................................................7

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Ex parte Garland*,
 71 U.S. (4 Wall.) 333 (1866) ................................................................................................14

*FEC v. Mass. Citizens for Life, Inc.*,
 479 U.S. 238 (1986).............................................................................................................19

*Finnish Temperance Soc'y Sovittaja v. Finnish Socialistic Pub. Co.*,
 130 N.E. 845 (Mass. 1921) ...................................................................................................8

*First Nat'l Bank of Boston v. Bellotti*,
 435 U.S. 765 (1978)........................................................................................................3, 11

*Foretich v. United States*,
 351 F.3d 1198 (D.C. Cir. 2003) ...................................................................................7, 13, 18

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
 561 U.S. 477 (2010).............................................................................................................2

*Graham v. Florida*,
 560 U.S. 48 (2010)..............................................................................................................16

*Grosjean v. Am. Press. Co.*,
 297 U.S. 233 (1936).............................................................................................................18

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
 466 U.S. 408 (1984)..............................................................................................................1

*Hurtado v. California*,
 110 U.S. 516 (1884).............................................................................................................16

*INS v. Chadha*,
 462 U.S. 919 (1983)......................................................................................................3, 5, 15

*Interstate Optical Co. v. Ill. State Soc'y of Optometrists*,
 244 Ill. App. 158 (App. Ct. 1927).........................................................................................8

*Joplin Mercantile Co. v. United States*,
 213 F. 926 (8th Cir. 1914) ...................................................................................................4

*K Mart Corp. v. Cartier, Inc.*,
 486 U.S. 281 (1988).............................................................................................................19

*Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*,
 909 F.3d 446 (D.C. Cir. 2018) .......................................................................................17, 18

*Korte v. Sebelius*,
 735 F.3d 654 (7th Cir. 2013) ...............................................................................................11

*Lundell Mfg. Co. v. Am. Broad. Co.*,
 98 F.3d 351 (8th Cir. 1996) ..............................................................................................7, 8

*Maytag Co. v. Meadows Mfg. Co.*,
 45 F.2d 299 (7th Cir. 1930) ..............................................................................................7, 8

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise*,
    501 U.S. 252 (1991)..................................................................................................1, 2

*Michelin Tire Corp. v. Wages*,
    423 U.S. 276 (1976)......................................................................................................2

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982)........................................................................................................2

*N.Y. Cent. & Hudson River R.R. Co. v. United States*,
    212 U.S. 481 (1909)......................................................................................................4

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977)................................................................................................14, 16

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998)......................................................................................................16

*Paul v. Virginia*,
    75 U.S. (8 Wall.) 168 (1868) ......................................................................................19

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995).....................................................................................5, 9, 19, 20

*Railroad Tax Cases*,
    13 F. 722 (C.C.D. Cal. 1882).......................................................................................8

*Railway Express Agency v. New York*,
    336 U.S. 106 (1949)....................................................................................................15

*Ross v. Bernhard*,
    396 U.S. 531 (1970)......................................................................................................6

*Russian Volunteer Fleet v. United States*,
    282 U.S. 481 (1931)..................................................................................................6, 11

*S. Union Co. v. United States*,
    567 U.S. 343 (2012)..............................................................................................6, 11, 17

*SBC Commc'ns, Inc. v. FCC*,
    154 F.3d 226 (5th Cir. 1998) ............................................................................... *passim*

*SBC Commc'ns, Inc. v. FCC*,
    981 F. Supp. 996 (N.D. Tex. 1997) ...........................................................................11

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966)..................................................................................................9, 19

*Southern S.S. Co. of New Orleans v. Portwardens*,
    73 U.S. (6 Wall.) 31 (1867) ..........................................................................................2

*State ex rel. Bunker Res. Recycling & Reclamation, Inc. v. Mehan*,
    782 S.W.2d 381 (Mo. 1990) ....................................................................................9, 11

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003)................................................................................4

*Trs. of Dartmouth Coll. v. Woodward*,
17 U.S. (4 Wheat.) 518 (1819)............................................................2, 3

*United States v. Am. Socialist Soc'y*,
260 F. 885 (S.D.N.Y. 1919)..................................................................14

*United States v. Brown*,
381 U.S. 437 (1965) .......................................................................... *passim*

*United States v. Cocivera*,
104 F.3d 566 (3d Cir. 1996)....................................................................6

*United States v. Hospital Monteflores, Inc.*,
575 F.2d 332 (1st Cir. 1978).................................................................6, 7

*United States v. Lovett*,
328 U.S. 303 (1946)............................................................................3, 5

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950)..............................................................................19

*United States v. Pelley*,
132 F.2d 170 (7th Cir. 1942) ................................................................14

*United States v. Sec. Nat'l Bank*,
546 F.2d 492 (2d Cir. 1976)...........................................................7, 9, 16

*United States v. White*,
322 U.S. 694 (1944)..............................................................................18

*Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*,
434 S.W.3d 142 (Tex. 2014)...................................................................8

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. art. I, § 9, cl. 3...................................................................3

U.S. Const. art. I, § 10, cl. 1.................................................................3

50 U.S.C. §§ 4302–03..........................................................................14

**OTHER AUTHORITIES**

1 & 2 Geo. 4, c. 47 (Eng. 1821)...........................................................12

William Lake,
2 A Complete Parochial History of the County of Cornwall (1868) ......................12

Carlton F.W. Larson,
*The Forgotten Constitutional Law of Treason and the Enemy Combatant
Problem*, 154 U. Penn. L. Rev. 863 (2006) ..........................................15

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Martin L. Newell,
 Law of Slander and Libel in Civil and Criminal Cases § 448 (3d ed. 1914)............................7

Prosser, Torts § 111 (4th ed. 1971)..................................................................................................8

As explained in Huawei's opening brief (Pl. Br. 1, 10–13, 28–34), the Framers adopted the Bill of Attainder, Due Process, and Vesting Clauses in order, among other things, to limit the powers of Congress and the States to target specific persons for sanction without hearing or trial conducted by the executive or the courts.  The Supreme Court has sustained Due Process and Vesting Clause claims brought by corporations and other artificial legal entities.  *See, e.g.*, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 409, 418–19 (1984); *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise*, 501 U.S. 252, 261–62, 276–77 (1991).  The Second Circuit has similarly held that corporations may enforce the Attainder Clauses, *see Consolidated Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338, 345–49 (2d Cir. 2002), and the Fifth Circuit has stated that it "seem[s] likely" that this approach is correct. *SBC Commc'ns, Inc. v. FCC*, 154 F.3d 226, 234 n.11 (5th Cir. 1998).

But the Government nonetheless asks this Court to hold that corporations may not enforce the Attainder Clauses, and to reject the contrary holding of the Second Circuit and the informed suggestion of the Fifth Circuit.  The Government argues that the Attainder Clauses are concerned only with "purely personal" rights—a theory that supposedly finds support in the function, history, purpose, and nature of the Attainder Clauses.  But the Government is wrong, and this Court can enforce Huawei's Attainder Clause claim every bit as much as it can enforce its Due Process and Vesting Clause claims.

Simply put, the Attainder Clauses do not confer rights that are "purely personal."  Rather, the Clauses are integral to the separation of powers and constitute express limitations on the legislative powers of Congress and the States.  These limitations are exceeded by any selective legislative punishment—whether the target is a natural person, a corporation, or some other entity.  The Clauses prohibit all such punishments in order to prevent abuse of legislative power,

preserve the separation of powers, and ensure that trials of guilt and punishment are conducted

by and in forums that are conducive to non-partisan, deliberative decisionmaking—which

legislatures are not.  These purposes would not be achieved if only natural persons—and not

corporations, unions, unincorporated associations, and other non-natural persons—could enforce

the Clauses.  Indeed, denying corporations the benefit of these protections would conflict with

case law recognizing that corporations are presumptively equal under the law and that

corporations can suffer the very kinds of injuries that the Attainder Clauses serve to prevent.

Under the Government's approach, Congress and the States could target specific

unpopular (American and foreign) corporations (large and small), unions, trusts, and other non-

natural persons, and impose fines and other punitive measures on them with impunity.  The

Government can cite *no* judicial precedent that supports this position.  The Court should reject it.

## I.      The Attainder Clauses Are Enforceable by Corporations.

### A.      The Text and Structure of the Attainder Clauses and the Reasons for Their Inclusion in the Constitution Allow Enforcement by Any Person Subject to Legislative Punishment.

The Supreme Court has allowed any person with Article III standing, including

corporations, to enforce the limitations on legislative powers set forth in Article I itself (as

opposed to in the Bill of Rights).  *See, e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight

Bd.*, 561 U.S. 477, 487, 492 (2010); *Metro. Wash. Airports Auth.*, 501 U.S. at 261–62, 276–77;

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 56–57 (1982); *Michelin Tire

Corp. v. Wages*, 423 U.S. 276, 278–79 (1976); *Southern S.S. Co. of New Orleans v.

Portwardens*, 73 U.S. (6 Wall.) 31, 34–35 (1867); *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S.

(4 Wheat.) 518, 626, 654 (1819).  These Article I power limitations serve important "institutional

interests" in our constitutional scheme of limited government subject to checks and balances; and

these "institutional interests" are separate from, and do not depend on, the identity of the persons

seeking to enforce Article I's structural limitations.  *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850–51 (1986) (the Constitution's structural limitations cannot be waived as they "serve institutional interests"); *INS v. Chadha*, 462 U.S. 919, 956–59 (1983) (constitutional requirements of bicameralism and presentment cannot be waived by Congress and the President).  As the Supreme Court has stated, "[t]he Constitution often protects interests broader than those of the party seeking their vindication," and the "proper question" is thus not "whether and to what extent corporations have [constitutional] rights" that are "coextensive with those of natural persons," but rather whether the challenged law undermines interests that the constitutional provision in issue "was meant to protect."  *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 775–76 (1978).  Under these principles, the Attainder Clauses are necessarily enforceable by corporations as well as natural persons.

The Clauses are direct limitations on the legislative powers of Congress and the States, rather than just conferrals of rights on "individuals" or "persons" (as done in the Bill of Rights).  Both Clauses appear in the Article that addresses "legislative powers," and both are phrased as direct prohibitions on the respective authorities of Congress and the States—and not merely as personal rights.  *See* U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder . . . shall be passed"); *id.* art. I, § 10, cl. 1 ("No State shall . . . pass any Bill of Attainder").  Thus, just as other such direct limitations on those authorities have been held enforceable by corporations, *see, e.g.*, *Trs. of Dartmouth Coll.*, 17 U.S. (4 Wheat.) at 626, 654 (addressing Contract Clause), so too should be the Attainder Clauses.

Indeed, this constitutional language naturally extends to claims by corporations.  A bill of attainder is a "legislative act which inflicts punishment without a judicial trial."  *United States v. Lovett*, 328 U.S. 303, 315 (1946).  Corporations, like natural persons, can be subjected to such

"punishment[s]."  *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 412

(2003) (determining "measure of punishment, by means of punitive damages," that may be

imposed on a corporation); *N.Y. Cent. & Hudson River R.R. Co. v. United States*, 212 U.S. 481,

493, 495–96 (1909) ("corporations may be criminally prosecuted"); *Joplin Mercantile Co. v.

United States*, 213 F. 926, 936 (8th Cir. 1914) (corporations are subject to prosecution and, "as

nearly as may be, to the same pains and penalties imposed upon individuals").

Equally important, the reasons these Clauses were included in Article I require that they

be enforceable by corporations.  As explained in *United States v. Brown*, "the Bill of Attainder

Clause" applicable to Congress "was intended . . . as an implementation of the separation of

powers, a general safeguard against legislative exercise of the judicial function, or more

simply—trial by legislature." 381 U.S. 437, 442 (1965).  And both Attainder Clauses addressed

concerns about potential abuse of legislative power and "reflected the Framers' belief that the

Legislative Branch is not so well suited as politically independent judges and juries to the task of

ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons."

*Id*. at 445; *see also Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 322–23 (1866) (Attainder

Clause "intended to guard" against the "excited action of the States").  These constitutional

objectives can be fully achieved only if corporations can also enforce the Clauses.

With respect to separation of powers, the Framers saw the Attainder Clause as preventing

Congress from encroaching on the executive and the judiciary by itself improperly exercising

their exclusive charging and adjudicative functions.  That encroachment occurs whenever

Congress enacts a selective legislative punishment—regardless of who the target is.  If the

Attainder Clause is effectively to function as a "structural safeguard" against such

encroachments, it must apply to every selective legislative punishment and be enforceable by

corporations and natural persons alike.  *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995).

With respect to abuse of legislative power and ensuring that punishment is imposed only after appropriate executive and judicial process, the Attainder Clauses are likewise undermined whenever a punishment is directly imposed on anyone by a legislature.  Legislatures are not subject to the substantive and procedural restraints that promote impartiality, fairness, and accuracy in assessments of guilt, blameworthiness, and punishment.  *Accord Lovett*, 328 U.S. at 317–18 ("[L]egislative trials and punishments" are "dangerous to liberty" because they lack the "tested safeguards" of a judicial trial, such as trial by an "impartial jury," a "right to be represented by counsel," and the right to be "clearly informed of the charge."); *Brown*, 381 U.S. at 445 (legislatures are "not properly constituted to try with coolness, caution, and impartiality a criminal charge" (citation omitted)); *Chadha*, 462 U.S. at 966 (Powell, J., concurring in the judgment) ("Unlike the judiciary or an administrative agency, Congress is not bound by established substantive rules.  Nor is it subject to the procedural safeguards, such as the right to counsel and a hearing before an impartial tribunal, that are present when a court or an agency adjudicates individual rights." (footnote omitted)).  Thus, for the Attainder Clauses to serve their purpose, adjudication of blameworthiness and punishment must be beyond the powers of federal and state legislatures—without regard to the identity of the target.

**B.**    **Denying Corporate Enforcement of the Attainder Clauses Would Undermine the Equal Status of Corporations Under the Law and Permit Injuries That the Attainder Clauses Were Designed to Prevent.**

Furthermore, denying corporations the right to enforce the Attainder Clauses would undermine the equal status of corporations under the law and permit injuries that the Clauses were designed to prevent.

As the Fifth Circuit's pattern jury instructions state, "[a] corporation and all other persons are equal before the law and must be treated as equals in a court of justice."  Fifth Circuit Pattern Civil Jury Instruction 2.16.  Courts have thus repeatedly found corporations entitled to the same constitutional fair trial protections as natural persons receive.  *See, e.g.*, *S. Union Co. v. United States*, 567 U.S. 343, 346, 348–52 (2012) (Sixth Amendment right to have a jury decide "facts that determine [a criminal] fine's maximum amount"); *Ross v. Bernhard*, 396 U.S. 531, 532–34 (1970) (Seventh Amendment right to jury trial); *United States v. Cocivera*, 104 F.3d 566, 571 (3d Cir. 1996) (Sixth Amendment guarantee of effective assistance of counsel); *United States v. Hospital Monteflores, Inc.*, 575 F.2d 332, 333–35 (1st Cir. 1978) (double jeopardy); *Colo. Dep't of Labor & Emp't v. Dami Hosp., LLC*, 442 P.3d 94, 99–100 (Colo. 2019) (excessive fines).  And courts have likewise found corporations entitled to the same protections of property and liberty through the Takings and Due Process Clauses.  *See, e.g.*, *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 489 (1931) (takings); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 563, 585–86 (1996) (due process); *see also Covington & L. Turnpike Road Co. v. Sandford*, 164 U.S. 578, 592 (1896) ("[i]t is now settled that corporations are persons, within the meaning of the constitutional provisions forbidding the deprivation of property without due process of law").  It would be inconsistent with this principle of equality under the law, and these correlative constitutional protections, for corporations to be subject to selective legislative punishments from which natural persons are immune.

Further, corporations and their beneficial shareholders and employees can suffer injuries that the Attainder Clauses were intended to prevent.  These injuries include selectively imposed fines or other loss of liberty or property rights.  *See Cummings*, 71 U.S. (4 Wall.) at 320 ("deprivation of any rights, civil or political, previously enjoyed, may be punishment").  They

- 6 -

also include legislative stigma or badges of disloyalty or infamy.  *See SBC*, 154 F.3d at 243

(many attainders reflect "an impermissible 'judgment censuring or condemning any man or

group of men' for their personal conduct" (quoting *Brown*, 381 U.S. at 453–54)); *Foretich v.*

*United States*, 351 F.3d 1198, 1219 (D.C. Cir. 2003) ("[A] statute will be particularly susceptible

to invalidation as a bill of attainder where its effect is to mark specified persons with a brand of

infamy or disloyalty.").

Corporations themselves are injured when they have to pay fines (criminal or civil), or

lose liberty or property rights.  *See, e.g.*, *Consolidated Edison*, 292 F.3d at 348 (punishment can

impose "economic injury" on corporations); *United States v. Sec. Nat'l Bank*, 546 F.2d 492, 494

(2d Cir. 1976) ("[t]he financial penalties for some [corporate criminal] offenses can be

substantial indeed").  They are also injured by legislative censures or badges of disloyalty and

infamy:  The *SBC* court effectively so recognized in pointing to Madison's Attainder Clause

objection to legislative "denunciation" of the Jacobin Societies.  154 F.3d at 236 n.17.  And, as

the First Circuit has stated, "corporate well-being is heavily dependent on that elusive quality

known as 'good will.'  A corporation that falls out of favor with society will suffer. . . .

Corporations can be made very insecure by prolonged periods of bad publicity.  This insecurity

. . . is very real and may affect the corporation's ability to do business with the public or to raise

capital on public markets."  *Hospital Monteflores*, 575 F.2d at 335.[1]

---

[1] In *Diplomat Elec., Inc. v. Westinghouse Elec. Supply Co., Div. of Westinghouse Elec. Corp.*,
378 F.2d 377 (5th Cir. 1967), the Fifth Circuit, applying Florida law but discussing the general
common law of torts, stated that the "legal principles constituting the law of libel and slander *are
the same whether corporations or individuals are involved*."  *Id*. at 382–83 (emphasis added)
(quoting *Maytag Co. v. Meadows Mfg. Co.*, 45 F.2d 299, 302 (7th Cir. 1930)).  And while a
corporation cannot sue for defamation with respect to allegations of incest or adultery, because it
cannot commit those crimes, false accusations that go to a corporation's honesty, integrity, and
character are actionable, and the law protects a corporation as it would an individual.  Martin L.
Newell, Law of Slander and Libel in Civil and Criminal Cases § 448 (3d ed. 1914); *see Lundell*

A corporation's shareholders and employees also suffer injury when a corporation is subjected to legislative punishment.  As the Supreme Court has recognized, "[a] corporation is simply a form of organization used by human beings to achieve desired ends." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014); *see also Railroad Tax Cases*, 13 F. 722, 747 (C.C.D. Cal. 1882) (Field, J.) ("To deprive the corporation of its property, or to burden it, is, in fact, to deprive the corporators of their property or to lessen its value.").  Thus, "[w]hen rights, whether constitutional or statutory, are extended to corporations, the purpose is to protect the rights of these people." *Hobby Lobby*, 573 U.S. at 706–07.  For example, "extending Fourth Amendment protection to corporations protects the privacy interests of employees and others associated with the company.  Protecting corporations from government seizure of their property without just compensation protects all those who have a stake in the corporations' financial well-being.  And protecting the free-exercise rights of corporations . . . protects the religious liberty of the humans who own and control those companies." *Id.* at 707.  Similarly, when a corporation is required to pay a fine, is deprived of property, is stigmatized, or loses other rights, its

---

*Mfg. Co. v. Am. Broad. Co.*, 98 F.3d 351, 364 (8th Cir. 1996); *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 268–69 (7th Cir. 1983); *Maytag*, 45 F.2d at 302; *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 149, 151 (Tex. 2014); Prosser, Torts § 111 at 745 (4th ed. 1971) ("language which casts an aspersion upon [a corporation's] honesty, credit, efficiency or other business character may be actionable"); *see also Advanced Training Sys., Inc. v. Caswell Equip. Co., Inc.*, 352 N.W.2d 1, 10 (Minn. 1984) ("This court has suggested that corporate plaintiffs stand on the same footing as individuals in defamation actions."); *Interstate Optical Co. v. Ill. State Soc'y of Optometrists*, 244 Ill. App. 158, 162 (App. Ct. 1927) ("It is the law that a corporation may have a business reputation which is equally as valuable to it as such reputation would be to a natural person, and that a corporation may be injured in that reputation in the same way as a natural person."); *Adirondack Record v. Lawrence*, 195 N.Y.S. 627, 629 (App. Div. 1922) (a corporation "is as much entitled to the protection of the law in those respects as is the natural person" (quoting *Reporters' Ass'n of Am. v. Sun Printing & Publ'g Ass'n*, 79 N.E. 710, 711 (Mass. 1921))); *Finnish Temperance Soc'y Sovittaja v. Finnish Socialistic Pub. Co.*, 130 N.E. 845, 847 (Mass. 1921) ("A corporation therefore may have a reputation which is equally as valuable to it as to a natural person, and may be injured in that reputation in the same way.").

shareholders and employees also suffer injury—certainly derivatively and oftentimes directly (as the affidavits submitted in this case illustrate).  *Accord Consolidated Edison*, 292 F.3d at 348; *see also Sec. Nat'l Bank*, 546 F.2d at 494 (noting the "incalcu[l]able effect which a conviction may have on the public attitude toward [a] company," and that "shareholders . . . in the end must bear the financial burden consequent upon criminal liability" (citation and internal quotation marks omitted)).  Allowing corporations to enforce the Attainder Clauses protects the interests of these persons as well.

### C.    Precedent and Prudence Support Enforcement by Corporations.

It is therefore unsurprising that no court has ever held that corporations cannot enforce the Attainder Clauses.  To the contrary, the Supreme Court has twice suggested that the Attainder Clauses apply to more than just natural persons.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) (the Clauses provide "protections for individual persons and private groups"); *Plaut*, 514 U.S. at 239 n.9 (a prohibited attainder may target a "single individual or firm").  Moreover, the Supreme Court repeatedly has adjudicated Attainder claims of non-natural persons without questioning their right to assert such claims.  *See, e.g.*, *Communist Party of the United States v. Subversive Activities Control Bd.*, 367 U.S. 1, 4, 19 (1961); *Am. Commc'ns Ass'n, C.I.O., v. Douds*, 339 U.S. 382, 386 (1950).  Furthermore, at least two courts have held unconstitutional selective legislative punishments imposed on corporations.  *See Consolidated Edison*, 292 F.3d at 349; *State ex rel. Bunker Res. Recycling & Reclamation, Inc. v. Mehan*, 782 S.W.2d 381, 385–89 (Mo. 1990); *see also ACORN v. United States*, 618 F.3d 125, 136 (2d Cir. 2010) ("[T]he scope of the 'specification of the affected persons' element includes corporate entities.").  And, in reviewing another case in which corporate enforcement of the Attainder Clauses was permitted, the Fifth Circuit found that this conclusion "does seem likely."  *SBC*, 154 F.3d at 234 & n.11.

Indeed, if the Attainder Clauses cannot be enforced by corporations, Congress and the state legislatures would be free to impose targeted, punitive measures on any non-natural person, including not just large corporations but also small businesses and closely-held corporations, foreign or domestic; unions and other unincorporated associations; trusts; and other artificial legal entities.  Consequently, they could single out any such entities and directly subject them to fines, confiscation of property, legislative censure or condemnation, punitive restrictions, and other burdens—all without executive charging, judicial adjudication, or any substantive or procedural safeguards.  As discussed above, the text, structure, and reasons for including the Attainder Clauses in the Constitution make such a specter constitutionally inappropriate.

No court has ever suggested that corporations and other non-natural persons cannot enforce the Attainder Clauses.  This Court should decline to be the first.

## II.    The Government's Contrary Arguments Are Meritless.

### A.    The Government Poses the Wrong Question.

For its part, the Government initially errs in suggesting (Def. Supp. 2–5) that the question here is whether the "historic function" of the Attainder Clauses "has been limited to the protection of individuals."  In *Brown*, the Supreme Court specifically ruled that, where the Attainder Clauses are concerned, "[w]hile history . . . provides some guidelines, the wide variation in form, purpose and effect of ante-Constitution bills of attainder indicates that the proper scope of the Bill of Attainder Clause[s], and [their] relevance to contemporary problems, must ultimately be sought by attempting to discern the reasons for [their] inclusion in the Constitution, and the evils [they were] designed to eliminate."  381 U.S. at 442.  That is the question that must be answered; and, as shown above, the text, structure, and reasons for inclusion of the Attainder Clauses in the Constitution make clear that the Clauses directly restrict

the legislative powers of Congress and the States, protect more than "purely personal" rights, and

must be enforceable by corporations and other non-natural persons as well.[2]

### B.     The Function, History, Purposes, and Nature of the Attainder Clauses Do Not Limit Enforcement Rights to Natural Persons.

1.      The Government also errs in suggesting (Def. Supp. 3–5, 8–9) that limiting

enforcement to claims of natural persons is appropriate because, other than in *Consolidated*

*Edison*, courts have not applied the Clauses to protect non-natural persons.  In fact, the Missouri

Supreme Court in *Mehan* applied an Attainder Clause to invalidate a law targeting a corporation,

782 S.W.2d at 385–89; the district court in *SBC* did so as well, *see SBC Commc'ns, Inc. v. FCC*,

981 F. Supp. 996, 1003 n.4 (N.D. Tex. 1997), *rev'd on other grounds by SBC*, 154 F.3d at 226;

and the Supreme Court in *Communist Party* and *Douds* adjudicated claims by organizational

plaintiffs without suggesting that they could not enforce the Clauses, *Communist Party*, 367 U.S.

at 1; *Douds*, 339 U.S. at 413–15.  Moreover, conscientious legislators such as James Madison

successfully opposed proposed censures of non-natural persons on the ground that they were

unconstitutional attainders.  *See SBC*, 154 F.3d at 236 n.17.  And, in all events, because of the

Attainder Clauses, selective legislative punishments have been rare, and the fact that most of the

---

[2] The Government derives its "historic function" question from a footnote in *Bellotti*.  Def. Supp. 2–3.  But *Brown*, not *Bellotti*, addresses how the scope of the Attainder Clauses is to be determined.  Moreover, the Supreme Court has never held that the *Bellotti* footnote establishes a generally applicable—much less a universally applicable—test for courts to use in deciding whether and when corporations may enforce particular provisions of the Constitution.  *See Korte v. Sebelius*, 735 F.3d 654, 682 (7th Cir. 2013) (explaining that "the Court has never elaborated" on *Bellotti*'s footnote language in subsequent decisions).  Thus, both before and after *Bellotti*, the Supreme Court has resolved such questions without applying the "historic function" inquiry of the *Bellotti* footnote.  *See, e.g.*, *Hobby Lobby*, 573 U.S. at 706–07; *S. Union Co.*, 567 U.S. at 346, 348–52; *Russian Volunteer Fleet*, 282 U.S. at 489.  Indeed, *Bellotti* itself instructed in text that, in the end, the "proper question" is whether the challenged law undermines interests that the constitutional provision in issue "was meant to protect," 435 U.S. at 775–76, and, as shown in Part I, that impairment of constitutional interests is as true for bills of attainder applied to non-natural persons as it is for ones applied to natural persons.

few that have been enacted involved natural persons is simply a reflection of who Congress or

the States nonetheless selectively chose to target.  It does not even begin to prove that

corporations and other non-natural persons lack protection and cannot enforce the Clauses.[3]

    2.    The Government next errs in suggesting (Def. Supp. 1, 5–8, 20) that the Attainder

Clauses protect only natural persons because they were a response to attainders directed

exclusively at natural persons.  This argument is belied by the evidence, cited in *SBC*, that the

Framers understood attainders to include measures denouncing non-natural persons, *see* 154 F.3d

at 236 n.17, and by the attainder targeting the Borough of Grampound, cited in *Consolidated

Edison*, 292 F.3d at 348.[4]  Moreover, as *Brown* held, while history can "provide[] some

[3] Contrary to the Government (Def. Supp. 3), the reference to "personal rights" in material quoted in a footnote in *Brown* does not show that the Attainder Clauses are "purely personal guarantee[s]" limited to natural persons.  James Madison—the author of the statement quoted in *Brown*—expressly recognized that bills of attainder could target non-natural persons.  *See SBC*, 154 F.3d at 236 n.17.  Moreover, in referring to "legislative interferences" with "personal rights" in the quoted passage, Madison was recounting threats to "private rights"—like liberty, security, and property interests—that had arisen from legislative adjudication in the colonies; he was not contrasting the rights of natural and non-natural persons.  *Brown*, 381 U.S. at 444 n.18 (quoting THE FEDERALIST, No. 44 (James Madison)).  As shown above, the liberty and property rights of corporations, like those of natural persons, can be threatened by selective legislative punishments; and, in all events, as *Brown* established, the Attainder Clauses aimed not only to prevent such "legislative interferences" with "personal rights," but also to preserve the separation of powers, prevent abuse of legislative power, and require adjudication of blameworthiness and punishment to be conducted by the executive and/or the courts, *Brown*, 381 U.S. at 442–46, 444 n.18—constitutional interests that go well beyond "purely personal guarantees."

[4] In its brief, the Government offers no response to the historic attainder discussed in *SBC*.  It does address the statute directed at the Borough of Grampound—which indisputably was a chartered corporation.  *See* William Lake, 2 A Complete Parochial History of the County of Cornwall 113 (1868) (explaining that Grampound was a chartered corporation).  The Government, however, instead argues that this statute was not an example of an attainder directed at a non-natural person, because its effect was "to deprive the individual residents" of the borough of the "purely personal guarantee" of "the right to vote for local representation." Def. Supp. 7.  But the plain text of the statute—"[T]he Borough of *Grampound* . . . shall cease to elect and return Burgesses to serve in the High Court of Parliament"—denies the Borough itself the right to "elect and return" representatives to Parliament, thus compromising the Borough's own right to representation.  1 & 2 Geo. 4, c. 47 (Eng. 1821).  In any event, as *Hobby Lobby* held, corporations exist as vessels for the rights and interests of their shareholders and

- 12 -

guidelines" in understanding the Clauses' reach, their "proper scope" and meaning must be determined in light of "the reasons for [their] inclusion in the Constitution, and the evils [they] w[ere] designed to eliminate," 381 U.S. at 442—both of which demonstrate that the Clauses must be enforceable by anyone who is the target of selective legislative punishment.  Thus, as the Second Circuit has observed, "the broadness of the American prohibition of bills of attainder . . . is more a reflection of the Constitution's concern with fragmenting the government power than merely preventing the recurrence of unsavory British practices of the time."  *ACORN*, 618 F.3d at 135.[5]

3.      The Government similarly errs in suggesting (Def. Supp. 1, 8–12, 20) that the Attainder Clauses are limited to protecting natural persons because their purpose is supposedly only to shield vulnerable political minorities from retribution for their political beliefs and this purpose is not advanced by protecting corporations and other non-natural persons.

To begin with, the Attainder Clauses are *not* in fact limited to shielding persons from retribution for their political beliefs.  While the Attainder Clauses certainly have that effect, they also bar laws that selectively target and punish for other reasons as well.  *Foretich* and *Consolidated Edison* so illustrate—as the legislative punishments in issue in those cases did not concern political beliefs.  *See Foretich*, 351 F.3d at 1207; *Consolidated Edison*, 292 F.3d at 344.

employees, *see* 573 U.S. at 706; so, on the Government's own theory of the Borough of Grampound, corporations should also be able to enforce the Attainder Clauses to prevent adverse effects on those shareholders and employees.

[5] The Treason Clause does not qualify the Attainder Clauses, or in any way address who can enforce them.  The Government provides no reasoning, much less authority, for its contrary suggestion.  (Def. Supp. 7–8.)

Indeed, while it did not punish, the law at issue in *Nixon* also did not target on the basis of

political beliefs.  *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 433–36 (1977).[6]

Moreover, contrary to the Government's argument, corporations can be targeted on the

basis of political beliefs and can be marked as disloyal.  As the Supreme Court has held,

corporations can hold and express political views.  *See Citizens United v. FEC*, 558 U.S. 310,

349 (2010).  And corporations can be accused of offenses involving disloyalty, including but not

limited to alleged violations of the Trading With the Enemy Act, *see* 50 U.S.C. §§ 4302–03

(prohibiting "any person in the United States," including corporations, from trading with "the

enemy"), and sedition, *see United States v. Pelley*, 132 F.2d 170, 182 (7th Cir. 1942) ("The

charge against the corporation [for sedition] was proper and well grounded."); *United States v.

Am. Socialist Soc'y*, 260 F. 885, 887 (S.D.N.Y. 1919) (the "obvious intent of the Congress was to

reach corporations as well as individuals who did the acts prohibited by the Espionage law"),

*aff'd Am. Socialist Soc'y v. United States*, 266 F. 212 (2d Cir. 1920).  Indeed, the text of section

889 implies, and its sponsors overtly alleged, that Huawei is a disloyal tool of the Chinese

government; and, as Huawei has alleged, section 889 was motivated in part by Huawei's putative

associations with the Chinese Communist Party, Complaint ¶ 99(g); *see* Pl. Br. 2, 6, 16–17, 22–

23; Pl. Reply 1–4, 3, 6, 11, 13, 27–28.[7]

---

[6] The Government is equally wrong to contend (Def. Supp. 10–11) that the Clauses are focused only on "freedom of conscience" concerns, and apply only to entities that can suffer "mental anguish."  The Supreme Court has itself never made this linkage, and *Nixon* and *Consolidated Edison* are contrary examples.  Further, no claim of impairment of political freedom or belief was raised in *Cummings* or *Garland*, and, contrary to the Government's contention, the Court in those cases did *not* assume that the laws at issue would force affected parties to "lie under oath" about their past beliefs.  Rather, the Court concluded that the laws would prevent affected parties from exercising their chosen vocations because they would *not* lie under oath.  *Cummings*, 71 U.S. (4 Wall.) at 316, 328–29; *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 375, 377 (1866).

[7] The Government mistakenly argues (Def. Supp. 10) that "punishment for *disloyalty*, like that animating attainders, necessarily presupposes an expectation of allegiance."  The Trading With

The Government is likewise wrong to contend (Def. Supp. 12) that corporations "typically do not lack the political power or resources to defend themselves" from selective legislative targeting and thus do not merit the Attainder Clauses' protection.  The subjects of selective legislation are by definition a vulnerable minority, because when a legislature targets specific persons, the ordinary protections afforded by the democratic process are absent, due to the fact that so few are adversely affected by the law.  *See, e.g.*, *Railway Express Agency v. New York*, 336 U.S. 106, 112 (1949) (Jackson, J., concurring) ("[N]othing opens the door to arbitrary action so effectively as to allow . . . officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected."); *Chadha*, 462 U.S. at 966 (Powell, J., concurring in the judgment) ("Congress is most accountable politically when it prescribes rules of general applicability.  When it decides rights of specific persons, those rights are subject to the tyranny of a shifting majority." (internal quotation marks omitted)); *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 469 (7th Cir. 1988) ("The smaller the class affected by a nominally legislative act, the weaker the democratic check; in the limit, where the class has only one member, we have the bill of attainder, which Congress and state legislatures are forbidden to enact.").  Indeed, though the Government omits the crucial language (Def. Supp. 9), its own authority holds that enforcement of the Attainder and Due Process Clauses "by judicial process is

---

the Enemy Act and the espionage and sedition laws, among others, refute that claim, as they apply to any person or entity that violates their terms, not just to those who promise allegiance to the United States and violate that promise.  In any event, even non-citizens present in the United States owe "temporary allegiance" to this country for purposes of compliance with and the protection of our laws.  *See Carlisle v. United States*, 83 U.S. (16 Wall.) 147, 154 (1872); *see also* Carlton F.W. Larson, *The Forgotten Constitutional Law of Treason and the Enemy Combatant Problem*, 154 U. Penn. L. Rev. 863, 867–68 (2006) ("[U]nder American law, allegiance is owed to the United States by any person present within its borders other than those persons accompanying an invading military force.").

the device of self-governing communities to protect the rights of individuals and minorities, *as well against the power of numbers*, as against the violence of public agents transcending the limits of lawful authority, even when acting in the name and wielding the force of the government." *Hurtado v. California*, 110 U.S. 516, 536 (1884) (emphasis added).  And, as courts of appeals have recognized, "[n]o corporation, no matter how large, can pit its resources against the overwhelming might of the State." *Sec. Nat'l Bank*, 546 F.2d at 494–95.[8]

4.      The Government also errs in suggesting (Def. Supp. 12–16, 21) that, because some historic punishments apply only to natural persons, the Attainder Clauses are limited to protecting natural persons.  The Supreme Court clearly held in *Brown* that the scope of the Bill of Attainder Clauses is *not* defined by the scope of the historic punishments.  *See* 381 U.S. at 442.  *Nixon* repeated the point.  *See* 433 U.S. at 475.

There is no basis for the suggestion (Def. Supp. 13–14 n.16) that these admonitions are inapplicable to the question whether corporations may enforce the Clauses.  *Brown* is clear that the scope of the Clauses must be defined by their underlying constitutional purposes, and not simply by the reach of historic attainders or punishments.  *See* 381 U.S. at 442.[9]

In any event, while some historic punishments may apply only to natural persons, others clearly apply to corporations and other non-natural persons.  As *SBC* makes clear,

---

[8] This point is well-illustrated by section 889 itself, in the wake of which Huawei USA has laid off more than half of its employees.  Dowding Supp. Aff. ¶¶ 5–8.

[9] The Supreme Court's holding that the scope of the Clauses is not defined by the scope of historic punishments, *see Brown*, 381 U.S. at 442; *Nixon*, 433 U.S. at 475, is consistent with decisions in other contexts holding that constitutional provisions or statutes are generally not limited to the specific circumstances that motivated their adoption or enactment.  *See, e.g.*, *Graham v. Florida*, 560 U.S. 48, 58 (2010) ("To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society." (internal quotation marks omitted)); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils").

"denunciation" falls within the historic ambit of punishment, and non-natural persons can be subjected to that punishment. *SBC*, 154 F.3d at 236 n.17. Another example of historic punishment imposed on corporations is deprivation of property interests, through confiscation of property or imposition of fines. *See, e.g.*, *S. Union Co.*, 567 U.S. at 349 ("Fines were by far the most common form of noncapital punishment in colonial America. They are frequently imposed today, especially upon organizational defendants who cannot be imprisoned."). With respect to the death penalty, section 889's principal sponsor thought that this law imposed that penalty on Huawei. Pl. Reply 3, 10, 27 n.17, 28. And, as discussed in Huawei's earlier briefs, banishment can likewise be suffered by corporations: selective laws can, as section 889 intended as to Huawei, drive a company from a particular area by preventing it from doing business there. *Id.* at 12–14. Corporations can likewise be barred from practicing their chosen vocations through selective exclusion from major markets. *Id.* at 6–12. And, even more fundamentally, whether labeled "banishment," a "vocational exclusion," or something else, it is clear that some early attainders sought to "ostracize" targeted persons and prevent "trade" or "intercourse" with them—punishments that can clearly be applied to corporations, as in fact section 889 does to Huawei. *Id.* at 12. In short, some historic punishments clearly do apply to corporations, and the Attainder Clauses are thus served by allowing enforcement by corporations.[10]

---

[10] The Government repeatedly insinuates that these punishments are "different in kind" when applied to corporations rather than to individuals. Def. Supp. 11, 13, 15 (citing *Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446 (D.C. Cir. 2018)). This argument is outside the scope of the permitted supplemental briefing, because it asserts that certain kinds of measures are not punitive as applied to corporations, not that the Clause does not apply to corporations at all. But, in any event, the argument is unfounded: A fine is a fine; a vocational exclusion is a vocational exclusion; and a legislative censure is a legislative censure. As *Hobby Lobby* and the principle of equal treatment under law counsel, there is no proper legal basis for treating these burdens as punishments for natural persons but not for corporations. *Kaspersky* itself did not actually rest on a different judgment; it merely held that the law at issue there did not impose a badge of infamy or disloyalty on Kaspersky. *See* 909 F.3d at 463. And, in any

Finally, the Government also errs in suggesting (Def. Supp. 13) that the scope of the

Attainder Clauses depends on the "severity of the deprivation imposed."  The Supreme Court has

expressly rejected that contention in the Bill of Attainder context, stating that the Framers

"sought to bar[] legislative punishment[] *of any form or severity*, of specifically designated

persons or groups."  *Brown*, 381 U.S. at 447 (emphasis added); *see also Foretich*, 351 F.3d at

1222.

5.      In short, the history of judicial decisions, attainders, purposes, and punishments is

not what the Government claims it to be.  But, more significantly, the history at most shows only

some motivations for, and some applications of, the Clauses.  It does not show that the Clauses

are limited to those motivations and applications; and a fuller inquiry shows that the Clauses are

structural in purpose and properly apply well beyond both the incidents that inspired them and

the few judicial decisions that the Government cites.[11]

## C.      The Few Constitutional Provisions That Are Not Enforceable by Corporations Are Distinguishable.

The Government also points out (Def. Supp. 2, 19–20) that the Supreme Court has held

that three constitutional guarantees are not enforceable by corporations: the Privileges and

Immunities Clause, *see Grosjean v. Am. Press. Co*., 297 U.S. 233, 244 (1936); the privilege

against self-incrimination, *see United States v. White*, 322 U.S. 694, 698 (1944); and certain

---

event, *Kaspersky*'s discussion of reputational injury and corporate recoveries in libel actions is against the vast weight of authority, including from the Fifth Circuit.  *See supra* note 1.

[11] Contrary to the Government's claim (Def. Supp. 16–17), permitting non-natural persons to enforce the Attainder Clauses does not prevent Congress or the States from enacting legislation that regulates corporations or protects the Nation from foreign or domestic threats.  *See* Pl. Br. 24–25; Pl. Reply 18–19.  Rather, consistent with the Framers' design, doing so merely prevents Congress and the States from pursuing such ends through the specific mechanism of selective legislative punishments.  That restriction—imposed to preserve the separation of powers and to ensure that punishment is only imposed through adjudication in a neutral forum—in no way disables legislatures from pursuing valid goals through constitutional means.

rights to privacy, *see United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).  But these holdings were based on judgments that those particular constitutional provisions conferred "purely personal" rights, and none of these provisions involved an express limitation on legislative powers in Article I, the separation of powers, or any structural feature of the Constitution.  As a result, they did not implicate "institutional" interests as do the Attainder Clauses.[12]

### D.    *Consolidated Edison* Was Correctly Decided.

Finally, the Government errs in its challenge to *Consolidated Edison*.  Def. Supp. 4–5, 6–7, 17–20.  While the Government faults the Second Circuit for invoking the Supreme Court's dicta in *Katzenbach* and *Plaut*, the plain meaning of "private groups" and "firm[s]" encompasses corporations.  *See, e.g.*, *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 286–87 (1988) (using "firm" as a general term encompassing corporations); *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 263 (1986) (using "corporations" and "firms" as synonyms).  Moreover, *Consolidated Edison*'s comparison of the Attainder Clauses to the Due Process and Takings Clauses was entirely apt, as all of these Clauses involve constitutional protections of property rights.  And *Consolidated Edison* properly understood that the Attainder Clauses' purpose of ensuring that courts, not legislatures, adjudicate questions of guilt and punishment is institutional as well as

---

[12] Further, the Court's analysis of the Privileges and Immunities Clause relied on the fact that it applies only to "[c]itizens," and on the negative effects on relations between the States that would arise if the "corporate powers and franchises" granted by one State "could be exercised in other States without restriction."  *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 181–82 (1868), *overruled in part on other grounds by United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533 (1944).  No such issues are raised by application of the Attainder Clauses to corporations.  And the anti-self-incrimination and privacy rights cases involved constitutional guarantees that protect only the unique interests of individuals and thus could be treated as matters of "purely personal" rights.  That is not true of the Attainder Clauses, which protect broader "institutional" interests in our constitutional system of limited government subject to checks and balances.

personal.  292 F.3d at 347–48.  The Government's counter-argument (Def. Supp. 20) that "not all criminal process protections are available to corporations" misses the mark:  Like the protections of the Due Process Clause, Bill of Attainder protections are not limited to criminal punishments, *see, e.g.*, *Cummings*, 71 U.S. (4 Wall.) at 320, and, as discussed above, serve important institutional purposes—*i.e.*, preserving the fractionalization of power and promoting fair adjudications in neutral forums.[13]

## CONCLUSION

For the reasons set forth above, the Court should hold that the Bill of Attainder Clauses are fully enforceable by corporations.

---

[13] The Government describes *Plaut* as "dicta" in "a passing footnote in a case that did not involve an attainder claim."  Def. Supp. 18.  In doing so, it impeaches its own earlier (erroneous) reliance on *Plaut*—made in the context of purportedly (but not) addressing the punishment and Due Process issues presented by section 889.  *See* Def. Motion 42–43; Def. Reply 14–15.

October 17, 2019

Respectfully submitted,


_/s/ Glen D. Nager_____

Clyde M. Siebman (TX Bar No. 18341600)
Michael C. Smith (TX Bar No. 18650410)
Elizabeth Forrest (TX Bar No. 24086207)
SIEBMAN, FORREST, BURG & SMITH, LLP
Federal Courthouse Square
300 North Travis Street
Sherman, TX 75090
(903) 870-0070
clydesiebman@siebman.com
michaelsmith@siebman.com
elizabethforrest@siebman.com

Glen D. Nager (D.C. Bar No. 385405)*
Ryan J. Watson (D.C. Bar No. 986906)*
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
gdnager@jonesday.com
rwatson@jonesday.com

*Admitted _pro hac vice_


Andrew D. Lipman (D.C. Bar No. 280123)*
Russell Blau (D.C. Bar No. 366697)*
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-6033
andrew.lipman@morganlewis.com
russell.blau@morganlewis.com


_Counsel for Plaintiffs_

- 21 -