# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

HUAWEI TECHNOLOGIES USA, Inc. and  §
HUAWEI TECHNOLOGIES CO., LTD.  §
 §  Civil Action No.  4:19-CV-159
v.  §  Judge Mazzant
 §
UNITED STATES OF AMERICA, et al.  §

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are Plaintiffs' Motion for Summary Judgment (Dkt. #27) and Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. #33).  Having considered the motions and the relevant pleadings, the Court finds that Plaintiffs' motion should be denied and Defendants' motion should be granted.

## BACKGROUND

The dispute in this case surrounds Section 889 ("Section 889") of the John S. McCain National Defense Authorization Act for Fiscal Year 2019, Public Law 115-232, ("2019 NDAA"). However, the history of the case starts far earlier than the enactment of Section 889.

Plaintiff Huawei Technologies Co., Ltd. ("Huawei Technologies") is a limited liability company organized in Shenzhen, Guangdong Province in the People's Republic of China. (Dkt. #1 ¶ 9).  Huawei Technologies is a global telecommunications company that provides both products and services within the field of telecommunications.  (Dkt. #1 ¶ 29). Its subsidiary and/or affiliate, Plaintiff Huawei Technologies USA, Inc., ("Huawei USA") (collectively "Huawei" or "the Huawei Entities") is a corporation organized under Texas law.  (Dkt. #1 ¶¶ 3, 8).  Huawei USA provides telecommunications equipment and services to eighty-five active United States

wireline and wireless carriers and numerous enterprise customers, which include corporations, schools, and other institutions.  (Dkt. #1 ¶ 32).  Huawei produces, markets, and sells, among other things, products—including routers and layer 3 switches—that are capable of routing and redirecting user data traffic.  (Dkt. #1 ¶ 34).  The Huawei Entities are "wholly-owned subsidiaries of Huawei Investment & Holding Co. Ltd. ("Huawei Investment")."  (Dkt. #1 ¶ 10).  Huawei Investment is a private company wholly owned by its 97,000 employees and Huawei's founder. (Dkt. #1 ¶ 12).

While Huawei is a privately owned company based on its registrations, in 2011, the U.S.-China Economic and Security Review Commission identified Huawei as a privately owned company subject to Chinese influence based on favorable government policies, which aim to support Huawei's development and pose obstacles to foreign competition.  (Dkt. #34, Exhibit 4 at p 4).  Around the same time, the U.S.-China Economic and Security Review Commission reported that "[n]ational security concerns have accompanied the dramatic growth of China's telecom sector" with "large Chinese companies—particularly those 'national champions' prominent in China's 'going out' strategy of overseas expansion"  posing a threat as they "are directly subject to direction by the Chinese Communist Party."  (Dkt. #34, Exhibit 3 at p. 4).

These concerns resulted in a year-long investigation into "the counterintelligence and security threat posed by Chinese telecommunications companies doing business in the United States." The investigation was led by the House Permanent Select Committee on Intelligence ("HPSCI") in November 2011, which published its findings in a report dated October 8, 2012 ("HPSCI Report").  (Dkt. #34, Exhibit 2).  The investigation primarily focused on Huawei and ZTE Corporation ("ZTE")[1] because they were "the two largest Chinese-founded, Chinese-owned

---

[1] ZTE is another Chinese telecommunications company that is mentioned in Section 889 but does not challenge Section 889 in this lawsuit.

telecommunications companies seeking to market critical network equipment to the United States"

and thus posed the greatest threat.  (Dkt. #34, Exhibit 2 at p. 14).  After the investigation, the

HPSCI determined that "Huawei and ZTE cannot be trusted to be free of foreign state influence

and thus pose a security threat to the United States and to our systems"; although, there was no

explicit finding of wrongdoing.   (Dkt. #34, Exhibit 2 at pp. 5, 30).   The HPSCI made

recommendations for excluding Huawei and ZTE's products and services from sensitive United

States systems, including government systems and government contractors.  The HPSCI further

encouraged private-sector entities and United States network providers and system developers to

seek telecommunications businesses other than Huawei and ZTE.  (Dkt. #34, Exhibit 2 at p. 30).

Similar concerns were echoed by various government committees, officials, and agencies from

2012 through 2018.  (*See generally* Dkt. #27; Dkt. #33; Dkt. #36; Dkt. #40) (citing supporting

documentation).

In December 2017, Congress enacted the National Defense Authorization Act for Fiscal

Year 2018 ("2018 NDAA").  Section 1656 of the 2018 NDAA reads as follows:

**SEC. 1656. SECURITY OF NUCLEAR COMMAND, CONTROL, AND COMMUNICATIONS SYSTEM FROM COMMERCIAL DEPENDENCIES**

(a) CERTIFICATION.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall certify to the congressional defense committees whether the Secretary uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system, to carry out—
    (1) the nuclear deterrence mission of the Department of Defense, including with respect to nuclear command, control, and communications, integrated tactical warning and attack assessment, and continuity of government; or
    (2) the homeland defense mission of the Department, including with respect to ballistic missile defense.
(b) PROHIBITION AND MITIGATION.—
    (1) PROHIBITION.—Except as provided by paragraph (2), beginning on the date that is one year after the date of the enactment of this Act, the Secretary of Defense may not procure or obtain, or extend or renew a contract to procure or obtain, any equipment, system, or service to carry out the missions described in

3

paragraphs (1) and (2) of subsection (a) that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.

(2) WAIVER.—The Secretary may waive the prohibition in paragraph (1) on a case-by-case basis for a single one-year period if the Secretary—

(A) determines such waiver to be in the national security interests of the United States; and

(B) certifies to the congressional committees that—

(i) there are sufficient mitigations in place to guarantee the ability of the Secretary to carry out the missions described in paragraphs (1) and (2) of subsection (a); and

(ii) the Secretary is removing the use of covered telecommunications equipment or services in carrying out such missions.

(3) DELEGATION.—The Secretary may not delegate the authority to make a waiver under paragraph (2) to any official other than the Deputy Secretary of Defense or the co-chairs of the Council on Oversight of the National Leadership Command, Control, and Communications System established by section 171a of title 10, United States Code.

(c) DEFINITIONS.—In this section:

(1) The term "congressional defense committees" has the meaning given that term in section 101(a)(16) of title 10, United States Code.

(2) The term "covered foreign country'' means any of the following:

(A) The People's Republic of China.

(B) The Russian Federation.

(3) The term "covered telecommunications equipment or services" means any of the following:

(A) Telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

(B) Telecommunications services provided by such entities or using such equipment.

(C) Telecommunications equipment or services produced or provided by an entity that the Secretary of Defense reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

(Dkt. #28, Exhibit 1 at pp. 4–5).

Early in 2018, bills entitled "Defending U.S. Government Communications Act" were introduced into both the House of Representatives ("House") and the United States Senate ("Senate"). Those bills were identified as: H.R. 4747 and S. 2391. The bills provided that:

The head of an agency may not procure or obtain, may not extend or renew a contract to procure or obtain, and may not enter into a contract (or extend or renew a contract) with an entity that uses any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.

. . . . .

The term "covered telecommunications equipment or services" means any of the following:
> (A) Telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

. . . . .

(Dkt. #28, Exhibit 2; Dkt. #28, Exhibit 3).  Both bills contain substantially similar findings:

(1) In its 2011 "Annual Report to Congress on Military and Security Developments Involving the People's Republic of China", the Department of Defense stated that, "China's defense industry has benefited from integration with a rapidly expanding civilian economy and science and technology sector, particularly elements that have access to foreign technology. Progress within individual defense sectors appears linked to the relative integration of each, through China's civilian economy, into the global production and R&D chain . . . Information technology companies in particular, including Huawei, Datang, and Zhongxing, maintain close ties to the PLA."

(2) In a 2011 report titled "The National Security Implications of Investments and Products from the People's Republic of China in the Telecommunications Sector", the United States China Commission stated that "[n]ational security concerns have accompanied the dramatic growth of China's telecom sector. . . . Additionally, large Chinese companies—particularly those 'national champions' prominent in China's 'going out' strategy of overseas expansion—are directly subject to direction by the Chinese Communist Party, to include support for PRC state policies and goals."

(3) The Commission further stated in its report that "[f]rom this point of view, the clear economic benefits of foreign investment in the U.S. must be weighed against the potential security concerns related to infrastructure components coming under the control of foreign entities. This seems particularly applicable in the telecommunications industry, as Chinese companies continue systematically to acquire significant holdings in prominent global and U.S. telecommunications and information technology companies."

(4) In its 2011 Annual Report to Congress, the United States China Commission stated that "[t]he extent of the state's control of the Chinese economy is difficult to quantify . . . There is also a category of companies that, though claiming to be

private, are subject to state influence. Such companies are often in new markets with no established SOE leaders and enjoy favorable government policies that support their development while posing obstacles to foreign competition. Examples include Chinese telecoms giant Huawei and such automotive companies as battery maker BYD and vehicle manufacturers Geely and Chery."

(5) General Michael Hayden, who served as Director of the Central Intelligence Agency and Director of the National Security Agency, stated in July 2013 that Huawei had "shared with the Chinese state intimate and extensive knowledge of foreign telecommunications systems it is involved with."

(6) The Federal Bureau of Investigation, in a February 2015 Counterintelligence Strategy Partnership Intelligence Note stated that, "[w]ith the expanded use of Huawei Technologies Inc. equipment and services in U.S. telecommunications service provider networks, the Chinese Government's potential access to U.S. business communications is dramatically increasing. Chinese Government-supported telecommunications equipment on U.S. networks may be exploited through Chinese cyber activity, with China's intelligence services operating as an advanced persistent threat to U.S. networks."

(7) The FBI further stated in its February 2015 counterintelligence note that, "China makes no secret that its cyber warfare strategy is predicated on controlling global communications network infrastructure."

(8) At a hearing before the Committee on Armed Services of the House of Representatives on September 30, 2015, Deputy Secretary of Defense Robert Work, responding to a question about the use of Huawei telecommunications equipment, stated, "In the Office of the Secretary of Defense, absolutely not. And I know of no other—I don't believe we operate in the Pentagon, any [Huawei] systems in the Pentagon."

(9) At such hearing, the Commander of the United States Cyber Command, Admiral Mike Rogers, responding to a question about why such Huawei telecommunications equipment is not used, stated, "as we look at supply chain and we look at potential vulnerabilities within the system, that it is a risk we felt was unacceptable."

(10) In March 2017, ZTE Corporation pled guilty to conspiring to violate the International Emergency Economic Powers Act by illegally shipping U.S.-origin items to Iran, paying the United States Government a penalty of $892,360,064 dollars for activity between January 2010 and January 2016.

(11) The Treasury Department's Office of Foreign Assets Control issued a subpoena to Huawei as part of a Federal investigation of alleged violations of trade restrictions on Cuba, Iran, Sudan, and Syria.

(12) In the bipartisan House Permanent Select Committee on Intelligence "Investigative Report on the United States National Security Issues Posed by Chinese Telecommunication Companies Huawei and ZTE" released in 2012, it was recommended that "U.S. government systems, particularly sensitive systems, should not include Huawei or ZTE equipment, including in component parts. Similarly, government contractors—particularly those working on contracts for sensitive U.S. programs—should exclude ZTE or Huawei equipment in their systems."

(Dkt. #28, Exhibit 2); *accord* (Dkt. #28, Exhibit 3).

Subsequently, H.R. 5515, was introduced in the House.  During an initial markup, a provision similar to the Defending U.S. Government Communications Act was added to the bill, including findings substantially similar to those included in the previous House and Senate bills. H.R. 5515, however, added three additional findings:

(13) Christopher Wray, who serves as Director of the Federal Bureau of Investigation, stated in February 2018 during a hearing of the Select Committee on Intelligence of the Senate that he was "deeply concerned about the risks of allowing any company or entity that is beholden to foreign governments that don't share our values to gain positions of power inside our telecommunications networks. That provides the capacity to exert pressure or control over our telecommunications infrastructure. It provides the capacity to maliciously modify or steal information. And it provides the capacity to conduct undetected espionage." Admiral Mike Rogers, who served as Director of the National Security Agency, agreed with Director Wray's characterization, and added that Government programs need "to look long and hard at companies like this."

(14) Director of National Intelligence Dan Coats, Federal Bureau of Investigation Director Christopher Wray, Director of the Defense Intelligence Agency General Robert Ashley, Director of the National Geospatial-Intelligence Agency Robert Cardillo, Director of the National Security Agency Admiral Michael Rogers, and Director of the Central Intelligence Agency Michael Pompeo all indicated by show of hands in February 2018 at a hearing of the Select Committee on Intelligence of the Senate that they would not "use products or services from  Huawei or ZTE.".

(15) General Paul Nakasone, who served as the Commanding General of United States Army Cyber Command, stated during his confirmation hearing to be National Security Agency director in March 2018 before the Select Committee on Intelligence of the Senate that he "would not'" use any Huawei, China Unicom, or China Telecom products nor would he recommend his family do so.

(Dkt. #28, Exhibit 5 at pp. 8–10).  Through markups and amendments in the House and Senate,

H.R. 5515 became Section 889 of the 2019 NDAA, which was enacted on August 13, 2018.

Section 889, as it was enacted, does not contain any of the findings of H.R. 5515, but retains the

general structure of the bill.  Section 889 reads as follows:

### SEC. 889. PROHIBITION ON CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT.

(a) PROHIBITION ON USE OR PROCUREMENT.—(1) The head of an executive agency may not—

(A) procure or obtain or extend or renew a contract to procure or obtain any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system; or

(B) enter into a contract (or extend or renew a contract) with an entity that uses any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.

(2) Nothing in paragraph (1) shall be construed to—

(A) prohibit the head of an executive agency from procuring with an entity to provide a service that connects to the facilities of a third-party, such as backhaul, roaming, or interconnection arrangements; or

(B) cover telecommunications equipment that cannot route or redirect user data traffic or permit visibility into any user data or packets that such equipment transmits or otherwise handles.

(b) PROHIBITION ON LOAN AND GRANT FUNDS.—(1) The head of an executive agency may not obligate or expend loan or grant funds to procure or obtain, extend or renew a contract to procure or obtain, or enter into a contract (or extend or renew a contract) to procure or obtain the equipment, services, or systems described in subsection (a).

(2) In implementing the prohibition in paragraph (1), heads of executive agencies administering loan, grant, or subsidy programs, including the heads of the Federal Communications Commission, the Department of Agriculture, the Department of Homeland Security, the Small Business Administration, and the Department of Commerce, shall prioritize available funding and technical support to assist affected businesses, institutions and organizations as is reasonably necessary for those affected entities to transition from covered communications equipment and services, to procure replacement equipment and services, and to ensure that communications service to users and customers is sustained.

(3) Nothing in this subsection shall be construed to—

(A) prohibit the head of an executive agency from procuring with an entity to provide a service that connects to the facilities of a third-party, such as backhaul, roaming, or interconnection arrangements; or

(B) cover telecommunications equipment that cannot route or redirect user data traffic or permit visibility into any user data or packets that such equipment transmits or otherwise handles.

(c) EFFECTIVE DATES.—The prohibition under subsection (a)(1)(A) shall take effect one year after the date of the enactment of this Act, and the prohibitions under subsections (a)(1)(B) and (b)(1) shall take effect two years after the date of the enactment of this Act.

(d) WAIVER AUTHORITY.—

(1) EXECUTIVE AGENCIES.—The head of an executive agency may, on a one-time basis, waive the requirements under subsection (a) with respect to an entity that requests such a waiver. The waiver may be provided, for a period of not more than two years after the effective dates described in subsection (c), if the entity seeking the waiver—

(A) provides a compelling justification for the additional time to implement the requirements under such subsection, as determined by the head of the executive agency; and

(B) submits to the head of the executive agency, who shall not later than 30 days thereafter submit to the appropriate congressional committees, a full and complete laydown of the presences of covered telecommunications or video surveillance equipment or services in the entity's supply chain and a phase-out plan to eliminate such covered telecommunications or video surveillance equipment or services from the entity's systems.

(2) DIRECTOR OF NATIONAL INTELLIGENCE.—The Director of National Intelligence may provide a waiver on a date later than the effective dates described in subsection (c) if the Director determines the waiver is in the national security interests of the United States.

(f) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committee on Banking, Housing, and Urban Affairs, the Committee on Foreign Relations, and the Committee on Homeland Security and Governmental Affairs of the Senate; and

(B) the Committee on Financial Services, the Committee on Foreign Affairs, and the Committee on Oversight and Government Reform of the House of Representatives.

(2) COVERED FOREIGN COUNTRY.—The term "covered foreign country" means the People's Republic of China.

(3) COVERED TELECOMMUNICATIONS EQUIPMENT OR SERVICES.— The term "covered telecommunications equipment or services" means any of the following:

(A) Telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

(B) For the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities).

(C) Telecommunications or video surveillance services provided by such entities or using such equipment.

(D) Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

(4) EXECUTIVE AGENCY.—The term "executive agency" has the meaning given the term in section 133 of title 41, United States Code.

(Dkt. #28, Exhibit 15 at pp. 3–5).  Essentially, Section 889 contains three main prohibitions.  First, Section 889(a)(1)(A) prohibits federal agencies from procuring, extending, or renewing a contract to procure "any equipment, system, or service" if Huawei products constitute "a substantial or essential component," or "critical technology," of any system.  (Dkt. #28, Exhibit 15 at p. 3).  Second, Section 889(a)(1)(B) prohibits federal agencies from entering into, extending, or renewing a contract with an entity that uses any such "equipment, system, or service" comprised of Huawei products.  (Dkt. #28, Exhibit 15 at p. 3).  Third, Section 889(b) prohibits heads of executive agencies from obligating or expending loan or grant funds to procure, obtain, or renew a contract from any "equipment, system, or service" if Huawei products constitute "a substantial or essential component," or "critical technology," of any system.  (Dkt. #28, Exhibit 15 at p. 3).

Seeking to invalidate this statute, on March 6, 2019, Huawei filed suit against the United States of America, and several individual defendants[2] (collectively "the Government") in the

---

[2] The individual Defendants consist of Emily Webster Murphy, Administrator of the General Services Administration; Alexander Acosta, former Secretary of Labor; Alex Azar II, Secretary of Health and Human Services; Betsy DeVos,

Eastern District of Texas, Sherman Division (Dkt. #1).  On May 28, 2019, Huawei filed the present

motion for summary judgment (Dkt. #27).  Supporting exhibits to plaintiff's motion were filed

separately (Dkt. #28; Dkt. #29).  On July 3, 2019, the Government filed the present motion to

dismiss or, in the alternative, motion for summary judgment combined with the Government's

response to Huawei's motion (Dkt. #33).  Supporting exhibits were filed separately (Dkt. #24;

Dkt. #25).  On August 14, 2019, Huawei filed its combined reply in support of Huawei's motion

and response in opposition to the Government's motion (Dkt. #36).  On September 3, Plaintiff

filed a notice of correction, correcting a typographical error (Dkt. #37).  On September 9, 2019,

the Government filed its reply in support of its motion (Dkt. #40).  On September 19, 2019, the

Court held a hearing on the motions.  At the hearing, the Court requested additional briefing

regarding the applicability of the Bill of Attainder Clause to corporations.  On October 3, 2019,

the Government filed a brief in response to the Court's request (Dkt. #45).  Huawei filed a response

to this brief on October 17, 2019 (Dkt. #46).[3]

## LEGAL STANDARDS

### *Motion to Dismiss*

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short

and plain statement . . . showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  Each

claim must include enough factual allegations "to raise a right to relief above the speculative level."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the

complaint fails to state a claim upon which relief can be granted.  FED. R. CIV. P. 12(b)(6).  When

---

Secretary of Education; Sonny Perdue, Secretary of Agriculture; Robert Wilkie, Secretary of Veterans Affairs; and
David L. Bernhardt, Acting Secretary of the Interior.
[3] Because the Court finds Section 889 is not a bill of attainder, the Court need not decide whether the Bill of Attainder
Clause can apply to a corporation.

considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012).  The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).  The Court must then determine whether the complaint states a claim for relief that is plausible on its face.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion.  First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 664.  Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief."  *Id.*  "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'"  *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citation omitted).  This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

### Motion for Summary Judgment

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning*

*News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Huawei challenges Section 889 as unconstitutional on three grounds. Namely, Huawei asserts that Section 889: (1) violates the Bill of Attainder Clause; (2) violates the Due Process Clause; and (3) violates the Vesting Clauses. The Government maintains that Section 889 is constitutional on all challenged grounds. The Government further seeks dismissal of the individual defendants, which Huawei opposes.

"A statute is presumed constitutional," and "'[t]he burden is on the one attacking the legislative arrangement.'" *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993) (alteration in original) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). Because statutes are presumed constitutional, "only the clearest proof [will] suffice to establish the unconstitutionality of a statute . . . ." *Communist Party of U.S. v. Subversive Activities Control*

*Bd.*, 367 U.S. 1, 83 (1961) (quotations omitted).  Understanding this burden, the Court will address each constitutional ground in turn, beginning with the arguments regarding the individual defendants.

## I.      Individual Defendants

The Government seeks dismissal of several named agency defendants because Huawei solely challenges the constitutionality of Section 889 without challenging the actions of any agency.  (Dkt. #33 at p. 56) (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004)). Huawei responds that the named agency heads need to be defendants so the Court may enjoin agencies from enforcing Section 889; thereby, affording Huawei complete relief.  The Court agrees with Huawei that an injunction of the individual defendants in this case would provide full relief to Huawei should the Court find that Section 889 is unconstitutional.  Therefore, the Court does not find dismissal of the individual defendants warranted at this time.

## II.      Bill of Attainder

Huawei argues that Section 889 violated the Bill of Attainder Clause.  The Constitution prohibits Congress from passing a bill of attainder: "No Bill of Attainder or ex post facto Law shall be passed."  U.S. CONST. art. I, § 9, cl. 3.  Bills of attainder are a form of "legislative punishment, of any form or severity, of specifically designated persons or groups."  *United States v. Brown*, 381 U.S. 437, 447 (1965) (citations omitted).  In other words, a bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."  *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977) (citations omitted).   "[E]ach bill of attainder case 'has turned on its own highly particularized context.'"  *Kaspersky Lab, Inc. v. U.S.  Dep't of Homeland Sec.*, 909 F.3d 446, 454 (D.C. Cir. 2018) (quoting *Flemming v. Nestor*, 363 U.S. 603, 616 (1960)).

"Where, as here, the liability in question clearly attaches by operation of the legislative act alone, the constitutional test may be summarized in the following two-pronged test: First, has the legislature acted with specificity? Second, has it imposed punishment?" *SBC Commc'ns, Inc. v. FCC*, 154 F.3d 226, 233 (5th Cir. 1998). Assuming without deciding that the Bill of Attainder Clause applies to corporations, the Court will address each prong.

### A. Specificity

"The element of specificity may be satisfied if the statute singles out a person or class by name *or* applies to 'easily ascertainable members of a group.'" *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) (quoting *United States v. Lovett*, 328 U.S. 303, 315 (1946)). "In this case, there can be no serious dispute that [Section 889] satisfies the specificity prong of our analysis." *See id.* Huawei argues that Section 889 meets the specificity requirement as it is mentioned by name in the statute. The Government "do[es] not dispute that the specificity element is satisfied here[.]" (Dkt. #33 at p. 24 n.9). The Court agrees that the specificity prong is clearly met in this case as Huawei, along with ZTE, Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, and Dahua Technology Company, are mentioned by name in Section 889. Because the parties agree that the first prong is satisfied, the Court considers the next prong.

### B. Punishment

Courts have explained that "specificity alone does not render a statute an unconstitutional bill of attainder. Rather, a law may be so specific as to create a 'legitimate class of one' without amounting to a bill of attainder unless it also satisfies the 'punishment' element of the analysis." *Foretich*, 351 F.3d at 1217 (quoting *Nixon*, 433 U.S. at 469–73). "A 'punishment' is something more than a burden. The task, then, is to distinguish permissible burdens from impermissible

16

punishments." *Kaspersky Lab*, 909 F.3d at 455 (citing *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 851 (1984)).

> To ascertain whether a statute imposes punishment, the Supreme Court has instructed that a court should pursue a three-part inquiry: (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a congressional intent to punish."

*Foretich*, 351 F.3d at 1218 (quoting *Selective Serv. Sys.*, 468 U.S. at 852).  This three part-inquiry has been commonly referred to as the "historical test," the "functional test," and the "motivational test."  The Court engages in the three-part inquiry below.

### 1.  Historical Test

The concept of a bill of attainder has its roots in the English common law.  "In England[,] a bill of attainder originally connoted a parliamentary Act sentencing a named individual or identifiable members of a group to death." *Nixon*, 433 U.S. at 473 (footnote omitted).  The United States Constitution also "proscribes enactments originally characterized as bills of pains and penalties, that is, legislative Acts inflicting punishment other than execution." *Id.* at 474 (citations omitted).  The bills of pains and penalties "historically consisted of a wide array of punishments: commonly included were imprisonment, banishment, and the punitive confiscation of property by the sovereign." *Id.* (footnotes omitted).  Additionally, "[o]ur country's own experience with bills of attainder resulted in the addition of another sanction to the list of impermissible legislative punishments: a legislative enactment barring designated individuals or groups from participation in specified employments or vocations, a mode of punishment commonly employed against those legislatively branded as disloyal." *Id.* (citations omitted).

Huawei argues that Section 889 is an improper bill of attainder under three historical "punishments": (1) brand of disloyalty and infamy; (2) employment bar; and (3) banishment.  The

Government disagrees on each ground.  The Court addresses each argument starting with an analysis of disloyalty and infamy, as this idea permeates the other two historical punishments.

### a.  Disloyalty and Infamy

Huawei asserts that Section 889 has removed it from positions of trust and that the statute casts it as a tool of the Chinese Communist Party.  Huawei argues that this branded Huawei and its employees disloyal and infamous like the restrictive bills of attainder in *Cummings* and *Foretich* did.  The Government responds that the brand of infamy and disloyalty does not apply to corporations.  The Government additionally contends that Huawei's employees are not plaintiffs in this case and any alleged "punishment" of the employees does not factor into the analysis for Huawei.

Bills of attainder do in fact "focus on legislative enactments that 'set[ ] a note of infamy' *on the persons to whom the statute applies*."  *Foretich*, 351 F.3d at 1220 (quoting *Brown*, 381 U.S. at 453–54) (emphasis added).  Thus, the Court must focus on the person who is the subject of the statute.  In Section 889, that is Huawei.[4]  Huawei's employees are not named in the statute, and the statute does not apply to Huawei's employees.  Therefore, the Court does not consider any brand of disloyalty or infamy on Huawei's employees in its analysis.

Having determined that the Court will not consider Huawei's employees, the Court turns to the alleged brand of disloyalty and infamy cast on Huawei.  The impermissible, legislative brand of infamy and disloyalty can be demonstrated by *Foretich*.  In *Foretich*—after a man's ex-wife had made allegations in a custody battle that he had sexually abused his daughter—Congress passed an act that prevented the father from seeing his daughter without obtaining consent of his ex-wife.  *Id.* at 1203–1204.  The D.C. Circuit noted that the "deprivation of parental rights and the

---

[4] The Court acknowledges that there are other named companies in Section 889; however, at times, the Court will simply mention Huawei, as Huawei Technologies and Huawei USA are the only named plaintiffs in this case.

opprobrium of being branded a criminal child abuser" casts a brand of infamy and disloyalty of "even greater magnitude than many of those at issue in the historical cases." *Id.* at 1220. Dr. Forteich, based on the act passed, no longer had any "credit or reputation." *Id.* It affects the individual personally. This is the reason the D.C. Circuit noted that "the stain of a 'brand of infamy or disloyalty' matters most to flesh-and-blood humans." *See Kaspersky Lab*, 909 F.3d at 461. *Kaspersky* goes on to explain that, individuals are the ones who have: "but one country of citizenship—a country which they exercise civic privileges available exclusively to living individuals, such as voting, running for office, or serving in the armed forces"; "neighbors and colleagues and communities in whose good graces they hope to remain"; and "families and friends whose own reputations and happiness are tied, at least in part, to their own" *Id.*

> Corporations are very different. To be sure, corporations may derive substantial value from their brands' reputations. But that is precisely the point: reputation is an asset that companies cultivate, manage, and monetize. It is not a quality integral to a company's emotional well-being, and its diminution exacts no psychological cost.

*Id.* Section 889 is a financial difficulty posed on a business, as opposed to a destruction of a person in his own community. Thus, this historical punishment applies to corporations in a different sense than it does to individuals.

The D.C. Circuit did "not foreclose the possibility that Congress could impose a brand of infamy or disloyalty upon a corporation that would rise to the level of legislative punishment." *Id.* at 463. Nevertheless, the D.C. Circuit explained that the statute at issue in *Kaspersky* "represent[ed] no more than a customer's decision to take its business elsewhere. Though costly to [the entity], such a decision falls far short of the 'historical meaning of legislative punishment.'" *Id.* (quoting *Selective Serv. Sys.*, 468 U.S. at 852)).

The Court finds that Section 889 is not a statute that rises to the level of punishment based

on infamy and disloyalty.  In fact, the statute in *Kaspersky* and Section 889 are remarkably similar.

In the 2018 NDAA, Congress passed section 1634, which stated:

> [n]o department, agency, organization, or other element of the Federal Government
> may use, whether directly or through work with or on behalf of another department,
> agency, organization, or element of the Federal Government, any hardware,
> software, or services developed or provided, in whole or in part, by—(1) Kaspersky
> Lab (or any successor entity); (2) any entity that controls, is controlled by, or is
> under common control with Kaspersky Lab; or (3) any entity of which Kaspersky
> Lab has majority ownership.

*Id.* at 452–53 (quoting Pub. L. No. 15-91, § 1634, 131 Stat. 1283, 1740 (2017)).  Essentially,

section 1634 prohibited federal departments, agencies, organizations, or other federal government

elements from using any Kaspersky Lab products.  Here, Section 889, states:

> (a) PROHIBITION ON USE OR PROCUREMENT.—(1) The head of an
> executive agency may not—
> > (A) procure or obtain or extend or renew a contract to procure or obtain any
> equipment, system, or service that uses covered telecommunications equipment or
> services as a substantial or essential component of any system, or as critical
> technology as part of any system; or
> > (B) enter into a contract (or extend or renew a contract) with an entity that
> uses any equipment, system, or service that uses covered telecommunications
> equipment or services as a substantial or essential component of any system, or as
> critical technology as part of any system.
>
> . . . .
>
> (b) PROHIBITION ON LOAN AND GRANT FUNDS.—(1) The head of an
> executive agency may not obligate or expend loan or grant funds to procure or
> obtain, extend or renew a contract to procure or obtain, or enter into a contract
> (or extend or renew a contract) to procure or obtain the equipment, services, or
> systems described in subsection (a).

(Dkt. #28, Exhibit 15 at p. 3).  Section 889 essentially prohibits the head of an executive agency

from: (1) using the specific covered telecommunications equipment made by Huawei;

(2) contracting with an entity that uses the specific covered telecommunications equipment made

by Huawei; and (3) obligating or expending funds to procure or obtain the specific covered telecommunications equipment made by Huawei.

The Court acknowledges that the statutes are not identical.  There are certain limitations in Section 889 that are not contained in section 1634. For example, Section 889 prevents federal agencies from contracting with those who use covered Huawei products and prevents federal agencies from obligating or expending federal grant and loan money on covered Huawei products, which are restrictions not contained in section 1634.  However, Section 889 is also more tailored than section 1634 in certain areas.  Section 889 limits the products covered under the statute to equipment that can "route or redirect data traffic or permit visibility into any user data or packets that [telecommunications] equipment transmits or otherwise handles" in order to target the products that pose the greatest risk (Dkt. #28, Exhibit 15 at p. 3).  Additionally, Section 889 only applies to products where the covered equipment appears as a substantial or essential component or serves as critical technology, which is again targeted to the posed risk.  Section 1634 on the other hand applied to all Kaspersky Lab products regardless of how large a role it plays in that product, its ability to direct or redirect data, or whether its is a product that poses a risk.

After analyzing the similarities and differences, the Court finds Section 889—like section 1634—is a statute that "represents no more than a customer's decision to take its business elsewhere."  *See Kaspersky Lab*, 909 F.3d at 463.  The federal government made the decision not to use or spend its money on Huawei's covered equipment.  To accomplish that decision, Section 889 prohibited the heads of federal agencies from using, contracting with entities that use Huawei products, or obligating or expending federal grant and loan funds from procuring Huawei's covered equipment.  While this decision may be "costly to [Huawei], such a decision falls short of

'the historical meaning of legislative punishment.'" *Id.* (quoting *Selective Serv. Sys.*, 468 U.S. at 852)).

### b. Employment Bar

Huawei additionally asserts that Section 889 acts as an employment bar because it prevents Huawei from participating in its chosen advocation in life and is a permanent proscription from any opportunity to serve the Government.[5]  The Government contends that Section 889 does not preclude Huawei from engaging in its chosen profession.

The Court agrees with the Government.  As previously acknowledged, "[o]ur country's own experience with bills of attainder resulted in the addition of another sanction to the list of impermissible legislative punishments: a legislative enactment barring designated individuals or groups from participation in specified employments or vocations, a mode of punishment commonly employed against those legislatively branded as disloyal."  *Nixon*, 433 U.S. at 474 (citations omitted).

Huawei is not barred from participation in its chosen profession.  Huawei itself claims that it is a "global leader in information and communications technology products and services." (Dkt. #1 ¶ 29).  Aside from federal agencies, "all other individuals and companies in the universe of potential clients remain free to buy and use [Huawei] products."  *See Kaspersky Lab*, 909 F.3d at 457.  It may be true that entities wishing to contract with the federal government may be dissuaded from purchasing Huawei products and that other purchases may be chilled, but the

---

[5] Huawei also argues that based on the brand of disloyalty and infamy that Huawei is indirectly barred from doing business in the United States.  However, this test does not consider indirect results as the Court explains in greater detail.  Regardless, the Court previously found that the brand of infamy and disloyalty does not apply to corporations as it would to a flesh-and-blood human.  Even if the brand of disloyalty and infamy could apply to corporations, the Court determined that this is not such a case.  Thus, the Court is unpersuaded that the brand of disloyalty and infamy in this case turns Section 889 into an employment bar.

employment bars in our jurisprudence do not consider such an indirect effect.[6]  *See generally Brown*, 381 U.S. 437 (analyzing a direct bar to members of the Communist Party from serving as an officer or employee of labor unions); *Lovett*, 328 U.S. 303 (analyzing direct bar to named individuals from being paid for Government employment based on a legislative determination that they were engaged in "subversive activity"); *Cummings v. Missouri*, 4 Wall.. 277 (1866) (analyzing the direct bar of clergymen from their chosen profession for not subscribing to a loyalty oath); *Ex parte Garland*, 4 Wall. 333 (1866) (analyzing the direct bar of lawyers from their chosen profession for not subscribing to a loyalty oath).

Moreover, even if the employment-bar jurisprudence did consider such an indirect result, the Court remains unpersuaded that Section 889 prevents Huawei from engaging in its chosen profession.  Huawei can still conduct business with every other company and individual in America as well as the remaining 169 countries and regions it currently does business with throughout the world.  (Dkt. #1 ¶ 7).  Section 889 is markedly different from an individual who is prohibited from being a lawyer like in *Garland* or a federal employee as in *Lovett*, the cases Plaintiff uses as support for its argument.

In *Garland*, Congress passed a law requiring lawyers to take an oath regarding past actions, thereby prohibiting certain individuals from being lawyers.  4 Wall. at 374–76.  Here, Huawei is still permitted to engage as a global telecommunications technology product and service supplier, in America and other countries.  While it may not be permitted to engage with the federal government, that is a far cry from being permanently barred from its chosen profession.

---

[6] The Court did not include grant and loan recipients in this description of possible lost customers, because grant and loan recipients themselves remain free to use Huawei products.  It is merely the heads of executive agencies who are not permitted to obligate or expend loan and grant funds to be spent on the covered Huawei products.

In *Lovett*, Congress passed a statute that prevented payment of salaries to government employees who were determined to be "subversives" by the House Appropriations Committee. 328 U.S. at 305–13.  Although Section 889 and *Lovett* both concern working or doing business with the federal government, the statutes are vastly different.  As an initial matter, an individual choosing a profession in the federal government does not equate to a company attempting to do business with the federal government.  For the individual, this fits squarely into the employment bar that is prohibited, because the individual is no longer permitted to engage in his or her chosen profession.  On the other hand, a corporation is still permitted to engage in its chosen profession—even if it loses a potential client.  Additionally, Section 889 does not act as a complete bar to Huawei doing business with the federal government.  Section 889 is limited to the "covered equipment" that is a "substantial or essential component of any system, or as a critical technology as part of any system."  (Dkt. #28, Exhibit 15 at p. 3).  Thus, Section 889 merely functions as one client choosing to take some of its business elsewhere.  It does not act as a ban to Huawei's chosen profession.[7]  *See Kaspersky Lab*, 909 F.3d at 462.

### c.  Banishment

Huawei additionally argues that Congress is seeking to drive Huawei out of the United States for past misdeeds.  Such argument falls within the historical category of banishment.[8]  The Government counters that Huawei is not prevented from being in the United States.

The Court agrees with the Government.  "Banishment has traditionally been associated with deprivation of citizenship and 'does more than merely restrict one's freedom to go or remain

---

[7] The parties additionally argue about whether Section 889 is a trial-like adjudication, which will be addressed *infra* II.B.2.a.i.

[8] Huawei also argues that based on the brand of disloyalty and infamy that Huawei was essentially banished from the United States.  The Court previously found that the brand of infamy and disloyalty does not apply to corporations as it would to a flesh-and-blood human.  Even if the brand of disloyalty and infamy could apply to corporations, the Court determined that this is not such a case.  Thus, the Court is unpersuaded that the brand of disloyalty and infamy in this case turns Section 889 into an employment bar.

where others have the right to be: it often works a destruction of one's social, cultural, and political existence.'" *SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 673 (9th Cir. 2002) (quoting *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 897 (2d Cir. 1996)).  Huawei is not being deprived of citizenship and is not even being permanently banned from doing business in the United States.  Huawei is free to do business with any company, or individual, in the United States, except for federal agencies.  Thus, the Court finds Section 889 does not meet the historical definition of punishment for banishment.

Because Section 889 is not a brand of disloyalty or infamy, an employment bar, or banishment, the Court finds that Section 889 is not a historical punishment.

## 2.  Functional Test

"But our inquiry is not ended by the determination that the Act imposes no punishment traditionally judged to be prohibited by the Bill of Attainder Clause."[9]  *Nixon*, 433 U.S. at 475. "Such a rule would render the [Bill of Attainder Clause] unable to respond to attempts by contemporary legislatures to punish individuals in new and heretofore unforeseen ways."  *Consol. Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338, 351 (2d Cir. 2002) (citing *Nixon*, 433 U.S. at 475).  Courts, "therefore, often ha[ve] looked beyond mere historical experience and ha[ve] applied a functional test of the existence of punishment, analyzing whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes."  *Nixon*, 433 U.S. at 475–76.

"Our cases have noted, however, that the second factor—the so-called 'functional test'— 'invariably appears to be the most important of the three.'"  *Foretich*, 351 F.3d at 1218 (quoting

---

[9] The Government argues that, even if there is a historical punishment, as long as there is a legitimate nonpunitive purpose, the statute would not be a bill of attainder.  Because the Court found there is no historical punishment, the Court need not address this argument.

*BellSouth Corp. v. FCC*, 162 F.3d 678, 684 (D.C. Cir. 1998) ("*BellSouth II*")).  Under this second factor, courts analyze whether the challenged law, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Nixon*, 433 U.S. at 475–76 (citations omitted).  Thus, "[i]n short: identify the purpose, ascertain the burden, and assess the balance between the two." *Kaspersky Lab*, 909 F.3d at 455.  As such, the Court will first identify the purpose and then evaluate the balance between both the burden and purpose to determine if the statute is reasonably tailored.

### a.  Purpose of Section 889

Huawei asserts that the purpose of Section 889 is punitive, which is demonstrated by the lack of tailoring to the most apparent purposes.  The Government contends that Section 889 is prophylactic.  The nonpunitive nature of the statute is readily apparent according to the Government.  The parties present several arguments related to the purpose.  The Court subsequently addresses each argument.

### i.       Retrospective Focus

As an initial matter, the Government asserts that the prophylactic nature is clear from the fact that Section 889 has a prospective focus as opposed to serving as a punishment for past conduct.  Huawei responds that punishment can govern future misconduct and is not limited to past conduct.  (Dkt. #36 at p. 9) (quoting *Nixon*, 433 U.S. at 476 n.40).  Moreover, Huawei asserts that the prohibitions in Section 889 are based on past misdeeds and association.

A statute is punitive in nature when it has a "retrospective focus" and "it defines past conduct as wrongdoing and then imposes punishment on that past conduct.  Such a bill attributes guilt to the party or parties singled out in legislation."  *See Consol. Edison Co.*, 292 F.3d at 349 (citations omitted).  A bill of attainder "legislatively determines guilt" without "the protections of

a judicial trial." *Nixon*, 433 U.S. at 468 (citations omitted).  As argued by Huawei, *Nixon* states

that "punishment is not restricted purely to retribution for past events, but may include inflicting

deprivations on some blameworthy or tainted individual in order to prevent his future misconduct."

*Nixon*, 433 U.S. at 476 n.40 (citing *Brown*, 381 U.S. at 458–59).  In other words, the bill of

attainder inquiry does not end once the Court identified a statute as prospective—a prospective

statute can still be impermissibly punitive.  In order for a prospective statute to be impermissibly

punitive, however, it must actually "constitute[] punishment" as opposed, to being a "legitimate

regulation of conduct."  *Id.*  An act constitutes punishment, when as evidenced in *Brown*,

individuals are legislatively determined guilty.  *See id.*  Absent that determination, the statute is a

legitimate regulation of conduct.  *See id.*

The facts in *Consolidated* provide the quintessential example of a punitive statute

demonstrated through an impressible legislative determination of guilt based on a past event.  In

*Consolidated*, the New York legislature passed a bill ("Chapter 190") in response to a power

outage caused by a defective generator that was known to be defective and not replaced.  *Consol.*

*Edison Co.*, 292 F.3d at 343–44.  The company that failed to replace the generator then "increased

its rates to incorporate the cost of purchasing replacement electricity and the other costs associated

with the outage."  *Id.* at 344.  Chapter 190 found that "continuing to operate steam generators

known to be defective, and thereby increasing the risk of a radioactive release and/or an expansive

plant outage, the Consolidated Edison Company failed to exercise reasonable care on behalf of the

health, safety and economic interests of its customers."  *Id.*  Based on the failure to exercise

reasonable care, Chapter 190 explained that "it would not be in the public interest for the company

to recover from ratepayers any costs resulting from" the power outage.  *Id.*  Chapter 190

27

consequently prohibited "the Consolidated Edison Company from recovering from its ratepayers any costs associated with replacing the power from such facility." *Id.*

The Second Circuit found that Chapter 190 "focus[ed] on Con[solidated] Ed[ison]'s conduct related to a single, past incident, [the outage], as the basis for the sanction it impose[d]"; that the statute made "explicit findings about the outage," and that the statute was limited in scope to the outage. *Id.* at 349. Based on these findings, the Second Circuit held that Chapter 190 had a "retrospective focus" and "impose[d] liability 'determined by no previous law or fixed rule.'" *See id.* (quoting *Lovett*, 328 U.S. at 317).

Another example of a trial-like adjudication made by the legislature is found in *Lovett*. In *Lovett*, Congress sought to determine whether a list of thirty-nine individuals who worked for the federal government, identified by Congressman Martin Dies, were engaging in "subversive" activity. *Lovett*, 328 U.S. at 309–10. Congressman Dies's recommendation became known as the indictment of the thirty-nine individuals. *Id.* The Appropriations Committee was then permitted to investigate, giving the employees "a chance to prove themselves 'innocent' of communism or disloyalty [] so that each 'man would have his day in court[.]'" *Id.* During the hearings that followed, the accused could appear to testify but were not permitted to have lawyers. *Id.* at 310–11. Moreover, the accused were only permitted to be present during his or her testimony, not while any other witness was testifying. *See id.* at 311. The Committee was permitted to summon witnesses and papers and then make a recommendation to the House on whether the individual was engaging in "subversive activity" and on appropriate remedial measures. *Id.* at 310. Because "subversive activity" had not yet been defined by Congress, the Committee formulated its own definition, and then used that definition to find the plaintiffs in *Lovett* guilty. *Id.* at 311.

Subsequently, those who were determined to be guilty of "subversive activity" were prevented from getting paid for working in the federal government in the future.

This is not the situation before the Court.  Section 889 does not reference any one, single, past incident.  Nor does Section 889 make explicit findings about a specific past incident or limit the scope of its application to a past incident.  Section 889 did not determine Huawei's guilt.  In fact, the HPSCI could not conclusively determine any wrongdoing by Huawei.  (*See* Dkt. #34, Exhibit 2 at p. 5).  The legislature did not have trial-like hearings by calling witnesses or requesting evidence.  The legislature did not put Huawei on trial or prevent it from having representation during a trial.  Finally, the legislature did not make a determination of guilt.  Congress did, in fact, hold hearings regarding the bill and there were findings included in the initial House and Senate bills.  But hearings and findings are a permissible way for Congress to regulate conduct.  In fact, "[the Supreme Court] has often noted that the power to investigate is inherent in the power to make laws because '[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'" *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) (second alteration in original) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927)).

Regardless, Huawei argues that Section 889 was the product of a trial-like adjudication because it is permanent and selective.  However, selectivity on its own is not enough to make a bill of attainder or to turn an otherwise legitimate regulation of conduct into an impressible adjudication.  *See Foretich*, 351 F.3d at 1217 (citing *Nixon*, 433 U.S. at 469–73).  Further, although Huawei argues that this is a permanent ban, it is not.  As an initial matter, there is a waiver provision contained in Section 889 permitting the Director of National Intelligence ("DNI") to, in the national security interest of the United States, waive the prohibitions in Section 889.  Moreover,

Section 889 is part of the 2019 NDAA, which is a yearly appropriations law.  Thus, anything Huawei does after the enactment of Section 889 can be taken into account in terms of the prohibition on Huawei products.  Finally, the alleged permanence of the statute does not make the procedure in this case akin to a secret trial without certain protections like in *Lovett* or constitute a legislative adjudication of wrongdoing like in *Lovett* and *Consolidated.*

While there is some retrospective aspect of Section 889—namely, that there needed to be a basis to create the terms of the statute—that is common.  Generally, all statutes have prospective and retrospective bases.  But the focus of punishment in the bill of attainder context is a determination of past wrongdoing and sanctioning that conduct.  That is what is missing from Section 889 and that is what distinguishes Section 889 from functionally appearing punitive.  Thus, the fact that Section 889 does not serve as a trial-like adjudication with a retrospective focus supports the Government's assertion that Section 889 is a nonpunitive statute.  But the analysis does not end here.

### ii.        Purpose Stated Within the Statute

Huawei argues that Section 889 must be punitive because the statute itself is silent as to its purpose.  Section 889's silence combined with its selectivity is sufficient to label a statute punitive according to Huawei.  Huawei cites *Nixon*, *Foretich*, and *Kaspersky* as support for this contention.  The Government contends that there is not a rule requiring a statute to state its purpose and that, in fact, cases in this context have suggested the opposite is true.

In *Nixon*, the Supreme Court stated that, under the functional test, a law must "reasonably . . .  further nonpunitive legislative purposes" when "viewed in terms of the type and severity of the burden imposed."  433 U.S. at 475–76.  The Supreme Court continued: "[w]here such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of

individuals disadvantaged by the enactment was the purpose of the decisionmakers." *Id.* at 476. The Supreme Court did not, however, state that these nonpunitive purposes needed to explicitly appear in the statute. Similarly, while the *Foretich* court maintained that the nonpunitive purposes needed to be sufficiently clear and convincing, and the *Kaspersky* court stated that the nonpunitive purpose needed to be actual rather than conceivable, the D.C. Circuit did not require that the legitimate purposes be explicitly stated in the statute. In fact, no court—as far as this Court is aware—has ever required such a statement. Thus, the Court here does not create such a bright-line rule. *See Kaspersky Lab*, 909 F.3d at 456; *Foretich*, 351 F.3d at 1221.

### iii. Purported Nonpunitive Purpose

As previously noted, under the functional inquiry, there must exist more than "some conceivable nonpunitive purpose, but rather an actual nonpunitive purpose." *Kaspersky Lab*, 909 F.3d at 456 (citations omitted). "Where such legitimate purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers." *Nixon*, 433 U.S. at 476.

The Government contends that, even though not explicit in the statute, the primary purpose of Section 889 is: "[t]o further national and informational security by protecting the networks of federal agencies, contractors, and grantees from the threat of cyber-attacks and -espionage by the Chinese government via companies in a position to exploit those networks." (Dkt. #33 at p. 37). Moreover, the Government asserts that there is "an ancillary purpose of ensuring that federal tax dollars were not spent to procure, or otherwise further propagate on U.S. networks, products that pose the aforementioned Chinese cyber-threat." (Dkt. #33 at p. 37 n.20). The purposes offered by the Government are "legitimate and eminently reasonable" nonpunitive functions. *See Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 311 F. Supp. 3d 187, 211 (D.D.C. 2018).

Huawei asserts that the most apparent purposes are national defense and government network security.  Huawei avers that the Government reverse-engineered the purposes alleged in the briefing only after it realized that the statute is not reasonably tailored to its most obvious purposes.  According to Huawei, these purposes are not genuine and actually constitute a "shift of gears" based on the Government's claim that Section 889 is motivated by a "similar purpose" to the law upheld in *Kaspersky*.  (Dkt. #36 at pp. 21–22).  Noteworthy in this case is that Huawei does not challenge the fact that the Government's purported purposes are legitimate nonpunitive purposes.  With that, the Court addresses the arguments in turn, starting with Huawei's claim that the Government "shifted gears."

In *Kaspersky*, the legislature in the 2018 NDAA prohibited any "department, agency, organization, or other element of the Federal Government" from using "any hardware, software, or services developed or provided, in whole or in part, by—(1) Kaspersky Lab" or any other entity in its lineage, control, or ownership.  *Kaspersky Lab*, 909 F.3d at 452–53 (quoting Pub. L. No. 15-91, § 1634, 131 Stat. 1283, 1740 (2017)).  The D.C. Circuit affirmed the lower court's finding that the nonpunitive interest at stake in that case was "the security of the federal government's information systems."  *Id.* at 457.  Ultimately, the D.C. Circuit explained that the law's nonpunitive purpose was sufficiently clear and convincing.  *See id.* at 457–60.

The Government, in its opening brief, stated that a "similar purpose" motivated Section 889.  The Court does not find that this comparison demonstrates a change of course by the Government as suggested by Huawei.  In fact, in the sentence immediately preceding the discussion of *Kaspersky*, the Government states that the prophylactic purpose of Section 889 is that "it serves to protect the telecommunications systems of federal agencies, contractors, and grant and loan recipients against Chinese cyber-threats by regulating the extent to which those systems

will incorporate telecommunications products that carry substantial risk of exploitation by the Chinese government." (Dkt. #33 at p. 8).  This statement of the Government's nonpunitive purpose is not a change of direction from what it later argued.  Instead, it is consistent with the Government's purported nonpunitive purpose.  Moreover, while the primary nonpunitive purpose offered here is not identical to that offered in *Kaspersky*, the Government never asserted that it was the exact same.  The Government asserted that the purpose was similar.  The Court agrees. Protecting the federal government's information systems is similar, although not identical, to protecting the networks of federal agencies, contractors, and loan and grant recipients, thereby furthering national and information security.[10]  Finally, it stands to reason that there would be a difference between the purposes in the present statute and the statute in *Kaspersky*.  They are different statutes.  The statutes accomplish different results.  They must have different, although similar, purposes.

Turning to Huawei's argument that the Court should use the most obvious nonpunitive purposes, rather than the ones offered by the Government, the D.C. Circuit explained that the statute must further an "actual" purpose.  *Kaspersky Lab*, 909 F.3d at 456.  Not merely "some conceivable nonpunitive purpose, but rather an actual nonpunitive purpose." *Id.* (citation omitted). There is no requirement that there needs to be several purposes or that every conceivable purpose needs to be furthered by the statute.[11]  Thus, if the Government's purported purposes are actual nonpunitive purposes, the Court can move to the next inquiry.

---

[10] The Court notes that having a similar purported nonpunitive purpose is not dispositive to the bill of attainder question.  The statute still needs to support the stated purpose, and the burden needs to be reasonably tailored to that purpose.

[11] This is contrary to Huawei's argument that Section 889 must have "wholly nonpunitive purposes."  (Dkt. #36 at pp. 22–25).  The "wholly nonpunitive" language comes from *Consolidated Edison*; however, the actual analysis seen in *Consolidated Edison* does not determine that the statute must have "wholly nonpunitive purposes."  *See Consol. Edison Co.*, 292 F.3d at 352–54.  Instead, the *Consolidated* analysis supports the language from *Kaspersky* that the bill of attainder analysis "demands not some conceivable nonpunitive purpose, but rather an actual nonpunitive purpose."  *Kaspersky*, 909 F.3d at 456 (citations omitted).  The Second Circuit analyzed the possible and purported

Again, the purported nonpunitive purpose of Section 889 is "[t]o further national and informational security by protecting the networks of federal agencies, contractors, and grantees from the threat of cyber-attacks and -espionage by the Chinese government via companies in a position to exploit those networks."  (Dkt. #33 at p. 37).  The ancillary purpose is "ensuring that federal tax dollars were not spent to procure, or otherwise further propagate on U.S. networks, products that pose the aforementioned Chinese cyber-threat."  (Dkt. #33 at p. 37 n.20).  The Court analyzes each purpose to determine whether it is an actual nonpunitive purpose.

### aa.    National and Informational Security

The support for the Government's primary purpose can be found in case law and the evidence presented.  As stated in *Kaspersky*, "[g]iven the volume and variety of governmental functions conducted by and through computers, . . . the government's networks . . . [are] 'extremely important strategic national assets,'" which "face[] significant 'information security risks,' including the threat of 'unauthorized access, use, disclosure, disruption, modification, or destruction of' government information."  *Kaspersky Lab*, 909 F.3d at 457 (quoting *Kaspersky Lab*, 311 F. Supp. 3d at 192–93; 44 U.S.C. §§ 3551, 3553).

More than what was at issue in *Kaspersky*, the development of the Internet of Things ("IoT") is placing these government networks at further risk.  The IoT is "[t]he widespread incorporation of 'smart' devices into everyday objects" (Dkt. #34, Exhibit 7 at p. 7), such as "the electric grid, vehicles—including autonomous vehicles—and household appliances" (Dkt. #34, Exhibit 12 at p. 4).  While improving efficiency, the IoT also "introduce[s] vulnerabilities into both the infrastructure that they support and on which they rely, as well as the processes they guide."  (Dkt. #34, Exhibit 7 at p. 7).  The DNI noted that "state and non-state actors will likely

nonpunitive purposes in that case and concluded that they did not actually support the effect of the statute and thus, no legitimate nonpunitive purposes existed.  *Consol. Edison Co.*, 292 F.3d at 354.

use IoT devices to support intelligence operations or domestic security or to access or attack targeted computer networks." (Dkt. #34, Exhibit 7 at p. 7). According to the DNI, "[c]yber actors have already used IoT devices for distributed denial-of-service [] attacks, and we assess they will continue." (Dkt. #34, Exhibit 7 at p. 7). The DNI reported that "[i]n the future, intelligence services might use the IoT for identification, surveillance, monitoring, location tracking, and targeting for recruitment, or to gain access to networks or user credentials." (Dkt. #34, Exhibit 12 at p. 4). Thus, the threat is growing wider than it has before.

While these "cyber-threats emanate from all over the world," *see Kaspersky Lab*, 909 F.3d at 457, China is one of the leading threats. (Dkt. #34, Exhibit 12 at p. 6). The DNI's Worldwide Threat Assessment of the US Intelligence Community Report acknowledged that "China will continue to use cyber espionage and bolster cyber attack capability to support national security priorities . . . . Most detected Chinese cyber operations against US private industry are focused on cleared defense contractors or IT and communications firms whose products and services support government and private sectors worldwide." (Dkt. #34, Exhibit 6 at p. 5). Thus, China has been known to attack government networks, not just through access to federal agencies but also through private sector contractors and firms that provide support to the government.

As early as 2010, there was focus on Huawei as posing a risk based on the Chinese cyber-threats. In a bipartisan letter to the Chairman of the Federal Communications Commission, lawmakers—citing a report from the Department of Defense and a RAND Corporation report—identified that Huawei was "financed by the Chinese government," "receiv[ing] tens of billions of dollars in export financing and 'low- to no-interest loans that needn't be repaid' from the Chinese government." (Dkt. #34, Exhibit 1 at p. 3). The loans were paired with Huawei taking "aggressive steps to increase penetration in the U.S. telecommunication market." (Dkt. #34, Exhibit 1 at p. 4).

Concerns regarding Huawei continued in several different national and cyber security reports. "Viewed in context, [Section 889] 'has the earmarks of a rather conventional response' to a security risk: remove the risk." *Kaspersky Lab*, 909 F.3d at 457 (quoting *BellSouth Corp. v. FCC*, 144 F.3d 58, 65 (D.C. Cir. 1998) ("*BellSouth I*").

### ba.  Federal Tax Dollars

There is also support for the ancillary purpose "of ensuring that federal tax dollars were not spent to procure, or otherwise further propagate on U.S. networks, products that pose the aforementioned Chinese cyber-threat." (Dkt. #33 at p. 37 n.20). This ancillary purpose is similar to the purpose seen in *ACORN v. United States*, 618 F.3d 125 (2d Cir. 2010). In *ACORN*, a nonprofit organization, which received 10% of its funding from the federal government, failed to properly disclose a discovery of embezzlement. 618 F.3d at 129–30. After the government's discovery of these actions, "Congress passed a 'stop-gap' appropriations law," which prevented any federal agency from providing federal funds to ACORN or any of its affiliates. *Id.* at 131. The stop-gap appropriations law was incorporated into a fiscal appropriations bill. *Id.* at 132.

The Second Circuit, although discussing the historical test for punishment, explained that "Congress must have the authority to suspend federal funds to an organization that has admitted to significant mismanagement." *Id.* at 137. Moreover, in *ACORN*, the government asserted that the nonpunitive purpose for the appropriations law was that "Congress was motivated by its desire to 'ensur[e] the effective expenditure of taxpayer dollars.'" *Id.* at 139. The government further claimed that the bill "provide[s] a temporary response to incontrovertible evidence of mismanagement by organizations that are part of a complex, poorly-managed family of organizations, pending the findings of ongoing investigations." *Id.* (quotations omitted). The plaintiff in *ACORN* acknowledged that this was a legitimate interest but still challenged that statute

as imposing punishment. *Id.* The Second Circuit eventually found that the appropriations law at issue did not constitute punishment under the functional test. *See id.* at 141.

Similarly, Huawei is challenging the 2019 NDAA, which is "an act [t]o authorize appropriations for fiscal year 2019 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe military personnel strengths for such fiscal year, and for other purposes." (Dkt. #28, Exhibit 15 at p. 2). Congress has a legitimate interest in the appropriations of its own funds. *See ACORN*, 618 F.3d at 132, 138–141.

Accordingly, the Court finds the two purported non-punitive purposes of Section 889 to be legitimate.

### b. Balance

Although the Government has stated actual nonpunitive purposes, the Court's inquiry is not over. The Court must now turn to whether there is proper tailoring between the burdens imposed and the nonpunitive purposes.[12]

"It is not the severity of a statutory burden in absolute terms that demonstrates punitiveness as much as the magnitude of the burden relative to the purported nonpunitive purposes of the statute." *Foretich*, 351 F.3d at 1222. "[W]here there exists a significant imbalance between the magnitude of the burden imposed and a purported nonpunitive purpose, the statute cannot reasonably be said to further nonpunitive purposes." *Id.* at 1221 (citing *Consol. Edison Co.*, 292 F.3d at 354).

> Although a serious imbalance may support an inference that the legislature's purported nonpunitive objective serves as a smokescreen for some undisclosed punitive purpose, an imperfect fit between purpose and burden does not necessarily

---

[12] Huawei presents several arguments, in this section, that Section 889 is not tailored to the two purposes Huawei proposes. The Court does not address these arguments as it is attempting to determine whether the statute is appropriately tailored to the Government's—not Huawei's—asserted purposes.

> prove punitive intent.  The difference is nuanced but critical: the question is not whether a burden is proportionate to the objective, but rather whether the burden is so disproportionate that it belies any purported nonpunitive goals.

*Kaspersky Lab*, 909 F.3d at 455 (internal quotations omitted) (citations omitted).  When considering whether a statute is properly tailored, "courts have considered a wide variety of factors in conducting this functional inquiry.  Generally speaking, these factors fall into two categories." *Id.*  "First, a statute performs poorly on the functional test when its effect is significantly overbroad." *Id.* (citations omitted).  "Second, a statute flounders on the functional test when its reach is underinclusive." *Id.* at 456 (citations omitted).

The strength of the connection remains a relatively unsettled area of the law.  There are two competing ideas: (1) that there must simply be a rational connection between the burdens imposed and the nonpunitive purposes; and (2) there must be clear and convincing nonpunitive purposes supported by the burdens imposed.  As explained in *Kaspersky*,

> [o]n the one hand, the Bill of Attainder Clause does not require narrow tailoring. Congress enjoys leeway to select among more or less burdensome options, and it "may read the evidence before it in a different way than might this court or any other, so long as it remains clear that Congress was pursuing a legitimate nonpunitive purpose." *BellSouth II*, 162 F.3d at 689.  On the other hand, the functional test is "more exacting" than rational basis review. *BellSouth I*, 144 F.3d at 67.  The functional inquiry demands not some conceivable nonpunitive purpose, but rather an actual nonpunitive purpose. *See Foretich*, 351 F.3d at 1223 ("[A] statute . . . does not escape unconstitutionality merely because the Government can assert purposes that superficially appear to be nonpunitive.").

> So somewhere between the two poles of narrow tailoring and rational basis lies the functional test's tipping point.  We have at times described the test as requiring a "coherent and reasonable nexus" or a "rational connection" between the burden imposed and nonpunitive purpose furthered. *Id.* at 1219, 1221.  At other times, we have used somewhat more stringent language, demanding that courts "ensure that 'the nonpunitive aims of an apparently prophylactic measure [are] sufficiently clear and convincing.'" *BellSouth II*, 162 F.3d at 686 (alteration in original) (quoting *BellSouth I*, 144 F.3d at 65).

*Id.*  Here, as in *Kaspersky*, the Court need not "choose between the rational-and-coherent or clear-and-convincing formulations, because [Section 889] easily clears the latter, higher bar."  *See id.* at 457.  The Court turns to the arguments concerning under inclusivity and overbreadth in turn.

### i.      Underinclusive

Huawei asserts that the statute is underinclusive in the sense that the selectivity of the statute makes it underinclusive and that the statute does not prohibit enough action to support the Government's alleged nonpunitive purposes.  The Government disagrees.  The Court addresses each argument.

### aa.      Selectivity

Huawei argues that while there are several other Chinese technology companies that may pose a threat, Huawei and ZTE are the only companies singled out by Section 889.  The Government contends that the statute's focus on a small number of specific companies does not undermine the prophylactic nature of the statute.

As the Supreme Court explained in *Nixon*, it is possible to have a "legitimate class of one." *Nixon*, 433 U.S. at 472.  "To be sure, selectivity alone does not a bill of attainder make.  '[T]he Court has clearly stated that satisfaction of the specificity prong alone is *not* sufficient to find that a particular law implicates the [B]ill of [A]ttainder [C]lause, let alone violates it.'" *Kaspersky Lab*, 909 F.3d at 456 (quoting *BellSouth II*, 162 F.3d at 684).  "Nevertheless, narrow application of a statute to a specific person or class of persons raises suspicion, because the Bill of Attainder Clause is principally concerned with '[t]he *singling out* of an individual for legislatively prescribed punishment.'"  *Foretich*, 351 F.3d at 1224 (quoting *Selective Serv. Sys.*, 468 U.S. at 847) (alteration in original).  As such, if the statute "seemingly burdens one among equals," specificity raises concerns under the functional test.  *Kaspersky Lab*, 909 F.3d at 456.  If the "[a]ct's

specificity . . . renders the asserted nonpunitive purposes suspect[,]" then it creates "a vilified class of one" as opposed to a "legitimate class of one."   *See Foretich*, 351 F.3d at 1224 (citations omitted).

*Foretich* demonstrates a vilified class of one.  There, one father was singled out from every other parent in the midst of a contested custody battle.  *Id.* at 1223–24.  This singling out was not supported by the purported nonpunitive purposes offered by the government in that case.  *Id.*  In fact, the purported "purposes of promoting the best interest of the child, reuniting a family, and facilitating the return of U.S. citizens to this country" were undermined by the fact that the law only applied to one family and only cast one father as a child abuser.  *Id.* at 1223.  Thus, the D.C. Circuit determined that the statute at issue was a punishment under the functional inquiry because the burdens imposed were not supported by the nonpunitive purposes asserted.  *Id.* at 1224.

The inappropriate selectivity of *Foretich* is different from the case before the Court.  Here, the HPSCI identified that Huawei and ZTE are the "two largest Chinese-founded, Chinese-owned telecommunications companies seeking to market critical network equipment to the United States."  (Dkt. #34, Exhibit 2 at p. 14).  The HPSCI made the conscious decision to "focus first on the largest perceived vulnerabilities, with an expectation that the conclusion of this investigation would inform how to view the potential threat to the supply chain from other companies or manufacturers operating in China and other countries."  (Dkt. #34, Exhibit 2 at p. 14).  "Congress had ample evidence that [Huawei and ZTE] posed the most urgent potential threat, and [the Court] must give Congress 'sufficient latitude to choose among competing policy alternatives,' lest 'our bill of attainder analysis . . . cripple the very process of legislating.'"  *See Kaspersky Lab*, 909 F.3d at 459 (quoting *Foretich*, 351 F.3d at 1222–23).  Notably, Section 889 leaves open the possibility of designating additional companies to be subject to the prohibitions identified in the statute based

on the recommendation of the DNI or the Director of the FBI.  Congress's determination of the legitimate class of individual companies that posed the greatest threat and the ability to subsequently add companies that are determined to pose a threat supports the nonpunitive purposes asserted in this case.  Thus, the Court finds that Congress considered Huawei and ZTE a "legitimate class of" two.  *See Nixon*, 433 U.S. at 472.

### ba.    Burdens Imposed

Huawei also argues that Section 889 does not contain enough prohibitions to further its purposes.[13]  The Government contends that this is not the appropriate inquiry for underinclusivity, and even if it was, the burdens imposed are not so underinclusive that they cannot be said to further the nonpunitive purposes.

Here, the Court finds that Huawei has conflated the inquiry courts take under the underinclusive analysis.  When analyzing the underinclusivity of a statute, courts generally focus on the selective nature of the statute as opposed to deciding whether the legislature went far enough to further its purposes.  *See Kaspersky Lab*, 909 F.3d at 456.  Indeed, the inquiry of the functional test is whether "Congress has tailored the burdens imposed to an appropriate end," not whether Congress could have done more.  *SBC Commc'ns*, 154 F.3d at 243.  Courts do not seek to determine whether every burden Congress *could* impose is being imposed, lest the law implicate the bill of attainder analysis.

Even if the Court indulges this argument, the Court is unpersuaded.  In balancing the burdens, the Court is not to determine whether there is a perfect fit between the burdens imposed

---

[13] As previously mentioned, using its own purported purposes of Section 889, Huawei argues that Section 889 does not prevent the continued use of covered equipment, but only the future procurement, of covered equipment by the federal government and it allows federal grant and loan recipients to use Huawei products, as long as they are not purchased with federal funds.  Thus, Huawei asserts that this does not further the purposes of national defense or government network security.

and the nonpunitive purposes asserted. *See Kaspersky Lab*, 909 F.3d at 455. The Court is to analyze whether or not the burdens are so disproportionate, in this case so underinclusive, that it would render any purported nonpunitive purpose a "smokescreen" for a punitive purpose. *See id.* The Court finds that it is not.

To start, the burdens imposed are not underinclusive in protecting national and informational security through the networks of federal agencies, contractors, and grantees. The HPSCI identified that a lack of diversity in the telecommunications market is a concern for cyber-security. At the very least, Section 889 can be read to promote market diversity. It diversifies the companies used in the federal government and by companies that the federal government contracts with, not completely removing Huawei, but using companies other than Huawei for the equipment covered by Section 889. Section 889 additionally promotes diversity by prohibiting grant and loan funds from being obligated or expended on Huawei's covered equipment, but not placing any restrictions on grant and loan recipients themselves. While there may be other ways to further Section 889's purposes, promoting market diversity is one possible way of doing so. Section 889 is not underinclusive in promoting diversity in the telecommunications market.

Additionally, the burdens imposed on Huawei very clearly support and are tailored to the "ancillary purpose of ensuring that federal tax dollars were not spent to procure, or otherwise further propagate on U.S. networks, products that pose" the identified Chinese cyber-threat. (Dkt. #33 at p. 37 n.20). Huawei has not argued that there are more federal funds that the Government could restrict. Thus, as to the ancillary purpose, Section 889 is not underinclusive at all.

If there were any additional burdens that could have been added to Section 889, the additional burdens do not create such an imbalance between the burdens imposed and the

nonpunitive purpose that the nonpunitive purposes in this case become mere "smokescreens" for hidden punitive purposes.

### ii.    Overbroad

Huawei argues that Section 889 is overbroad and ignores less burdensome alternatives. The Government asserts that Section 889 is appropriately tailored to the nonpunitive purposes and that less burdensome alternatives are unworkable.

> To determine whether the statute goes farther than necessary, courts compare the burden actually imposed with hypothetical "less burdensome alternatives" by which the legislature could have accomplished the same objective. *Nixon*, 433 U.S. at 482, 97 S. Ct. 2777. A statute may be "less burdensome" when it includes procedural safeguards to "protect the constitutional and legal rights of [the] individual[s] adversely affected," *id.* at 477, 97 S. Ct. 2777; lasts only temporarily or "sunsets" at a time certain, *BellSouth II*, 162 F.3d at 683; allows the affected individual to relieve himself of the burden by taking "belated[ ]" corrective action, *Selective Service System*, 468 U.S. at 855, 104 S. Ct. 3348; or imposes conditions instead of an absolute "bar," *BellSouth I*, 144 F.3d at 65. In considering less burdensome alternatives, however, courts must resist the temptation to label a statute a bill of attainder simply because "sometimes it works harshly." *Hawker*, 170 U.S. at 197, 18 S. Ct. 573.

*Kaspersky Lab*, 909 F.3d at 456 (alterations in orginial).

Again, the burdens imposed are that: (1) Huawei can no longer contract with a federal agency for the "covered equipment"; (2) Huawei will not be able to contract with any entity for "covered equipment" that wishes to contract with the federal government, as Section 889 prevents the head of a federal agency from contracting with any entity that uses the "covered equipment"; and (3) it will no longer receive federal grant or loan money for the "covered equipment." (Dkt. #28, Exhibit 15 at p. 3). The purported purposes are: (1) "[t]o further national and informational security by protecting the networks of federal agencies, contractors, and grantees from the threat of cyber-attacks and -espionage by the Chinese government via companies in a position to exploit those networks"; and (2) to "ensur[e] that federal tax dollars were not spent to

procure, or otherwise further propagate on U.S. networks, products that pose the aforementioned

Chinese cyber-threat."  (Dkt. #33 at p. 37 & n.20).

The Court finds that Section 889 is appropriately tailored to the burdens imposed.  First,

the statute is limited in scope.  Section 889 ensured the "covered equipment" was limited to

equipment "that cannot route or redirect user data traffic or permit visibility into any user data or

packets that such equipment transmits or otherwise handles."  (Dkt. #28, Exhibit 15 at pp. 3–5).  It

is further limited in its scope because it does not impose a blanket ban; instead, it applies only to

products that contain covered equipment as "a substantial or essential component" of any system,

or "critical technology as part of any system."  In its Counterintelligence Strategic Partnership

Intelligence Note, the Federal Bureau of Investigation ("FBI") explained that:

> Internet exchange points (IXP) use a host of networking equipment, including
> sophisticated routers and switches, which enables traffic to be properly routed.  This
> equipment is comprised of integrated circuits that can be severely impacted, thereby
> modifying functionality, including backdoors and/or kill switches.  Although
> hostile actors manufacturing such products could conceivably target all integrated
> circuits to be used in routers, they might instead target integrated circuits used in
> the most sophisticated equipment.  The Internet in the United States could
> theoretically be brought down or severely disrupted because the routers and
> switches serving the IXPs were disabled.

(Dkt. #34, Exhibit 9 at p. 3).  Thus, Section 889 tailors the covered equipment to the types of

technology that pose a risk of being disrupted by "hostile actors" who engage in cyber-attacks and

-espionage.  (Dkt. #34, Exhibit 9 at p. 3).

Moreover, applying Section 889 to all federal agencies, federal contractors, and federal

grant and loan recipients is tailored to the goal of "applying [a] government-wide" protection of

"critical telecommunication infrastructure."  (Dkt. #33 at p. 43).  The Committee on Oversight and

Government Reform recognized that all federal agencies needed protection, not just national-

defense agencies.  (Dkt. #35, Exhibit 13 at p. 3) (stating that "[n]o agency appears safe.  In recent

data breaches, hackers took information from the United States Postal Service; the State Department; the Nuclear Regulatory Commission; the Internal Revenue Service; and even the White House.  None of these data breaches though compare to the data breaches at the U.S. Office of Personnel Management [].").  Moreover, as previously noted, the DNI identified that the "[m]ost detected Chinese cyber operations against US private industry are focused on cleared defense contractors or IT and communications firms whose products and services support government and private sectors networks worldwide."  (Dkt. #34, Exhibit 6 at p. 5).  This concern was echoed by the U.S.-China Economic and Security Review Commission in the April 2019 Supply Chain Vulnerabilities from China in U.S. Federal Information and Communications Technology, which acknowledged that "[n]efarious actors linked to China have targeted the networks of private sector entities and private sector government contractors in order to obtain sensitive government information and to exploit vulnerabilities within federal information systems."   (Dkt. #34, Exhibit 10 at p. 4).

Regarding the prohibition on federal agencies obligating or expending federal loan or grant funds on procuring the covered equipment, the Court finds this prohibition properly tailored to the Government's primary purpose.  The House noted in its Investigative Report on the U.S. National Security Issues Posed by Chinese Telecommunications Companies Huawei and ZTE that, in the telecommunications network, when there are companies controlling "the market for sensitive equipment and infrastructure that could be used for spying and other malicious purposes, the lack of market diversity becomes a national concern for the United States and other countries." (Dkt. #34, Exhibit 2 at p. 8) (footnote omitted).  By preventing federal grant and loan recipients from using federal funds to purchase the covered equipment, Congress sought to diversify the market.  Moreover, the prohibition on grant and loan funds is also tailored to the ancillary purpose

of ensuring that federal funds are not used to support products that pose cyber-threats to the federal government—a logical measure.

The Court "think[s] it worth emphasizing, moreover, that the government discontinued only its own use of [Huawei] products." *See Kaspersky Lab*, 909 F.3d at 457.  To be sure, pursuant to Section 889, only federal agencies are prohibited from using Huawei's "covered equipment." (Dkt. #28, Exhibit 15 at p. 3).  Section 889 prohibits federal agencies from "procur[ing] or obtain[ing] or extend[ing] or renew[ing] a contract to procure or obtain" any covered equipment. (Dkt. #28, Exhibit 15 at p. 3).  Further, the heads of federal agencies are prohibited from "enter[ing] into a contract (or extend[ing] or renew[ing] a contract) with an entity that uses" the covered equipment.  (Dkt. #28, Exhibit 15 at p. 3).  Finally, federal grant and loan recipients are permitted to use Huawei's covered equipment; it is the "[t]he head of an executive agency [that] may not obligate or expend loan or grant funds to procure or obtain, extend or renew a contract to procure or obtain, or enter into a contract (or extend or renew a contract) to procure or obtain" Huawei's covered equipment.  (Dkt. #28, Exhibit 15 at p. 3). "[A]ll other individuals and companies in the universe of potential clients remain free to buy and use [Huawei] products as they please." *See Kaspersky Lab*, 909 F.3d at 457.

Additionally, contrary to Huawei's argument, the prohibition on Huawei products is not permanent.  In the event that security threats posed by Huawei subside, the DNI may waive the prohibition.  (Dkt #28, Exhibit 15 at p. 4) (stating "The Director of National Intelligence may provide a waiver on a date later than the effective dates described in subsection (c) if the Director determines the waiver is in the national security interests of the United States.").  Thus, the Court finds that Section 889 was tailored to the purposes it sought to achieve.

As to the less burdensome alternatives,  Huawei asserts that Section 889 lacks procedural safeguards for Huawei only; that Huawei could have been granted the same process as other companies; and that Congress could have prevented the use of only "equipment that did not satisfy specified design and engineering standards, independent security testing, and/or other protocols necessary to ensure national and network security." (Dkt. #27 at p. 31).  The Government asserts that the less burdensome alternatives posed by Huawei would not adequately further the purposes of Section 889.

As to the specified design/testing or mitigation measures, this less burdensome alternative does not adequately address the aims of Section 889.  The HPSCI considered and rejected this because it would "fall short of addressing security concerns given the breadth and scale of the U.S. telecommunications market."  (Dkt. #34, Exhibit 2 at p. 11).  Indeed, the HPSCI noted that "the programs may create a false sense of security that an incomplete, flawed, or misapplied evaluation would provide." (Dkt. #34, Exhibit 2 at p. 11).[14]  Regarding Huawei's argument that it is not being afforded the same process as other companies, Congress is permitted to identify the immediate threat while creating a process to identify more threats in the future.  *See Nixon*, 433 U.S. at 472. Moreover, Huawei "fails to identify how these procedural safeguards would have ultimately forestalled" the result in this case.  *See Kaspersky Lab*, 909 F.3d at 458.  The argument that this is

---

[14] Huawei quotes a sentence of the HPSCI Report that shows a possibility of how testing could work if it "addresse[d] a complete system-of-systems across its full lifecycle, from design to retirement and includes aspects such as discrete technology components, their interactions, the human environment, and threats from the full spectrum of adversaries." (Dkt. #34, Exhibit 2 at pp. 12–13).  However, the beginning of that paragraph states "[a] security evaluation of potentially suspect equipment being deployed in critical infrastructure roles may seem like an answer to the security problems posed.  Unfortunately, given the complexity of the telecommunications grid, the limitations of current security evaluation techniques, and the economics of vendor-financed analyses provide a sense of security but not actual security." (Dkt. #34, Exhibit 2 at p. 12).  The Report went on to explain that if it could come up with a process such as that cited by Huawei, that would result in "a set of diverse evidence that a system is worthy of our trust." (Dkt. #34, Exhibit 2 at p. 13).  The "evaluation programs" as they existed at the time of the Report rendered them "less useful than one might expect."  (Dkt. #34, Exhibit 2 at p. 11).  Huawei additionally complains of the Report being outdated, along with the technology in it.  Huawei did not present any evidence to the Court that the "evaluation programs" are more advanced now and can provide the sense of security that the Government is attempting to achieve with Section 889.

a permanent proscription of Huawei products has previously been addressed by the Court in that Section 889 is an annual appropriations bill, which is reexamined every year, and that there is a waiver provision contained directly in the text of Section 889.

Regardless, "the fact that [Huawei] can imagine slightly less restrictive measures does not demonstrate that the law Congress actually chose amounts to punishment." *See Kaspersky Lab*, 909 F.3d at 458. "'In other words, it does not matter that Congress arguably could have enacted different legislation in an effort' to secure federal networks, because 'it cannot be legitimately suggested that the risks . . . were so feeble that no one could reasonably assert them except as a [smokescreen] for some invidious purpose.'" *Id.* at 459 (alterations in original) (quoting *BellSouth II*, 162 F.3d at 689). "At the end of the day, the functional test does not require that Congress precisely calibrate the burdens it imposes to the goals it seeks to further or to threats it seeks to mitigate." *Id.* at 460. As the D.C. Circuit explained, "the test requires only that Congress refrain from 'piling on . . . additional, entirely unnecessary burden[s]." *Id.* (alterations in original). Here, "given the reasonable balance between the burden[s] imposed by [Section 889] and the nonpunitive [national security, informational security, and federal funding] objective[s] it furthers, [the Court] easily concludes that Congress has not done so here." *See id.*

### 3.  Motivational Test

"A third recognized test of punishment is strictly a motivational one: inquiring whether the legislative record evinces a congressional intent to punish." *Nixon*, 433 U.S. at 478 (citations omitted). "Under this prong, a court must inspect legislation for a congressional purpose to 'encroach[ ] on the judicial function of punishing an individual for blameworthy offenses.'" *Foretich*, 351 F.3d at 1225 (alteration in original) (quoting *Nixon*, 433 U.S. at 479). In order to

analyze this factor, courts look to "legislative history, the context or timing of the legislation, or specific aspects of the text or structure of the disputed legislation." *Id.*

Nevertheless, "[g]iven the obvious constraints on usefulness of legislative history as an indicator of Congress's collective purpose, this prong by itself is not determinative in the absence of 'unmistakable evidence of punitive intent.'" *Id.* (quoting *Selective Serv. Sys.*, 468 U.S. at 856 n.15). Because Section 889 does not demonstrate a historical punishment or punishment under the functional inquiry, Huawei needs to demonstrate "'smoking gun' evidence of punitive intent" under this factor. *See SBC Commc'ns, Inc.*, 154 F.3d at 243 (quoting *Selective Serv. Sys.*, 468 U.S. at 856 n.15).

Huawei maintains that the legislative record in this case shows that the House and Senate have both made findings that Huawei is subject to state influence and has close ties and connections to the Chinese Communist Party. Even further, Huawei asserts that the statements made by congressmen indicate an unmistakable intent to punish. Huawei maintains that this case has the markings of the motivational intent found in *Lovett*. The Government maintains that these isolated statements fall short of demonstrating the intent of Congress, as a whole, in passing Section 889. The Government further asserts that the entirety of the record demonstrates a nonpunitive intent.

"Statements by a smattering of legislators 'do not constitute [the required] unmistakable evidence of punitive intent.'" *ACORN*, 618 F.3d at 141 (alteration in original) (quoting *Selective Serv. Sys.*, 468 U.S. at 856 n.15). Thus, "isolated references" are not sufficient to indicate an intent to punish; instead the Court must look to the record of Congress "as a whole." *See SBC Commc'ns, Inc.*, 154 F.3d at 243; *accord Foretich*, 351 F.3d at 1225 (quoting *BellSouth II*, 162 F.3d at 690) (explaining "'[s]everal isolated statements are not sufficient to evince punitive intent,' and cannot render a statute a bill of attainder without any other indicia of punishment.").

The Court acknowledges that a few senators made concerning comments regarding Huawei.  For example, senators are quoted stating: "I think the only fitting punishment would be to give [Huawei] the death penalty; that is, to put them out of business in the United States" (Dkt. 28, Exhibit 11 at p. 3); "[b]oth parties in Congress must come together to bring the hammer down on [Huawei and ZTE]" (Dkt. #28, Exhibit 10 at p. 3); and "Huawei . . . shouldn't be allowed to operate in the United States, and we should put them out of business . . . ."  (Dkt. #28, Exhibit 13 at p. 2).  However, these statements do not represent the collective view of Congress.  While the senators are claiming that Huawei should not be allowed to operate in the United States, Section 889 does not implement a nation-wide ban on Huawei products.  Section 889 does not even place a ban on every Huawei product in the federal government—it only covers the designated "covered equipment," which is tailored to the products and services that pose the greatest threat.  Moreover, beginning in 2010, there have been several legislative reports discussing the cyber- and security-threats posed by Huawei.  *See generally infra* II.B.2.  Reading these statements in the context of the entire legislative record, the legislators' concerning comments do not represent Congress's intent as a whole.

Additionally, the legislative findings that Huawei complains of are not contained in Section 889.  The findings contained in the House and Senate bills were not what was eventually made law and thus, cannot represent Congress's intent as a whole.  Even if they could, Congress is allowed to investigate the conditions surrounding the legislation it makes, as the Court has previously identified, and these findings reflect that investigation.  *See Eastland*, 421 U.S. at 504–06.  The findings do not reflect the otherwise troubling sentiments of the senators identified above.  The findings contained in H.R. 5515 do not indicate that Huawei should be punished or not be

allowed to do business in the United States anymore; rather, the statements focus on the security risk posed by China and Huawei. *See supra* pp. 5–7.

Moreover, contrary to Huawei's assertion, this case differs from *Lovett*.

> Despite the evidence of punitive intent on the part of some members of Congress, unlike in *Lovett*, there is no congressional *finding* of guilt in this case. In *Lovett*, a secret trial was held by Congress to determine the guilt or innocence of the accused subversives. Upon a finding of guilt, Congress passed the law denying the accused their salary for federal services. Thus, in *Lovett*, the congressional record was 'unmistakably' clear as to Congress's intent to punish the subject individuals.

*ACORN*, 618 F.3d at 142. This case is more akin to *ACORN*, where "at most, there is the 'smattering' of legislators' opinions" regarding whether Huawei was a bad actor that deserved to be punished. *See id.* Thus, the legislative record does not provide "smoking gun" evidence of punitive intent.

Because Section 889 passes muster on the historical test, the functional test, and the motivational test, the Court finds that Huawei has failed to meet its burden to show that Section 889 is an unconstitutional bill of attainder.

## III. Due Process

Huawei next argues that Section 889 of the NDAA violates the Due Process Clause of the Fifth Amendment. The Fifth Amendment provides, in relevant part, that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V.

Specifically, Huawei argues that Section 889 imposes a particularized legislative deprivation of its protected property and liberty interests by interfering with its existing contracts and its ability to bid on future government and private contracts. The Government responds by arguing that the Supreme Court has considered—and found suspect—the assumption that legislation must be generally applicable to be valid. The Government also argues that Section 889 is a permissible economic regulation that survives scrutiny under rational basis review.

51

In the first place, the Court agrees with the Government's argument that legislation is not presumptively unconstitutional simply because it applies with specificity.  *See Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1327 (2016).  Indeed, laws of general applicability are "by no means [the legislature's] only legitimate mode of action."  *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 n.9 (1995).

As for Huawei's position that Section 889 interferes with its protected property and liberty interests on the ground that it impairs Huawei's existing and future contracts, the Court finds Huawei's arguments unpersuasive.  As previously noted, "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality . . . the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."  *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984) (citations omitted).  The Court recognizes that Section 889 may have economic consequences for Huawei; indeed, at least three Huawei representatives testified to the same (*see, e.g.*, Dkt. #29, Exhibit 6; Dkt. #29, Exhibit 17; Dkt. #29, Exhibit 18).  However, despite the potential economic impact, Huawei has not shown or even argued that Section 889 is not rationally related to a legitimate legislative purpose.[15]

Moreover, Congress may pass legislation that has the secondary effect of impacting private contracts without running afoul of the Fifth Amendment's due process guarantees.  *See Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. Chi., Rock Island & Pac. Ry. Co.*, 294 U.S. 648, 680 (1935) (explaining "Congress . . . undeniably, has authority to pass legislation pertinent to any of the

---

[15] For a discussion of Section 889's rational legislative purpose, *see supra* II.B.2.a.iii.  The Court notes that Huawei did argue that Section 889 was not reasonably tailored according to the bill of attainder analysis; however, that differs from a rational basis review.  Moreover, the Court previously determined that Section 889 was reasonably tailored to the legislative purposes, which is a higher bar than a rational basis.  *See supra* II.B.2.a.iv.  Thus, even if it had been argued, the Court finds Section 889 is rationally related to the legislative purposes.

powers conferred by the Constitution[,] however it may operate collaterally or incidentally to impair or destroy the obligation of private contracts.").  Section 889 prohibits the head of an executive agency from "procur[ing] or obtain[ing] or extend[ing] or renew[ing] a contract to procure or obtain any equipment, system, or service that uses covered telecommunications equipment" or entering into a contract with "an entity that uses any equipment, system, or service that uses covered telecommunications equipment or services." (Dkt. #28, Exhibit 15 at p. 3).  It further prohibits the head of an executive agency from "obligat[ing] or expend[ing] loan or grant funds to procure or obtain, extend or renew a contract to procure or obtain, or enter into a contract (or extend or renew a contract) to procure or obtain" covered telecommunications equipment (Dkt. #28, Exhibit 15 at p. 3).  The statute does not directly impact any of Huawei's private contractual relationships; rather, it limits who the federal government may contract with and what the subject of those contracts may be.  Any effect the statute may have on Huawei's contractual relationships is "collateral[] or incidental[]" to the statute's primary restrictions.  *See Cont'l Ill. Nat'l Bank*, 294 U.S. at 680.  Accordingly, without more, the Court does not consider Section 889 an impermissible interference with Huawei's existing contracts.

Contracting with the federal government is a privilege, not a constitutionally guaranteed right—at least not as far as this Court is aware.  Despite Section 889's particularized nature and its impact on Huawei's current and future contractual relationships, it is rationally related to a legitimate congressional purpose and thus does not violate Huawei's due process rights.  For the foregoing reasons, Huawei's due process challenge fails.

## IV.    Vesting Clauses

Finally, Huawei argues that Section 889 violates the Vesting Clauses.  "[T]he Constitution identifies three types of governmental power and, in the Vesting Clauses, commits them to three

branches of Government." *Dep't of Transp. v. Ass'n of Am. R.R.'s*, 575 U.S. 43, 67 (2015) (Thomas, J., concurring).  The Clauses establish that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States," U.S. CONST. art. I, § 1, "[t]he executive Power shall be vested in a President of the United States," U.S. CONST. art. II, § 1, cl. 1, and "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. CONST. art. III, § 1.

Huawei's argument goes like this: the most fundamental principle of separation of powers is that different branches of government write the law and apply the law; in recognition of that principle, the Constitution's Vesting Clauses prohibit Congress from exercising the executive and judicial powers of adjudicating facts and applying law to individuals; when Congress enacted Section 889, it adjudicated facts and applied law to Huawei; accordingly, Section 889 violates the Vesting Clauses.

The Government counters by first pointing to the Fifth Circuit's decision in *SBC Communications*, which the Government claims rejected Huawei's argument.  Next, the Government argues that the proper inquiry to determine whether Section 889 violates the Vesting Clauses is whether Congress has prevented another branch from accomplishing its constitutionally assigned functions; because Section 889 does not, the Government claims, Section 889 cannot violate the Vesting Clauses.

Huawei responds, arguing that *SBC* did not even address Huawei's Vesting Clauses argument.  Huawei then seemingly accepts the Government's legal framework, but it claims that, because Section 889 adjudicates that Huawei is connected to the Chinese government, Section 889 *does* prevent the Executive and Judicial branches from performing their constitutional functions. The Court is not persuaded by Huawei's arguments.

Huawei is correct—the Fifth Circuit did not explicitly address the Vesting Clauses argument in *SBC Communications* that Huawei makes here. But the Fifth Circuit's reasoning is still pertinent to Huawei's challenge. In *SBC Communications*, the appellees argued that the challenged legislation represented "an arrogation to the legislative branch of powers *functionally vested* in the judicial branch by the very firmament of the Constitution." 154 F.3d at 245 (emphasis added). The Fifth Circuit addressed and rejected this separation-of-powers argument. *Id.* at 244–45.

Analyzing the same cases that Huawei relies on for its Vesting Clauses argument, the Fifth Circuit reasoned:

> Although this [separation-of-powers] argument finds appealing rhetorical support in the more sweeping statements of some of the Court's older cases, including particularly the admonition offered by Justice Marshall in *Fletcher* and seconded by Chief Justice Warren in *Brown* . . . it is squarely and specifically contradicted by *Plaut*. In that case, Justice Breyer raised a very similar argument in his one-vote concurrence. Justice Scalia's six-vote majority opinion soundly rejected it . . . .

*Id.* at 246 (citation omitted).

Huawei argues that where Section 889 "entrusts the executive and judiciary with determining whether *others* meet statutory standards barring provision of covered equipment, [S]ection 889 itself determines that *Huawei* is barred from doing so." (Dkt. #27 at p. 40) (emphasis added). Though Huawei labels this "the kind of congressional adjudication that the Vesting Clauses prohibit" (Dkt. #27 at p. 40), Huawei's true complaint is—once again—with the particularized nature of Section 889. But it makes "no difference" to the separation-of-powers analysis whether Congress legislates generally or with particularity. *See Plaut*, 514 U.S. at 239 (rejecting the reasoning of Justice Breyer's concurrence, which Huawei cites for support). Indeed, Congressional action that is particularized is not presumptively nonlegislative. *See id.* at 239 & n.9. And as the Fifth Circuit definitively addressed in *SBC Communications*, the principles

Huawei cites in support of its Vesting Clauses argument—taken from *Fletcher v. Peck*, 6 Cranch 87 (1810), and *United States v. Brown*, 381 U.S. 437 (1965)—were "squarely and specifically contradicted by *Plaut*." *SBC Commc'ns*, 154 F.3d at 246.

Also, Section 889 does not prevent the Executive and Judicial branches from performing their constitutional functions as Huawei claims.  What Huawei pejoratively labels as Congress unconstitutionally adjudicating facts is better characterized as a thorough congressional investigation into a potential threat against the nation's cybersecurity.  Congress's investigation led to the passing of a defense-appropriations bill as a prophylactic response to that threat.

As previously stated by the Court, "[the Supreme Court] has often noted that the power to investigate is inherent in the power to make laws because '[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'" *Eastland*, 421 U.S. at 504 (second alteration in original) (quoting *McGrain*, 273 U.S. at 175).  And while Congress's power to investigate is not unlimited, it is "necessarily broad," and it extends to the limits of congressional power to "enact and appropriate under the Constitution." *Id.* at 504 n.15 (quotation omitted) (collecting cases).  Section 889—part of an appropriations bill—is the upshot of an "inherent[ly]" congressional function. *See id.* at 504. It does nothing to prevent the other two branches of government from performing their vested constitutional functions.  Accordingly, Huawei's challenge of Section 889 under the Vesting Clauses fails.

### CONCLUSION

It is therefore **ORDERED** Plaintiffs' Motion for Summary Judgment (Dkt. #27) is hereby **DENIED** and Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. #33) is hereby **GRANTED**.

**SIGNED this 18th day of February, 2020.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE